Joseph V. Womack, Attorney No. 2641
WALLER & WOMACK
303 N. Broadway, Suite 805
Billings, MT  59101
Telephone:      (406) 252-7200
Fax:              (406) 252-4266
E-mail:          jwomack@jvwlaw.com

John Cardinal Parks, Attorney No. 18669 (Colorado)
Bart B. Burnett, Attorney No. 21258 (Colorado)
Robert M. Horowitz, Attorney No. 17848 (Colorado)
Kevin S. Neiman, Attorney No. 36560 (Colorado)
HOROWITZ & BURNETT, P.C.
1660 Lincoln Street, Suite 1900
Denver, CO  80264
Telephone:      (303) 996-8600
Fax:              (303) 996-8636
E-mail:          jparks@hblegal.net
                 bburnett@hblegal.net
                 bhorowitz@hblegal.net
                 kneiman@hblegal.net

*Counsel for the Chapter 11 Trustee*

UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF MONTANA

| | | |
|---|---|---|
| In re: | ) | Case No. 11-62031-11 |
| | ) | |
| SOUTHERN MONTANA ELECTRIC | ) | **Hearing Date**: July 31, 2013 |
| GENERATION AND | ) | **Hearing Time**: 9:00 a.m. |
| TRANSMISSION | ) | **Hearing Location:** |
| COOPERATIVE, INC., | ) | Bankruptcy Courtroom |
| | ) | Russell Smith Courthouse |
| Debtor. | | 201 East Broadway |
| | | Missoula, Montana |

**TRUSTEE'S OBJECTION TO MOTION TO CONVERT TO CHAPTER 7**

Lee A. Freeman, the Chapter 11 trustee (the "**Trustee**") for debtor Southern Montana

Electric Generation and Transmission Cooperative, Inc. ("**Southern Montana**"), objects to the

*Motion to Convert to Chapter 7* (Dkt. No. 913) (the "**Motion to Convert**"), filed by the Unsecured Creditors' Committee (the "**Committee**"), and, as grounds therefor, states as follows:

## I.      BACKGROUND

From the time that the Committee was appointed until just recently, it has had very little involvement in the case.  Indeed, until this week, other than its counsel, the Committee had not sought to hire any other professionals, including accountants, financial advisors, or industry experts.  On July 16, 2013, the Committee filed an application to employ an accountant to assist it in connection with the Motion to Convert, but that was nearly three weeks after the motion was filed and just two weeks before the hearing on the motion.  That application, however, was withdrawn the same day that it was filed (Dkt. Nos. 936 and 937).  The apparent reason for the Committee's almost non-existent role in the case is that the unencumbered revenues from Southern Montana's wholesale power contract with Yellowstone Valley Electric Cooperative ("**YVEC**") were more than enough to fund all of the administrative costs of the estate, and then some.  The Committee was presumably content to let the case move forward in whatever direction it was heading as long as unencumbered funds from the YVEC contract were flowing into the estate.

But then the Trustee entered into a settlement with YVEC that resulted in, among other things, termination of its wholesale power contract in exchange for a lump sum payment in the amount of $2.5 million.  On May 31, 2013, after the Court approved the Trustee's settlement, YVEC stopped buying power from Southern Montana and wire transferred $2.5 million to Southern Montana's account at First Interstate Bank.  For the power that it had purchased in May, YVEC wire transferred $1,430,945.11 to Southern Montana on June 21, 2013, thus making its last infusion of unencumbered funds into the estate.

-2-

Just six days later, the Committee filed the Motion to Convert.  As far as the Committee was concerned, the party was over, and it was now time to shut down Southern Montana's business operations, terminate the Chapter 11 estate, and convert this case to Chapter 7.  There was no longer any upside to the Committee's constituents in continuing the Chapter 11 process and only a potential downside.

That the conversion of the case would be disastrous to certain of Southern Montana's other creditors, in particular The Prudential Insurance Company of America, Universal Prudential Arizona Reinsurance Company, Prudential Investment Management, Inc. as successor-in-interest to Forethought Life Insurance Company, and Modern Woodmen of America (collectively, the "**Noteholders**") as well as, potentially, to Southern Montana's remaining members and their members and other customers was of no moment to the Committee.  The YVEC funds had stopped flowing, and, as far as the Committee was concerned, it was time to pull the plug.

For the reasons stated herein, the Motion to Convert is unsupported by the facts and the law and should be denied.

## II.   ARGUMENT

### A.   The standards governing the Motion to Convert

Other than citing to 11 U.S.C. § 1112(b)(4)(A), the Committee's two-page motion fails to include "relevant citations to legal authorities" as required by Mont. LBR 9013-2.  Thus, the Motion to Convert could be denied on that basis alone.

Regardless, 11 U.S.C. § 1112(b)(4)(A) allows a bankruptcy court to convert a Chapter 11 case to a Chapter 7 case where there is "substantial or continuing loss to or diminution of the estate and the absence of a reasonable likelihood of rehabilitation."  Both of these elements must

-3-

be met to convert a case.  *In re Bay Area Material Handling, Inc.*, 76 F.3d 384, *1 and 2 (9th Cir. 1996) (table); *In re Khan*, BAP CC-11-1542-HPAD, 2012 WL 2043074, *5 (B.A.P. 9th Cir. June 6, 2012).  The burden of establishing grounds for conversion is on the movant, here, the Committee.  *In re Alaska Fur Gallery, Inc.*, A09-00196-DMD, 2010 WL 7765562, *1 (Bankr. D. Alaska May 21, 2010) (citation omitted).

The Committee cannot satisfy either of the required elements.  Therefore, the Motion to Convert should be denied.

**B.      The Committee cannot prove the first element under § 1112(b)(4)(A): substantial or continuing loss to or diminution of the estate.**

"Diminution of an estate exists where, for example, the debtor's business has ceased or the debtor's liabilities outstrip its assets."  *Bay Area Material Handling*, 76 F.3d 384, at *2.  In such a case, ongoing proceedings diminish the value of the estate and harm the interests of the creditors.  *In re Consol. Pioneer Mortgage Entities*, 264 F.3d 803, 809 (9th Cir. 2001) (affirming order converting case to Chapter 7 where board of debtor delayed providing an accounting of debtor's assets to investors for years while the costs of administration, including board salaries, continued to mount); *In re USA Commercial Mortgage Co.*, 452 F. App'x 715, 724 (9th Cir. 2011) (case converted where debtor had negative cash flow); *In re C.J. Corp.*, 78 B.R. 273, 276 (Bankr. D. Haw. 1987) (converting case where debtor had negative cash flow).

At the outset, if this case had been converted to Chapter 7 the day after it was filed, the Committee's constituents, that is, unsecured creditors, would have received nothing.  When Southern Montana filed its petition for reorganization, it had less than $80,000 in various bank accounts.  See Statements and Schedules (Dkt. No. 29).  All of Southern Montana's tangible and intangible assets, other than its wholesale power contract with YVEC, were encumbered by liens

-4-

and security interests.  Even if a Chapter 7 trustee could have settled Southern Montana's litigation claims against YVEC, as the Trustee was able to do, for $2.5 million, virtually all of the settlement proceeds would have gone to pay the allowed § 503(b)(9) claim of PPL EnergyPlus, LLC ("**PPL**").  Any remaining unencumbered cash would have been consumed by Chapter 7 administrative expenses.  Thus, any distribution to unsecured creditors will be a direct result of the fact that Southern Montana is reorganizing under Chapter 11, rather than liquidating in Chapter 7.

Under the Trustee's stewardship, as of April 30, 2012, that is, roughly six months after the commencement of the case, the estate's cash had ballooned from less than $80,000 on the petition date to $2,956,945.  See April 2012 Monthly Operating Report (Dkt. No. 423).  As of June 30, 2013, even after (i) making adequate protection payments to the Noteholders totaling $14,570,836, (ii) paying $1,681,562 to the Noteholders for their professionals' fees, and (iii) paying PPL's § 503(b)(9) claim in the agreed upon amount of $2,243,170, the estate still had $8,503,991 in cash.  In addition, NorthWestern Energy is holding a $1,250,000 post-petition deposit that will be returned to the estate upon confirmation of a plan (Dkt. No. 376).  Further, Southern Montana's members have enjoyed a two-year freeze on rates and, during the entire pendency of the case, have paid the same rates they were paying in June 2011 when Southern Montana's Board of Trustees last voted in favor of a rate increase.  These results are nothing short of spectacular.

Moreover, under the Trustee's recent settlement with the Noteholders, all of the adequate protection payments and professionals' fees that have thus far been paid to them, and will continue to be paid to them through confirmation, will pay down the principal on their $85 million debt.  When added to the proceeds of the Trustee's settlement with the City of Great

Falls, by the end of the calendar year, the Trustee projects that the principal amount of the Noteholders' debt under his settlement will have been paid down by approximately $25 million, leaving only $60 million of debt to restructure. Thus, creditors *are* benefitted by the continued pendency of the Chapter 11 case. Southern Montana will continue to have positive cash flows from its operations and those positive cash flows will continue to be used to pay down debt at a clip of over $1 million per month. The continued pendency of the Chapter 11 case has not resulted, nor will it result, in a substantial or continuing loss to or diminution of the estate. Rather, the Trustee will continue to pay down debt from Southern's positive cash flows and operating margins.

What the Committee is apparently complaining about is that continuing to pay the administrative costs of the estate (including the Committee's counsel), and Southern Montana's operating expenses will probably result in a diminution in the amount of unencumbered cash that will be available for distribution to unsecured creditors. In other words, only *certain* creditors (the ones the Committee represents) may be harmed if the Chapter 11 case continues. Other creditors, on the other hand, namely the Noteholders, undoubtedly would be harmed greatly by converting the case to Chapter 7. Under a Chapter 7 scenario, the Noteholders would be granted relief from stay to foreclose on their collateral. Because Southern Montana's all requirements contracts and its WAPA contract do not have any value in liquidation, the Noteholders would receive, at most, an additional $15 million, that is, the estimated orderly liquidation value of Highwood Generating Station. In contrast, under the Trustee's soon-to-be-filed amended plan of reorganization, the Noteholders will receive the entire balance of the principal of their debt plus interest at discounted rates, in exchange for substantial concessions that include the a waiver of their make-whole amount claims and their ability to assert they are oversecured. That certain

other creditors may be harmed if the Chapter 11 case continues is not a sufficient ground to convert the case to Chapter 7. Further, the Committee's allegation that the Noteholders "made a bad loan," Motion to Convert at ¶ 5, is not a valid reason for favoring the unsecured creditors over the Noteholders. Arguably, any lender that made a loan to a company that files for relief under Chapter 11 made a bad loan. Since there are no grounds for equitably subordinating the Noteholders' claims under § 510(c), the Committee's "bad loan" argument is a red herring.

Further, the margin between the costs of providing energy, power, and transmission services to Southern Montana's members has been far less than what the estate has charged the members for those services. Thus, the adequate protection payments and professional fees paid to the Noteholders have been fully funded from the revenues realized from Southern Montana's ongoing business operations. Based on ACES' projections for the cost of purchasing power to serve Southern Montana's remaining members for the next 12 months, revenues from Southern Montana's remaining members will be sufficient to continue to fund most, if not all, of the Noteholders' adequate protection payments and professionals' fees. Thus, creditors, that is, the Noteholders, will continue to benefit from Southern Montana's ongoing business operations and the continued pendency of the Chapter 11 case. Granted, the unencumbered cash currently held by estate will be diminished by the continued pendency of the Chapter 11 case through, for example, payments to the Trustee and his professionals for their services to the estate, but that will *always* be the case in *any* Chapter 11 case. If that were enough to satisfy the first prong of the test, then it would be satisfied in every case. The real question is whether incurring additional administrative expenses is of benefit to the estate. Certainly the Noteholders will benefit from continuing to receive adequate protection payments and payment of their professionals' fees, having Southern Montana's wholesale power contracts assumed, and the

-7-

Court confirming the Trustee's amended plan of reorganization.   Similarly, the Trustee's amended plan will provide for treatment for unsecured creditors that will satisfy the best interest test, among other confirmation requirements.   And Southern Montana's members will benefit by avoiding the sudden cut-off of power transmission that may result from the conversion the Committee seeks.   That the continued pendency of this Chapter 11 case may not benefit some creditors as much as other creditors is not a valid ground for converting the case to Chapter 7.   *In re Lykes Bros. S.S. Co., Inc.*, 207 B.R. 282, 284 (Bankr. M.D. Fla. 1997) ("In Chapter 11, the debtor proposes a plan of reorganization to maximize value for the general benefit of *all creditors*, thus avoiding a mad scramble for assets.") (emphasis added).   There is simply no legal basis for the notion that a Chapter 11 case must be converted to Chapter 7 as soon as the potential distribution to a particular class of creditors reaches its apparent apex.

**C.      The Committee cannot prove the second element § 1112(b)(4)(A): the absence of a reasonable likelihood of rehabilitation.**

A debtor lacks "a reasonable likelihood of rehabilitation" where, for example, it "lacks income, lacks operating funds, or lacks employees, capital, or continuing revenue-generating activity."   *Bay Area Material Handling*, 76 F.3d 384, at *2 (citations and quotations omitted). The issue of rehabilitation for purposes of § 1112(b)(4)(A) "is not the technical one of whether the debtor can confirm a plan, but, rather, whether the debtor's business prospects justify continuance of the reorganization effort."   *Khan*, 2012 WL 2043074, at *6 (citation omitted). This standard, "the absence of a reasonable likelihood of rehabilitation," requires a lesser showing [by the Debtor] than the feasibility showing required for confirmation."   *In re Zaruba*, 07-00100-DMD, 2007 WL 4589746, *4 (Bankr. D. Alaska Dec. 28, 2007).   In terms of evaluating plan feasibility under § 1129, "[t]he Code does not require the debtor to prove that

-8-

success is inevitable, and a relatively low threshold of proof will satisfy § 1129(a)(11), so long as adequate evidence supports a finding of feasibility."  *Id.* (quoting *Computer Task Group, Inc. v. Brotby (In re Brotby)*, 303 B.R. 177, 191 (B.A.P. 9th Cir. 2003)).  Since § 1129(a)(11) sets a relatively low threshold of proof of feasibility for confirmation of a plan, then the standard under §1112(b)(4)(A) is lower all the more.  Clearly, that lower standard is satisfied in this case.  Or, put more correctly, the Committee cannot prove the absence of a reasonable likelihood of rehabilitation.

In the Ninth Circuit, most of the cases that have been converted to Chapter 7 based on the debtor's inability to demonstrate a reasonable likelihood of rehabilitation involve debtors with negative or rapidly declining cash flow and a lack of future income streams sufficient to meet the demands of the debtor's business.  See*, e.g., USA Commercial Mortgage*, 452 F. App'x at 724 ("The record here contains evidence suggesting that Asset Resolution had a negative cash flow and could not reasonably depend on future fees as a loan servicer following the Direct Lenders' termination of the LSAs.  Based on this evidence, the district court did not abuse its discretion in finding there was 'nothing to reorganize' and converting the case pursuant to § 1112(b)(4)(A).");  *Bay Area Material Handling*, 76 F.3d 384, at *2 (affirming conversion because of debtor's "undisputed lack of operations, income, inventory, and employees, and its liquidation of assets all indicated "'continuing loss to or diminution of the estate and absence of a reasonable likelihood of rehabilitation . . . .'");  *Khan*, 2012 WL 2043074, at *7 (affirming bankruptcy court order converting case to Chapter 7 where debtor's income had dropped precipitously year over year and debtor could provide no evidence of income streams sufficient to support reorganization));  *In re Johnston*, 149 B.R. 158, 162 (B.A.P. 9th Cir. 1992) (converting case to Chapter 7 where "[t]he record shows that [Debtor] lacked the income which would indicate a

reasonable likelihood of rehabilitation."); *Lodgebuilder, Inc. v. Whinery*, 2:09-CV-1837 JCM LRL, 2010 WL 3154557, *2 (D. Nev. Aug. 9, 2010) (affirming conversion of case where debtor had very little income and no future prospects of generating income sufficient to support rehabilitation).

Conversely, courts have denied motions to convert cases to Chapter 7 where a debtor has substantial assets or income with which to fund a plan.  See*, e.g., Zaruba*, 2007 WL 4589746, at *5 (refusing to convert case because debtor had substantial assets to fund plan)*; In re Prods. Int'l Co.*, 395 B.R. 101, 110 (Bankr. D. Ariz. 2008) (refusing to convert case on grounds that rehabilitation was unlikely where debtor's financial statements showed "a viable company, operating at a profit, with a reasonable likelihood of rehabilitation.").  Further, the court in *Zaruba* rejected efforts by a creditor to litigate the value of a debtor's assets and the validity of its cash flow projections in the context of a motion to convert or dismiss, instead holding that these issues "are more appropriately considered in the confirmation context." *Zaruba*, 2007 WL 4589746, at *5.  Finally, at least one court has denied a motion to convert where, as here, it was supported only by the conclusory statements of counsel to the effect that the debtor's profitability was declining and would be unable to support reorganization.  *Alaska Fur Gallery*, 2010 WL 7765562, at *1-2 (rejecting arguments by counsel concerning profitability of debtor and stating that analysis by a qualified accountant was required to determine true profitability).

Here, the Committee must prove the absence of a reasonable likelihood of rehabilitation. The Trustee need prove nothing.  Nonetheless, ACES' projections regarding the price of purchased power and the availability of transmission capacity will show that the estate's costs of continuing to serve the members will continue to be far less than the rates that the estate charges the members.  Southern Montana's cost of purchased power over the next 12 months will

-10-

average around $30/MWh, and it will sell that power to its members for around $60/MWh. Thus, Southern Montana will continue to have positive cash flows from its business operations into the foreseeable future.  Further, within the next month if not sooner, the Trustee will file an amended plan of reorganization that includes his settlement with the Noteholders.  The pro forma financial projections that will be included in the disclosure statement for the Trustee's amended plan will show that by charging reasonable rates to its members, reorganized Southern Montana will be able to meet its obligations under the amended plan.  Moreover, under the amended plan, the Noteholders have agreed to leave sufficient cash in reorganized Southern Montana to provide adequate operating capital for its future operations.  Finally, through an all requirements power supply agreement with Morgan Stanley Capital Group, Inc. and its WAPA contract, reorganized Southern Montana will have reliable sources of power and energy at reasonable prices for the next 10 years.  Thus, at the very least, there is a reasonable likelihood of Southern Montana's rehabilitation.

Granted, the Trustee's plan settlement is currently limited to the Noteholders, and the Trustee may have to litigate with the remaining members over the assumability of their wholesale power contracts and the confirmability of his amended plan.  But the mere prospect that the Trustee's amended plan may not be fully consensual or that the amended plan may not be confirmed is not a valid ground for throwing in the towel and converting the case to Chapter 7.  If it were, all Chapter 11 cases, except those involving fully consensual plans, would be converted to Chapter 7.

### III.   CONCLUSION

For all of the foregoing reasons, the Motion to Convert should be denied.

Dated: July 18, 2013

/s/ Joseph V. Womack

Joseph V. Womack
WALLER & WOMACK
303 N. Broadway, Suite 805
Billings, MT  59101
Telephone:      (406) 252-7200
Fax:               (406) 252-4266
E-mail:          jwomack@jvwlaw.com

John Cardinal Parks
Bart B. Burnett
Robert M. Horowitz
Kevin S. Neiman
HOROWITZ & BURNETT, P.C.
1660 Lincoln Street, Suite 1900
Denver, CO  80264
Telephone:      (303) 996-8600
Fax:               (303) 996-8636
E-mail:          jparks@hblegal.net
                    bburnett@hblegal.net
                    bhorowitz@hblegal.net
                    kneiman@hblegal.net

*Counsel for Lee A. Freeman, Chapter 11 Trustee for Southern Montana Electric Generation and Transmission Cooperative*

## <u>CERTIFICATE OF SERVICE</u>

I, the undersigned, certify under penalty of perjury that, in accordance with the Trustee's Limited Notice List, on July 18 , 2013, or as soon as possible thereafter, copies of the foregoing were served electronically by the Court's ECF notice to all persons/entities requesting special notice or otherwise entitled to the same and that in addition service by mailing a true and correct copy, first class mail, postage prepaid, was made to the following persons/entities:

PPL EnergyPlus, LLC
2 North Ninth Street
Allentown, PA 18101

NorthWestern Energy
40 E. Broadway St.
Butte, MT 59701-9394

LS Jensen Construction
4685 Mullan Road
Missoula, MT 59808

Stanley Consultants
8000 S. Chester St.
Centennial, CO 80112

Electrical Consultants, Inc.
3521 Gabel Road, Ste. 2
Billings, MT 59102

Corval Group
1633 Eustis Street
Saint Paul, MN 55108

Falls Construction Company
1001 River Drive North
Great Falls, MT 59401

First Interstate Bank
PO Box 5010
Great Falls, MT 59403-5010

Grassman Tractor Service
512 51st Street South
Great Falls, MT 59405

Modern Woodmen of America
Attn: Investment Department
1701 First Avenue
Rock Island, IL 61201

National Rural Utilities Co-op Fin.
20701 Cooperative Way
Dulles, MT 20166

Prudential Capital Group
2200 Ross Avenue, Suite 4200E
Dallas, TX 75201

Yellowstone Electric Company
1919 4th Avenue North
Billings, MT 59101

By: /s/ Connie Reynolds
  Connie Reynolds
  Legal Asst.

-13-