Joseph V. Womack, Attorney No. 2641
WALLER & WOMACK
303 N. Broadway, Suite 805
Billings, MT  59101
Telephone:     (406) 252-7200
Fax:               (406) 252-4266
E-mail:          jwomack@jvwlaw.com

John Cardinal Parks, Attorney No. 18669 (Colorado)
Bart B. Burnett, Attorney No. 21258 (Colorado)
Robert M. Horowitz, Attorney No. 17848 (Colorado)
Kevin S. Neiman, Attorney No. 36560 (Colorado)
HOROWITZ & BURNETT, P.C.
1660 Lincoln Street, Suite 1900
Denver, CO  80264
Telephone:     (303) 996-8600
Fax:               (303) 996-8636
E-mail:          jparks@hblegal.net
                    bburnett@hblegal.net
                    bhorowitz@hblegal.net
                    kneiman@hblegal.net

*Counsel for the Chapter 11 Trustee*

## UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF MONTANA

| In re | |
|---|---|
| **SOUTHERN MONTANA ELECTRIC GENERATION AND TRANSMISSION COOPERATIVE, INC.,** | **Case No. 11-62031-11** |
| Debtor. | |

## DISCLOSURE STATEMENT FOR TRUSTEE'S THIRD AMENDED PLAN OF REORGANIZATION FOR SOUTHERN MONTANA ELECTRIC GENERATION AND TRANSMISSION COOPERATIVE, INC.

## TABLE OF CONTENTS

SUMMARY OF THE PLAN ................................................................................ 1

I.   INTRODUCTION ................................................................................. 2

    A.   HOLDERS OF CLAIMS/MEMBER INTERESTS ENTITLED TO VOTE .. 3

    B.   VOTING PROCEDURES ................................................................ 5

    C.   CONFIRMATION HEARING AND DEADLINE FOR OBJECTIONS ....... 6

II.  OVERVIEW OF THE PLAN .................................................................. 7

    A.   SUMMARY OF CLASSIFICATION AND TREATMENT OF CLASSIFIED CLAIMS AND MEMBER INTERESTS ............................................ 7

    B.   SUMMARY OF TREATMENT OF UNCLASSIFED CLAIMS ................. 14

        1.   Administrative Expense Claims and Bar Date .................... 14

        2.   Other Specific Claims ...................................................... 15

III. GENERAL INFORMATION .................................................................. 17

    A.   OVERVIEW OF CHAPTER 11 ...................................................... 17

    B.   THE DEBTOR'S PREPETITION ORGANIZATION AND BUSINESS OPERATIONS ........................................................................... 18

        1.   The Debtor, Its Members, Governance, and Commencement ........... 18

        2.   Highwood Generating Station and SME ............................. 20

        3.   Other Assets .................................................................... 22

        4.   Prepetition Indebtedness .................................................. 22

        5.   Power Purchase/Electricity Transmission/Gas Transmission Agreements ...................................................................... 28

        6.   Regulatory Oversight of the Debtor .................................. 29

        7.   Prepetition Business Operations ....................................... 30

        8.   The Debtor's Prepetition Rates to Its Members .................. 30

        9.   The Debtor's Prepetition Projections of Rates through 2021 as Compared to the Debtor's Projected Rates under the Trustee's Plan ................................................................................ 31

        10.  Prepetition Employee Matters .......................................... 33

C.  SIGNIFICANT ADDITIONAL EVENTS LEADING TO THE CHAPTER 11 CASE ................................................................................ 34

1.  The YVEC Litigation .......................................................... 36

2.  The Great Falls/ECP Litigation .......................................... 36

3.  The Billings Gazette Litigation ........................................... 37

IV.  THE CHAPTER 11 CASE ............................................................. 37

A.  PETITION DATE .................................................................... 37

B.  THE DEBTOR'S APPLICATIONS TO EMPLOY PROFESSIONALS; COMPENSATION ................................................................. 38

C.  THE SCHEDULES AND STATEMENT OF FINANCIAL AFFAIRS ......... 38

D.  THE § 341 MEETING OF CREDITORS ........................................ 38

E.  STIPULATION FOR APPOINTMENT OF TRUSTEE; APPOINTMENT OF TRUSTEE ........................................................................ 38

F.  THE TRUSTEE'S APPLICATIONS TO EMPLOY PROFESSIONALS ..... 39

G.  THE APPPOINTMENT OF OFFICIAL COMMITTEE OF UNSECURED CREDITORS; APPLICATION TO EMPLOY PROFESSIONAL ................. 40

H.  THE MONTHLY COMPENSATION PROCEDURES ................................. 40

I.  PAYMENTS TO PROFESSIONALS EMPLOYED PURSUANT TO SECTION 327; PAYMENTS TO THE PREPETITION SECURED PARTIES' PROFESSIONALS ...................................................... 40

J.  ADEQUATE ASSURANCE TO UTILITIES ..................................... 41

K.  USE OF CASH COLLATERAL ..................................................... 42

L.  LIMITING NOTICE ................................................................. 43

M.  ASSUMPTION/REJECTION OF EXECUTORY CONTRACTS ................ 43

1.  The Lease and the Sublease ................................................ 43

2.  The PPL Stipulation and Its Claim ..................................... 44

3.  The Pitney Bowes Lease ..................................................... 44

4.  The NWE Energy Stipulation .............................................. 44

N.  THE YVEC MOTIONS ................................................................. 44

-iii-

|   | 1. | **Determination that Automatic Stay Does Not Apply** ........................ 44 |
|   | 2. | **Relief from Stay/Abstention** ................................................................ 45 |
| O. | | **ORDINARY COURSE PROFESSIONALS** ................................................ 45 |
| P. | | **ADVERSARY PROCEEDINGS** ................................................................ 45 |
|   | 1. | **The Beartooth Adversary Proceeding** .................................................. 45 |
|   | 2. | **The City Adversary Proceeding** ........................................................... 46 |
|   | 3. | **The Construction Lien Adversary Proceeding** ..................................... 47 |
| Q. | | **CLAIMS PROCESS AND BAR DATE** ...................................................... 48 |
| R. | | **THE PLAN PROCESS** ................................................................................ 48 |
|   | 1. | **Reorganization Proposals and Choosing One** ...................................... 48 |
|   | 2. | **Fixing Date to File Plans and Disclosure Statements and Establishing Related Requirements** ......................................................................... 50 |
|   | 3. | **Filing of Trustee's Initial Plan and Disclosure Statement** .................. 51 |
| S. | | **THE PPL ADMINISTRATIVE EXPENSE CLAIM** .................................. 51 |
| T. | | **THE YVEC SETTLEMENT** ....................................................................... 52 |
| U. | | **THE TRUSTEE'S REPORT** ...................................................................... 53 |
| V. | | **THE VALUATION MOTION AND THE LIMITED OBJECTION** ........... 53 |
| W. | | **THE SETTLEMENT BETWEEN THE TRUSTEE AND THE NOTEHOLDERS** ...................................................................................... 56 |
| X. | | **THE MOTION TO CONVERT** ................................................................. 59 |
| Y. | | **POSTPETITION OPERATIONS** ............................................................... 60 |
| Z. | | **THE DEBTOR'S RATES TO ITS MEMBERS SINCE THE PETITION DATE** ............................................................................................................ 60 |
| V. | | **THE CHAPTER 11 PLAN** ......................................................................... 60 |
| A. | | **CONSIDERATIONS REGARDING THE PLAN** ..................................... 60 |
| B. | | **CLASSIFICATION AND TREATMENT OF CLAIMS AND MEMBER INTERESTS** ................................................................................................ 61 |
| C. | | **IMPLEMENTATION OF THE PLAN** ...................................................... 61 |
|   | 1. | **Continuation of Operations** ................................................................. 61 |

-iv-

    2.      **Post-Effective Date Rates** ........................................................ 62

    3.      **Implementation** ....................................................................... 62

    4.      **Corporate Governance** ........................................................... 62

    5.      **Management** ............................................................................ 63

    6.      **Board of Trustees** ................................................................... 63

    7.      **Power Supply Agreement** ....................................................... 64

    8.      **Assumption of All Requirements Contracts** ........................... 64

    9.      **Assumption of WAPA Contract** ............................................ 64

    10.     **Making of Distributions** ......................................................... 64

**D.**     **PLAN PROVISIONS GOVERNING DISTRIBUTIONS** ............................... 64

    1.      **Delivery of Distributions** ....................................................... 64

    2.      **Undeliverable Distributions** .................................................. 65

**E.**     **PROVISIONS FOR TREATMENT OF DISPUTED CLAIMS** ..................... 66

    1.      **Objections to Claims; Prosecution of Disputed Claims** ........ 66

    2.      **Allowance of Disputed Claims** .............................................. 66

    3.      **Settlement of Objections to Claims After Effective Date** ................... 66

**F.**     **EXECUTORY CONTRACTS AND UNEXPIRED LEASES** ...................... 66

    1.      **Assumption and Assignment of Executory Contracts and Unexpired Leases** ................................................................................... 67

    2.      **Rejection of Executory Contracts and Unexpired Leases** ................. 67

    3.      **Approval of Assumption and Assignment and Rejection of Executory Contracts and Unexpired Leases** .......................................... 67

    4.      **Objections** ................................................................................ 68

**G.**     **CONTINUED EXISTENCE OF THE ESTATE** ...................................... 68

**H.**     **EFFECTIVENESS OF THE PLAN** ....................................................... 69

    1.      **Conditions Precedent to the Confirmation of the Plan** ......... 69

    2.      **Conditions Precedent to the Effective Date of the Plan** .......... 69

    3.      **Effect of Non-Occurrence of the Effective Date** ................... 70

I.     OTHER PLAN PROVISIONS ....................................................... 70

    1.    Binding Effect ............................................................ 70

    2.    Discharge of Claims .................................................. 70

    3.    Exculpation and Release of the Trustee, the Indenture Trustee, Prudential, and Modern Woodmen ...................... 70

    4.    Retention of Causes of Action/Reservation of Rights ......... 71

    5.    Injunction ................................................................. 71

    6.    Jurisdiction of Bankruptcy Court ............................. 72

    7.    Modification of Plan ................................................ 72

    8.    Withdrawal or Revocation ........................................ 72

VI.   CERTAIN FACTORS AFFECTING THE DEBTOR ................................ 73

    A.   RISK OF NON-CONFIRMATION OF THE PLAN ....................................... 73

    B.   FAILURE OF CONDITIONS PRECEDENT TO CONFIRMATION OF THE PLAN ...................................................................................... 73

VII.  CONFIRMATION OF THE PLAN ........................................................ 73

    A.   REQUIREMENTS FOR CONFIRMATION OF THE PLAN ...................... 73

        1.    General Requirements of Section 1129 ..................... 73

        2.    Best Interests Tests ................................................... 75

        3.    Liquidation Analysis ............................................... 75

        4.    Feasibility ............................................................... 76

    B.   REQUIREMENTS OF SECTION 1129(b) OF THE BANKRUPTCY CODE ...................................................................................... 79

VIII. ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN ................................................................................................. 80

    A.   LIQUIDATION UNDER CHAPTER 7 ....................................................... 81

    B.   ALTERNATIVE PLAN OF REORGANIZATION ...................................... 81

IX.   TAX CONSIDERATIONS ............................................................................ 81

X.    CONCLUSION ............................................................................................. 82

-vi-

**THIS DISCLOSURE STATEMENT HAS NOT YET BEEN APPROVED BY THE COURT**

This proposed Disclosure Statement is not a solicitation of acceptance or rejection of the Plan. Acceptances or rejections may not be solicited until the Bankruptcy Court has approved this Disclosure Statement under Bankruptcy Code § 1125. This proposed Disclosure Statement is being submitted for approval only, and has not yet been approved by the Bankruptcy Court.  This Disclosure Statement was drafted by the Trustee and his counsel.  Certain language was added at the request of the Office of the United States Trustee, at the request of counsel for the Noteholders, and in response to the six objections that were filed to this Disclosure Statement.  Although the Trustee has not attempted to compare the number of words drafted by him and his counsel with those drafted by others, of the over 36,000 words in the Disclosure Statement, the Trustee's counsel estimates that at least over 99% of those words were drafted by the Trustee and his counsel.

## SUMMARY OF THE PLAN

The *Trustee's Third Amended Plan of Reorganization for Southern Montana Electric Generation and Transmission Cooperative, Inc.*, as it may be amended or modified (the "**Plan**"), submitted by Lee A. Freeman (the "**Trustee**"), the duly appointed chapter 11 trustee for Debtor Southern Montana Electric Generation and Transmission Cooperative, Inc. (the "**Debtor**"), provides for the continued operation of the Debtor, a settlement with the Noteholders (defined herein) which resolves the issue of the value of the Noteholders' collateral and under which the Noteholders' current claim for a $46 million "make-whole amount" is waived, significant recoveries to secured creditors, a distribution to unsecured creditors that is equal to if not greater than what they would receive if the Debtor were to be liquidated, and reasonable rates to the Debtor's members for at least the next decade.  The Trustee is seeking to obtain Bankruptcy Court approval of the Plan.  Section 1125 of the Bankruptcy Code requires that the Trustee prepare a disclosure statement containing adequate information of a kind, and in sufficient detail, to enable a hypothetical reasonable investor to make an informed judgment regarding acceptance of the Plan.  This Disclosure Statement has been submitted in accordance with such requirements.  **The Trustee urges all holders of Claims and Member Interests entitled to vote on the Plan to vote in favor of the Plan.**

In addition to the settlement with the Noteholders, one of the other key elements of the Plan is a 10-year, all requirements power supply agreement between Reorganized Southern and Morgan Stanley Capital Group, Inc. (the "**MSCGI Agreement**") under which all of the Debtor's power and energy needs will be met with under market-based prices that are, in real dollars, at historical lows.  The MSCGI Agreement replaces a pre-petition, long-term power supply agreement with PPL Montana ("**PPL**") that required the Debtor to purchase quantities of power that greatly exceeded its needs and at prices that turned out to be significantly over-market.  By any measure, the MSCGI Agreement will save the Debtor over $100,000,000 as compared to what it would have had to pay PPL through December 31, 2019, the expiration date of the PPL contract (an analysis performed by ACES, formerly known as ACES Power Marketing, the Trustee's industry advisor that estimates the savings, is available from counsel for the Trustee

upon request).  The significant savings achieved by the replacement of the PPL contract will allow the Debtor to pay off the debt on Highwood Generating Station ("**HGS**") on restructured terms and still charge rates to its members that are significantly lower than what they would have been had the PPL contract been performed.  Further, by paying off the HGS debt on restructured terms, the Debtor will be able to retain the optionality presented by continued ownership of a gas-fired power generation facility in an environment in which coal-fired plants across the country are being shut down or scheduled to shut down due to environmental issues  as well as the cost-effectiveness of operating gas-fired plants at current natural gas prices.  Finally, by continuing to operate rather than liquidate, the value of the Debtor's claims against certain members that are attempting to terminate their wholesale power contracts is preserved for the benefit of creditors.

The Trustee believes that the Plan provides creditors with the best possible recovery under the circumstances.

The Committee of Unsecured Creditors disagrees with this view, contending that holders of Claims and Member Interests in Classes 1, and 3-9, would be better off rejecting the Plan. The Trustee disputes this contention.  **THE TRUSTEE BELIEVES THAT THE PLAN PROVIDES THE GREATEST OPPORTUNITY FOR THE DEBTOR TO SUCCESSFULLY EMERGE FROM CHAPTER 11 ON TERMS THAT ARE FAIR TO ALL PARTIES IN INTEREST.  HE STRONGLY RECOMMENDS THAT YOU VOTE TO ACCEPT THE PLAN.**

## I.     INTRODUCTION

The Trustee submits this disclosure statement (the "**Disclosure Statement**") pursuant to section 1125 of title 11 of the United States Code (the "**BankruptcyCode**") in connection with the solicitation of acceptances and rejections with respect to the Plan, a copy of which is attached as **Exhibit 1** hereto.  The Plan incorporates, without limitation, all exhibits, supplements, appendices, and schedules thereto, either in their present form or as the same may be altered, amended, or modified from time to time, or added.  Unless otherwise defined herein, all capitalized terms contained herein have the meanings ascribed to them in the Plan.

The purpose of this Disclosure Statement is to set forth information (i) regarding the history of the Debtor, its business, and the Chapter 11 Case; (ii) concerning the Plan and alternatives to the Plan; (iii) advising holders of Claims and Member Interests of their rights under the Plan; (iv) assisting the holders of Claims in making an informed judgment as to whether they should vote to accept or reject the Plan; and (v) assisting the Bankruptcy Court in determining whether the Plan complies with the provisions of chapter 11 of the Bankruptcy Code and should be confirmed.

-2-

All holders of Claims and Member Interests are advised and encouraged to read this Disclosure Statement and the Plan in their entirety and to consult with counsel and business and tax advisors.  The Plan summary in this Disclosure Statement is qualified in its entirety by the Plan and the exhibits and schedules attached to the Plan and this Disclosure Statement.  The statements contained in this Disclosure Statement are made only as of the date hereof.  There can be no assurance that the statements will be correct at any later time.

This Disclosure Statement has been prepared, approved, and distributed in accordance with section 1125 of the Bankruptcy Code, and Bankruptcy Rule 3016(b), and not necessarily in accordance with federal or state securities laws or other non-bankruptcy law.  Further, any financial information contained in this Disclosure Statement was not prepared with a view toward compliance with the guidelines established by the American Institute of Certified Public Accountants, the practices recognized to be in accordance with generally accepted accounting principles, or the rules and regulations of the Securities and Exchange Commission regarding projections.  Furthermore, no financial information in this document has been reviewed or audited by the Debtor's independent accountants.

A Ballot for the acceptance of rejection of the Plan is enclosed with the Disclosure Statement submitted to the holders of Claims that the Trustee believes may be entitled to vote to accept or reject the Plan.

This Disclosure Statement is not and may not be construed as an admission of any fact or liability, stipulation, or waiver in contested matters, adversary proceedings, or other actions or threatened actions, but rather as a statement made in settlement negotiations.  This Disclosure Statement shall not be admissible in any non-bankruptcy proceeding nor shall it be construed to be conclusive advice on the tax, securities, or other legal effects of the Plan as to holders of claims against, or equity interests in, the Debtor.

No solicitation of votes to accept the Plan may be made except pursuant to section 1125 of the Bankruptcy Code.  No representations concerning the Debtor or the value of the Debtor's property has been authorized by the Trustee or the Bankruptcy Court other than as set forth in this Disclosure Statement.  Any information, representations, or inducements made to obtain acceptance of the Plan, which are other than or inconsistent with the information contained in this Disclosure Statement and in the Plan, should not be relied upon by any holder of a Claim entitled to vote on the Plan.

A.      HOLDERS OF CLAIMS/MEMBER INTERESTS ENTITLED TO VOTE

Pursuant to section 1126 of the Bankruptcy Code, only holders of allowed claims or interests that are (i) "impaired" by a plan of reorganization; and (ii) entitled to receive a distribution under such plan are entitled to vote to accept or reject a proposed plan.  Under

-3-

section 1126(f) of the Bankruptcy Code, classes of claims or interests in which the holders of claims or interests are unimpaired under a chapter 11 plan are deemed to have accepted the plan and are not entitled to vote to accept or reject the plan.  Section 1126(g) of the Bankruptcy Code provides that classes of claims or interests in which the holders of claims or interests are impaired under a chapter 11 plan such that they do not receive or retain property on account of their claims or interests are deemed to have rejected the plan and are not entitled to vote to accept or reject the plan.

Under section 1124 of the Bankruptcy Code, a class of claims or interests is deemed to be "impaired" under the Plan unless (i) the Plan leaves unaltered the legal, equitable, and contractual rights to which such claim or interest entitles the holder thereof; or (ii) notwithstanding any legal right to an accelerated payment of such claim or interest, the Plan, among other things, cures all existing defaults (other than defaults resulting from the occurrence of events of bankruptcy) and reinstates the maturity of such claim or interest as it existed before the default.  Claims in **Classes 2(A) (Prudential), 2(B) (Modern Woodmen), 2(C) (First Interstate Bank Secured Loan), 3 (CFC), 4 (First Interstate Bank Unsecured Loan), 5 (Construction Lien Claims), 6 (General Unsecured Claims), and 7 (Convenience Claims)** are impaired under the Plan and Claims in such Classes will receive distributions under the Plan to the extent not otherwise waived.  As a result, **holders of Allowed Claims in those Classes are entitled to vote to accept or reject the Plan.**

Holders of Claims in **Classes 1 (Priority Non-Tax Claims), 8 (Member Patronage Capital and similar Claims), and 9 (Member Interests)** are unimpaired by the Plan.  As a result, **holders of Claims or Member Interests in those Classes are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.**

Section 1126(c) of the Bankruptcy Code defines "acceptance" of a plan by a class of claims as acceptance by creditors in that class that hold at least two-thirds in dollar amount and more than one-half in number of the claims that cast ballots for acceptance or rejection of the plan.

In this case, if a Class of Claims entitled to vote on the Plan rejects the Plan, the Trustee reserves the right to amend the Plan or request confirmation of the Plan pursuant to section 1129(b) of the Bankruptcy Code or both.  Section 1129(b) of the Bankruptcy Code (commonly known as "cram down") permits the confirmation of a chapter 11 plan notwithstanding the rejection of a plan by one or more impaired classes of claims or member interests.  Under that section, a plan may be confirmed by a bankruptcy court if it does not "discriminate unfairly" and is "fair and equitable" with respect to each rejecting class.

The Trustee is commencing this solicitation after extensive negotiations with, among others, Prudential , Modern Woodmen , the Committee of Unsecured Creditors, the Western Area Power Administration, and the Debtor's current and prior members: Yellowstone Valley

-4-

Electric Cooperative, Inc. ("**YVEC**") located in Huntley, Montana; Tongue River Electric Cooperative, Inc. ("**Tongue River**") located in Ashland, Montana; Fergus Electric Cooperative, Inc. ("**Fergus**") located in Lewistown, Montana; Mid-Yellowstone Electric Cooperative, Inc. ("**Mid-Yellowstone**") located in Hysham, Montana; Beartooth Electric Cooperative, Inc. ("**Beartooth**"); and Great Falls/Electric City Power, Inc. (collectively, the "**City**") located in Great Falls, Montana.

**Despite his extensive negotiations with the Debtor's remaining Members, in the objections to this Disclosure Statement filed with the Bankruptcy Court prior to its approval, Fergus and Mid-Yellowstone expressly stated that they do not support the Plan and that they do not believe that the Plan is confirmable. They also assert that Tongue River and Beartooth also do not support the Plan. Although Tongue River filed an objection to the Disclosure Statement, it did not expressly state therein that it does not support the Plan. Beartooth also filed an objection to the Disclosure Statement and although it did not expressly state that it does not support the Plan, it has repeatedly stated that it no longer wishes to be a member of the Debtor and reiterated that in its objection.**

**THE TRUSTEE BELIEVES THAT THE PLAN IS FAIR AND EQUITABLE AND PROVIDES THE BEST RECOVERY TO CLAIM HOLDERS UNDER THE CIRCUMSTANCES. THE TRUSTEE BELIEVES THAT ACCEPTANCE OF THE PLAN IS IN THE BEST INTERESTS OF EACH AND EVERY CLASS OF CREDITORS ENTITLED TO VOTE ON THE PLAN AND STRONGLY RECOMMENDS THAT EACH CREDITOR VOTE TO ACCEPT THE PLAN.**

Holders of Claims or Member Interests may obtain a copy of the Disclosure Statement and the Plan by contacting the Trustee's counsel, John Cardinal Parks, at jparks@hblegal.net or (303) 996-8609.

B.    **VOTING PROCEDURES**

If you are entitled to vote to accept or reject the Plan, a Ballot is enclosed for the purposes of voting on the Plan. If you hold Claims in more than one Class and you are entitled to vote Claims in more than one Class, you will receive separate Ballots, which must be used for each separate Class. Ballots should be returned to:

**Office of the Clerk Court**
**U.S. Bankruptcy Court District of Montana**
**Mike Mansfield Federal Building and U.S. Courthouse, Room 303**
**400 North Main Street**
**Butte, MT 59701**

-5-

With copies to:

John Cardinal Parks
HOROWITZ & BURNETT, P.C.
1660 Lincoln Street, Suite 1900
Denver, CO 80264

Neal Jensen
United States Trustee's Office
Liberty Center, Suite 204
301 Central Avenue
Great Falls, MT 59401

**TO BE COUNTED, YOUR BALLOT INDICATING ACCEPTANCE OR REJECTION OF THE PLAN MUST BE RECEIVED BY NO LATER THAN [_____ ____ , 2013], THE VOTING DEADLINE.  ANY EXECUTED BALLOT RECEIVED THAT DOES NOT INDICATE EITHER AN ACCEPTANCE OR A REJECTION OF THE PLAN SHALL NOT BE COUNTED.**

In addition, as contemplated in the Plan, a Claim is a Class 7 Convenience Claim if such Claim is (a) Allowed in an amount equal to or less than $5,000, or (b) Allowed in an amount greater than $5,000 but is reduced to $5,000 by an irrevocable written election by the holder of such Allowed Claim on the timely submitted Ballot.  Accordingly, the Ballot provides for such election.

Do not return any other documents with your Ballot.

If you are a holder of a Claim entitled to vote on the Plan and you did not receive a Ballot, received a damaged Ballot, or lost your Ballot, or if you have any questions concerning the Disclosure Statement, the Plan, or the procedures for voting on the Plan, please contact the Trustee's counsel, John Cardinal Parks, at jparks@hblegal.net or (303) 996-8609.

### C.    CONFIRMATION HEARING AND DEADLINE FOR OBJECTIONS

Section 1128 of the Bankruptcy Code requires the Bankruptcy Court to hold a hearing on confirmation of the Plan.  The Confirmation Hearing will be held on November 12, 2013 at _____ (Mountain Time) before the Honorable Ralph B. Kirscher, United States Bankruptcy Court for the District of Montana, at 2601 Second Avenue North, Billings, Montana 59101 .  The Bankruptcy Court has directed that objections, if any, to confirmation of the Plan, must be in writing and must be filed with the Bankruptcy Court and served upon the Trustee's counsel, John Cardinal Parks, Horowitz & Burnett, P.C. 1660 Lincoln Street, Suite 1900 Denver CO 80264, so they are **received** by the Trustee's counsel no later than [_____ ___, 2013].  The

Confirmation Hearing may be adjourned from time to time without further notice except for the announcement of the adjournment date made at the Confirmation Hearing or at any subsequent adjourned Confirmation Hearing.

## II.    OVERVIEW OF THE PLAN

### A.    SUMMARY OF CLASSIFICATION AND TREATMENT OF CLASSIFIED CLAIMS AND MEMBER INTERESTS

The following table briefly summarizes the classification and treatment of classified claims and interests under the Plan:

| CLASS DESCRIPTION | IMPAIRMENT AND VOTE | TREATMENT |
|---|---|---|
| Class 1: Priority Non-Tax Claims | Unimpaired<br><br>No | Paid in full on the Effective Date or as soon thereafter as Allowed. |

| CLASS DESCRIPTION | IMPAIRMENT AND VOTE | TREATMENT |
|---|---|---|
| Class 2(A): Prudential- Series 2010A Notes[1] | Impaired<br><br>Yes | The Prudential Secured Claim, evidenced by the Series 2010(A) Notes, shall be Allowed in an aggregate principal amount equal to $75 million less (a) the total amount of adequate protection payments paid to Prudential pursuant to the DIP Order; (b) 88% of the Secured Lender Professional Fees; and (c) Prudential's share of the proceeds of the settlement between the Trustee and the City of Great Falls and Electric City Power, Inc.  The Prudential Secured Claim shall not include the Make-Whole Amount Claim, which is waived by Prudential in connection with the Plan. The Prudential Allowed Secured Claim shall bear interest at the rate of 6.0% per annum.  Monthly payment to Prudential shall be calculated based on a twelve (12) year amortization of the Allowed Secured Claim and paid in unequal monthly installments, as set forth on Schedule 2(A)[2], in cash, except that until the first anniversary of the Effective Date payment may be in-kind insofar as may be necessary to maintain Reorganized Southern's rates to its Members at the same level as they were on the Petition Date for one full year after the Effective Date or such other amortization term as may be agreed upon between the Trustee and Prudential.  The Prudential Allowed Secured Claim shall be paid over the twelve (12) year term on a fully amortized basis.  Prudential shall retain the Liens which secure its Allowed Secured Claim, under the Indenture or otherwise, including any pledge of the All Requirements Contracts as they may be assumed as amended by Reorganized Southern under the Plan, until the Allowed Secured Claim is paid in full in accordance with this Plan. The Series 2010(A) Notes, Indenture, Collateral Agency Agreement, and any other document evidencing or prescribed Class 2(A) treatment under the Plan shall be amended, restated and/or replaced, as appropriate, to be consistent with the Plan, in forms substantially as included in the Plan Supplement. Any fees, reimbursements, or obligations under the terms of any of the Notes, Indenture, Collateral Agency Agreement, or other agreements that may be amended, restated, or replaced under the Plan shall be paid by Reorganized Southern in the ordinary course of business on and after the Effective Date, as and when due.  No amounts paid to or on behalf of Prudential under the DIP Order or otherwise during the pendency of the Chapter 11 Case shall be avoidable or otherwise subject to disgorgement. |

---

[1]     As indicated herein, the Series 2010A Notes were due to mature in 2040 and the Series 2010B Notes were due to mature in 2026.  Notwithstanding the foregoing, the Trustee has proposed a 12 year plan with amortization over 10 years for Modern Woodmen and 12 years for Prudential.  The Trustee's proposal is in response from comments from the Members expressing a preference for a repayment of any restructured indebtedness in a much shorter timeframe.  The

| CLASS DESCRIPTION | IMPAIRMENT AND VOTE | TREATMENT |
|---|---|---|
| Class 2(B): Modern Woodmen-Series 2010B Note | Impaired<br><br>Yes | The Modern Woodmen Secured Claim, evidenced by the Series 2010(B) Note, shall be Allowed in an aggregate principal amount equal to $10 million less (a) the total amount of adequate protection payments paid to Modern Woodmen pursuant to the DIP Order; (b) 12% of the Secured Lender Professional Fees; and (c) Modern Woodmen's share of the proceeds of the settlement between the Trustee and the City of Great Falls and Electric City Power, Inc.  The Modern Woodmen Secured Claim shall not include the Make-Whole Amount Claim, which is waived by Modern Woodmen in connection with the Plan. The Modern Woodmen Allowed Secured Claim shall bear interest at the rate of 5.25% per annum.  Monthly payment to Modern Woodmen shall be calculated based on a ten (10) year amortization of the Allowed Secured Claim and paid in unequal monthly installments, as set forth on Schedule 2(B), in cash, except that until the first anniversary of the Effective Date payment may be in-kind[3] insofar as may be necessary to maintain Reorganized Southern's rates to its Members at the same level as they were on the Petition Date for one full year after the Effective Date, or such other amortization term as may be agreed upon between the Trustee and Modern Woodmen.  The Modern Woodmen Allowed Secured Claim shall be paid over the ten (10) year term on a fully amortized basis. Modern Woodmen shall retain the Liens, under the Indenture or otherwise, including any pledge of the All Requirements Contracts as they may be assumed as amended by Reorganized Southern under the Plan which secure its Allowed Secured Claim until the Allowed Secured Claim is paid in full in accordance with the Plan.  No amounts paid to or on behalf of Modern Woodmen under the DIP Order or otherwise during the pendency of the Chapter 11 Case shall be avoidable or otherwise subject to disgorgement. |

Noteholders have expressed a willingness to extend their respective amortization periods as provided in the Plan to longer terms.  This would lengthen the amortization period, lowering in any year the amount of principal paid, thus lowering the rate required to be charged to the members.

[2]       Schedules 2(A), 2(B), 3, 4, and 5 referenced herein are attached to **Exhibit 2** of this Disclosure Statement – the Pro Forma Financial Projections

[3]       Payment in-kind means essentially a payment that is not cash and is a financial instrument that pays interest on a note with additional debt instead of cash.

| CLASS DESCRIPTION | IMPAIRMENT AND VOTE | TREATMENT |
|---|---|---|
| Class 2(C): First Interstate Bank Secured Loan | Impaired<br><br>Yes | The First Interstate Bank Secured Loan Claim shall be Allowed in the amount of the First Interstate Bank Secured Loan outstanding as of the Petition Date.  First Interstate Bank shall be granted relief from stay with respect to the First Interstate Bank Secured Loan Collateral to exercise all of its state law rights and remedies against the First Interstate Bank Secured Loan Collateral.  The First Interstate Bank Secured Loan, as to Reorganized Southern, shall be deemed paid and satisfied in full as of the Effective Date and First Interstate Bank shall have no deficiency or other Claim with respect to the First Interstate Bank Secured Loan. |
| Class 3: CFC | Impaired<br><br>Yes | The CFC Claim, evidenced by the CFC Loan, shall be Allowed in the amount of the CFC Loan outstanding as of the Petition Date.  CFC shall be granted relief from stay with respect to the CFC Loan Collateral, and the amount of the CFC Loan Collateral shall be applied to payment of the CFC Allowed Claim.  The balance of the CFC Allowed Claim shall be paid in full over seven (7) years in unequal monthly payments, without interest, as set forth on Schedule 3.  In exchange for its Class 3 treatment under the Plan, CFC shall be deemed to have agreed, and shall be prohibited from, enforcing the guarantees it holds from Fergus, Mid-Yellowstone, and Tongue River pursuant to the respective Limited Member Reimbursement Agreements so long as CFC timely receives the payments provided by the Plan, provided, however, that nothing in the Plan shall prohibit CFC from seeking and receiving from Fergus, Mid-Yellowstone, and Tongue River interest payments owed on the CFC Allowed Class 3 Claim until the principal amount of the CFC Allowed Class 3 Claim is paid in full. |

| CLASS DESCRIPTION | IMPAIRMENT AND VOTE | TREATMENT |
|---|---|---|
| Class 4: First Interstate Bank Unsecured Loan | Impaired<br><br>Yes | The First Interstate Bank Unsecured Loan Claim shall be Allowed in the amount of the First Interstate Bank Unsecured Loan outstanding as of the Petition Date. The First Interstate Bank Unsecured Loan Claim shall be Allowed in the amount of the First Interstate Bank Unsecured Loan outstanding as of the Petition Date.  The First Interstate Bank Unsecured Loan Claim shall be paid in full over seven (7) years in unequal monthly payments, without interest, as set forth on Schedule 4.  In exchange for its Class 4 treatment under the Plan, First Interstate Bank shall be deemed to have agreed, and shall be prohibited from, enforcing the commercial guaranty it holds from each Member, so long as First Interstate Bank timely receives the payments provided by the Plan, provided, however, that nothing in the Plan shall prohibit First Interstate Bank from seeking and receiving from the Members interest payments owed on the First Interstate Bank Unsecured Loan until the principal amount of the First Interstate Bank Unsecured Loan Allowed Class 4 Claim is paid in full.    The First Interstate Bank Unsecured Loan and any other document evidencing or relating thereto shall be deemed amended as of the Confirmation Date to be consistent with this Plan and may be amended, restated, or replaced under the Plan, as appropriate, in forms substantially as may be included in the Plan Supplement. |
| Class 5: Construction Lien Claims | Impaired<br><br>Yes | The Construction Lien Claims, if any, will be Allowed in an amount equal to either: (i) the amount owed as of the Petition Date; (ii) an agreed upon amount; or (iii) an amount as determined by the Bankruptcy Court.  The Construction Lien Claims shall be paid in full over seven (7) years in unequal monthly payments, without interest, as set forth on Schedule 5.  To the extent that such Claims are not valid, properly perfected, and enforceable Construction Lien Claims, any Allowed amount shall be treated as a Class 6 General Unsecured Claim. For Plan voting purposes, each of the Construction Lien Claims shall be deemed to be in its own, distinct class. |

| CLASS DESCRIPTION | IMPAIRMENT AND VOTE | TREATMENT |
|---|---|---|
| Class 6: General Unsecured Claims | Impaired<br><br>Yes | The Allowed General Unsecured Claims will receive their Pro Rata share of the Unencumbered Cash in the Estate. Distribution of the Pro Rata payment shall be made within 30 days after the Effective Date, with additional distributions from any Unencumbered Cash proceeds received from the Litigation Recoveries to be made as and when available, provided, however, Allowed General Unsecured Claim holders shall have no interest in and shall receive no distribution from the Operating Cash Reserve.  The Plan defines "Unencumbered Cash" to mean "Cash, other than the Operating Cash Reserve, that is not subject to a Lien of any Secured Claim as of the Effective Date and that is available after payment of, or accounting for higher priority payments required to be made on the Effective Date or thereafter under this Plan, including, without limitation,  Administrative Expense Claims, Professional Fee Claims, Priority and Non-Priority Tax Claims, fees due the United Trustee, and the DIP Financing Claim."  The Unencumbered Cash in the Estate as of December 31, 2013 is projected to be approximately $2.1 million.[4]  Although they remain subject to objection, the Trustee estimates that Class 6 General Unsecured Claims aggregates approximately $392,500,000.  The vast majority of this amount is PPL's nearly $375,000,000 General Unsecured Claim, which is discussed herein.  While the $2.1 million Unencumbered Cash projection is the Trustee's best estimate under the circumstances and is subject to distributions from proceeds from any Litigation Recoveries, whatever they may be, if Class 6 Allowed General Unsecured Claims are fixed at $392,500,000 and the Unencumbered Cash is fixed at $2.1 million, this would equal approximately a .54 cents on the dollar distribution to Class 6 holders of Allowed General Unsecured Claims.  The Commmitte of Unsecured Creditors contends that, under these circumstances, especially given that there is a $10 minimum distribution amount in the Plan, all holders of Class 6 General Unsecured Claims other than PPL "would be better off" making a Class 7 Convenience Class election. |

---

[4]      This amount assumes estimated cash in the Debtor of about $4 million, reduced by encumbered YVEC proceeds of about $1.9 million.

| CLASS DESCRIPTION | IMPAIRMENT AND VOTE | TREATMENT |
|---|---|---|
| Class 7: Convenience Claims | Impaired<br><br>Yes | Except to the extent that the holder of an Allowed Convenience Claim agrees to less favorable treatment or has been paid on account of such Claim prior to the Effective Date, each holder, if any, of an Allowed Convenience Claim shall receive Cash in an amount equal to 50% of such Allowed Convenience Claim on the later of the Effective Date or the date such Claim becomes an Allowed Convenience Claim, or as soon thereafter as is practicable.  Each holder of a Claim Allowed in an amount greater than $5,000, which Claim would otherwise be a General Unsecured Claim, may elect to voluntarily reduce such Claim to $5,000 and be treated as the holder of an Allowed Convenience Claim for purposes of this Plan, and by so electing shall be deemed to have waived any right to participate in any distribution to any Class other than Class 7 as to any Claims it may have.  Such election must be made on the Ballot and be received by the Trustee on or prior to the Voting Deadline.  Any election made after the Voting Deadline shall not be binding or effective. |
| Class 8: Member Patronage Capital and similar Claims | Unimpaired<br><br>No | Member Patronage Capital and similar Claims shall retain their Allowed Claims in accordance with and as provided by the Debtor's Bylaws. |
| Class 9: Member Interests | Unimpaired<br><br>No | Member Interests and Member Certificates shall be retained by the Members in accordance with and as provided by the Debtor's Bylaws. |

-13-

**B.    SUMMARY OF TREATMENT OF UNCLASSIFIED CLAIMS**

As provided by section 1123(a)(1) of the Bankruptcy Code, the following Claims are not classified under the Plan, and instead are treated separately as unclassified Claims on the terms set forth below.  Such Claims are unimpaired under the Plan.

**1.    Administrative Expense Claims and Bar Date**

Except to the extent that any holder agrees to a different, less favorable treatment, the holder of an Allowed Administrative Expense Claim that has not been paid, shall receive on account of such Claim, Cash in the amount of such Allowed Administrative Expense Claim on the later of the Effective Date or the date such Claim becomes an Allowed Administrative Expense Claim, or as soon thereafter as is practicable; provided, however, that Allowed Administrative Expense Claims representing liabilities incurred in the ordinary course of business, consistent with past practice, by the Estate or Reorganized Southern shall be paid in full and performed by the Estate or Reorganized Southern, as applicable, in the ordinary course of business in accordance with the terms and subject to the conditions of any agreements governing, instruments evidencing, or other documents relating to such transactions.

**Administrative Expense Claims Bar Date**.  All requests for the allowance and payment of an Administrative Expense Claim must be filed with the Bankruptcy Court and served upon the Trustee and other parties in interest, in accordance with the Bankruptcy Code and the Bankruptcy Rules, no later than the first Business Day that is 30 days after the Effective Date or such other date as approved by order of the Bankruptcy Court.  **Failure to file and serve such an allowance and payment request timely and properly shall result in the Administrative Expense Claim being forever barred and discharged.**

**Administrative Expense Claims for Goods, Materials and Services Incurred in the Ordinary Course of Business.**  Administrative Expense Claims based on liabilities incurred by the Debtor after the Petition Date for goods, materials and services delivered, obtained or received in the ordinary course of business, and that first become due and payable within sixty (60) days prior to the Confirmation Date will  be  paid by Reorganized Southern pursuant to the terms and conditions of the particular transaction giving rise to such Administrative Expense Claims and, unless the Bankruptcy Court orders otherwise, holders of Administrative Expense Claims based on  liabilities incurred by the Debtor for goods, materials and services delivered, obtained or received in the ordinary course of business are not required to file or serve a request for payment of such Claim, and will not be subject to the Administrative Expense Claims Bar Date provided in section 2.1.1 of the Plan.

2.    **Other Specific Claims**

Notwithstanding the foregoing, the following Claims, even if Administrative Expense Claims, shall be treated as follows:

a.    *Professional Fee Claims*

Any entity seeking an award by the Bankruptcy Court of a Professional Fee Claim shall (i) file its final application for allowance of such Claim by no later than the date that is 30 days after the Effective Date or such other date as may be fixed by the Bankruptcy Court; and (ii) to the extent such entity has not already been paid in full on account of such Claim, be paid in full and in Cash in the amounts Allowed upon the date the order granting such award becomes a Final Order.  Reorganized Southern is authorized to pay compensation for professional services rendered and reimburse expenses incurred after the Effective Date in the ordinary course and without Bankruptcy Court approval.

b.    *Priority Tax Claims*

Except to the extent that a holder of an Allowed Priority Tax Claim has been paid by the Estate prior to the Effective Date or agrees to less favorable treatment, each holder of an Allowed Priority Tax Claim shall receive at the sole option of  Reorganized Southern, (i) Cash in an amount equal to such Allowed Priority Tax Claim on the later of the Effective Date or the date such Priority Tax Claim becomes an Allowed Priority Tax Claim, or as soon thereafter as is practicable; or (ii) equal Cash payments to be made initially on the Effective Date or as soon thereafter as is practicable and semi-annually thereafter in an amount equal to such Allowed Priority Tax Claim, together with interest at a fixed annual rate determined under applicable non-bankruptcy law, over a period from the Effective Date through the fifth (5th) anniversary date after the Petition Date; *provided, however*, that such election shall be without prejudice to the right of Reorganized Southern to prepay such Allowed Priority Tax Claim in full or in part without penalty.

c.    *Fees Due the United States Trustee*

To the extent that any fees are due to the United States Trustee pursuant to 28 U.S.C. § 1930 on the Effective Date, such fees shall be paid to the United States Trustee in full, in Cash, within thirty (30) days after the Effective Date of the Plan.  Any fees which become due to the United States Trustee following the Effective Date shall be paid when such fees are due and payable.  Reorganized Southern, through the Trustee,  shall comply with its obligation to file post-confirmation reports with the United States Trustee following the Effective Date of the Plan.

### d.   *Real Property Taxes*

Any real property taxes which are Allowed Administrative Expense Claims pursuant to section 503(b)(1)(B)(i) of the Bankruptcy Code shall either be paid when last due without penalty under applicable state law or, if the holder of such Claim consents, the holder shall retain any Lien afforded under applicable state law and the legal, equitable, and contractual rights of such holder shall be left unaltered by the Plan.  The holder's vote in favor of the Plan or its failure to object to confirmation of the Plan shall be deemed to be such a consent.

### e.   *Executory Contracts/Unexpired Leases; Claims*

Allowed Claims arising out of executory contracts or unexpired leases that are being assumed or assumed and assigned under the Plan, as set forth on Exhibit B to the Plan, are not classified.  Rather, except as may otherwise be agreed to by the parties, within 60 days after the Effective Date, Reorganized Southern shall cure any and all undisputed defaults under the executory contracts and unexpired leases by paying the Cure amount as determined by the Bankruptcy Court or as agreed to by the parties. All disputed defaults that are required to be cured shall be cured either within 60 days of the entry of a Final Order determining the amount, if any, of the Estate's or Debtor's liability with respect thereto, or as may otherwise be agreed to by the parties.  The Trustee reserves the right, however, after the date of this Disclosure Statement but on or prior to the Confirmation Date, to amend the Plan to delete any executory contract or unexpired lease from Exhibit B of the Plan, or add any executory contract or unexpired lease to Exhibit B of the Plan, in which event such executory contract or unexpired lease shall be deemed to be, respectively, rejected or assumed.  Any Claims that may arise from the rejection of executory contracts or unexpired leases pursuant to the Plan will be treated as General Unsecured Claims or Convenience Claims, as applicable.  As such, **to preserve its voting rights in the event that an executory contract or unexpired lease is ultimately rejected, any party to an executory contract or unexpired lease that believes it may have a claim relating to such executory contract or unexpired lease if the contact or lease were to be rejected should submit a Ballot in accordance with the voting procedures set forth herein whether or not such contract or lease is currently on Exhibit B to the Plan.**  For avoidance of doubt, the Trustee will send a Ballot to all parties to executory contracts or unexpired leases, including those that are currently contemplated to be assumed or assumed and assigned as set forth on Exhibit B to the Plan.  The Ballot will only be counted as a vote on the Plan if it is submitted in accordance with the voting procedures and if the executory contract or unexpired lease is not on Exhibit B to the Plan as of the Confirmation Date and is therefore an executory contract or unexpired lease that will be deemed rejected as of the Effective Date.

In its objection to the Disclosure Statement, Fergus asserts that the Trustee could not assign its All Requirements Contract and objected to such assignment.  The Plan, however, does not assign the All Requirements Contracts, it assumes them.  The Trustee believes, therefore, that Fergus, as well as Mid-Yellowstone, Beartooth, and Tongue River, will object to the assumption

-16-

of their All Requirements Contracts under the Plan.  It may be that Fergus used the word "assignment" because, under controlling Ninth Circuit law, an executory contract or unexpired lease cannot be assumed if "applicable law" prevents an assignment.  The Trustee is aware of no federal or Montana law that would prevent assignment, and, hence assumption of the All Requirements Contracts.  In one case, *In re Cajun Electric Power Coop., Inc.*, 230 B.R. 693 (M.D. La. 1999), the court denied confirmation based on the treatment of all requirements contracts between a G & T cooperative and its members, and the Trustee expects that the Members will rely heavily on *Cajun Electric* in opposing assumption of their All Requirements Contracts and confirmation of the Plan.  The Trustee believes, however, that *Cajun Electric,* which was based on the "civil" laws of Louisiana, is distinquishable and has no application to this case.

Similarly, Mid-Yellowstone contends that the assumption of the All Requirements Contracts will require numerous impermissible modifications.  The Trustee does not believe that the Plan modifies the contracts.

**Claims arising out of the rejection of an executory contract or unexpired lease pursuant to the Plan must be filed with the Bankruptcy Court and served upon the Trustee and Reorganized Southern by the later of: (a) 30 days after notice of entry of the Confirmation Order;  or (b) 30 days after the entry of a Final Order by the Bankruptcy Court resolving any pending motion for the assumption or rejection of any executory contract or unexpired lease All  such Claims not filed within such time shall be forever barred from assertion against the Debtor, the Estate, or the Reorganized Southern and their property and shall be deemed disallowed in full, released and discharged.**

## III.     GENERAL INFORMATION

### A.     OVERVIEW OF CHAPTER 11

Under chapter 11 of the Bankruptcy Code, a trustee may propose to reorganize or liquidate a debtor's business and assets subject to the provisions of the Bankruptcy Code.

In general, a chapter 11 plan (i) divides claims and interests into separate classes; (ii) specifies the consideration that each class is to receive under the plan; and (iii) contains other provisions necessary to implement the plan.  Under the Bankruptcy Code, "claims" and "interests," rather than "creditors" and "shareholders," are classified because creditors and shareholders may hold claims and interests in more than one class.  Under section 1124 of the Bankruptcy Code, a class of claims is "impaired" under a plan unless the plan (a) leaves unaltered the legal, equitable, and contractual rights of each holder of a claim in that class; or (b) to the extent defaults exist, provides for the cure of existing defaults, reinstatement of the maturity of claims in that class, compensates each holder of a claim for any damages incurred as

a result of reasonable reliance upon the default, and does not otherwise alter the legal, equitable or contractual rights of each holder of a claim in that class.

The consummation of a plan is a principal objective of a chapter 11 case.  A chapter 11 plan sets forth the means for satisfying claims against and interests in a debtor and, if appropriate, the future conduct of the debtor's business, the sale of the debtor's assets, and/or the liquidation of the debtor's remaining assets.  Confirmation of a plan by the bankruptcy court binds the debtor, any person acquiring property under the plan, and any creditor or member interest holder of a debtor to the terms and provisions of the plan as of the effective date of the plan.

## B.   THE DEBTOR'S PREPETITION ORGANIZATION AND BUSINESS OPERATIONS

### 1.   The Debtor, Its Members, Governance, and Commencement

#### a.   *Rural Electric Cooperatives*

Rural electric cooperatives were formed in order to extend electric service to rural areas. The United States Congress enacted the Rural Electrification Act in 1936 for the purpose of providing electric power to rural communities of America.

Congress recognized that private companies operating electrical generation facilities had failed to extend electric service to rural areas.  As a result of the Rural Electrification Act, rural communities formed non-profit electric distribution cooperatives.  The distribution cooperatives later formed upper tier generation and transmission cooperatives (commonly referred to as "G & T" cooperatives) to supply electricity and transmission services to the distribution cooperatives. In turn, the distribution cooperatives sell power to the individual customer that is also a member of the distribution cooperative.

#### b.   *The Debtor's Organization and Business*

The Debtor is a not-for-profit, Section 501(c)(12) tax exempt G & T cooperative duly formed under the Montana Rural Electric and Telephone Cooperative Act on March 26, 2003. The Debtor provides wholesale electricity and related services to its members for retail supply to farmers, ranchers, businesses, industries, and other citizens of 21 counties in Montana, encompassing approximately one-fourth of the area of the state and a portion of Wyoming.  The Debtor, through its member systems, provides electric service to 11,364 members and 19,619 meters.

#### c.   *The Debtor's Members and the All Requirements Contracts*

-18-

The Debtor's originating members are five electric distribution cooperatives, formerly of the Central Montana Electric Power Cooperative Inc. ("**Central Montana Electric**"): YVEC, Tongue River, Fergus, Mid-Yellowstone, and Beartooth.  The City, a municipal electric utility, was not one of the original members, but the City's request for membership was approved by the Debtor's Board of Trustees on September 3, 2003.  As described below, YVEC and the City are no longer members of the Debtor.

Each member is a party to a wholesale power contract with the Debtor.  These are known as "all requirements contracts."  In general, the all requirements contracts provide that the Debtor will sell and deliver to its members, and members shall purchase and receive from the Debtor, all electric power and related services necessary to meet their electricity supply requirements.  The all requirements contracts also contemplate that the Debtor has a commensurate obligation to serve electric power supply and related services needs of the members and secure long-term sources of power and related services for them.  As an attribute of the members' obligation to purchase and the Debtor's obligation to serve, a predictable long-term revenue stream is established upon which the Debtor can and has relied to purchase power and pay for other financial obligations incurred by the Debtor on behalf of the Debtor's member systems.

The all requirements contract is the structural keystone by which electric cooperative G & T systems across the nation provide a stable, interdependent power supply network whereby the distribution cooperatives pool their resources and band together to obtain power at wholesale prices, build central electric generation facilities, obtain favorable loans, and attempt to provide reliable, affordable, and predictably priced electric service to the customers they serve.  The all requirements contract is a multi-party agreement creating an essential interlocking relationship among the Debtor and all of its member systems.  This contractually defined long-term relationship has been historically fundamental to the ability of G & T cooperatives to secure long-term financing, demonstrate creditworthiness, and foster stability in long-term power supply for the member systems and the customers they serve.  Under this system, lending institutions, creditors, and contractual power suppliers are able to look to the revenue stream predictably defined under the all requirements contracts as an assured source of repayment and security for loans and as an essential factor to the cohesiveness and financial strength of the G & T systems.  Effectually, then, the all requirements contracts place the financial strength of the distribution cooperatives behind G & T loans.

As the Debtor operates as a tax exempt Section 501(c)(12) not-for-profit corporation, the all requirement contracts between the Debtor and its members provide that the rates for electric power, energy, and transmission charged to the members may be revised as the Debtor's Board of Trustees deems necessary so that the revenues produced from the all requirements contracts and other sources will be sufficient, but only sufficient, to meet the costs of operating and maintaining the Debtor's system, and sufficient, but only sufficient, to make payments on all of the Debtor's indebtedness.

-19-

### d.    *Corporate Structure*

The Debtor operates pursuant to a set of Bylaws and Polices.  Since its creation and until recently, the Debtor's Board of Trustees was comprised of six trustees, one from each of the member cooperatives and the City.  Each of the member cooperatives of the Debtor are Class A members of the Debtor.  Each of the Class A members of the Debtor are entitled to elect one trustee to serve on the Debtor's Board of Trustees.

As of the Petition Date, the Debtor's General Manager and Chief Executive Officer was Tim Gregori; its President was William FitzGerald; and its secretary and treasurer was Joe Dirkson.  On or about November 9, 2011, Mr. Gregori was placed on administrative leave, and Alan See, the General Manager for Tongue River, became the Interim General Manager.  As his services were no longer needed, Mr. See's tenure as Interim General Manager ceased in April 2012.  Mr. FitzGerald was replaced by James DeCock as the representative of Mid-Yellowstone on the Debtor's Board of Trustees.  Mr. Dirkson was replaced by David Dover as the representative of Fergus on the Debtor's Board of Trustees.  Because the Trustee has assumed virtually all of the rights and powers of the Debtor's Board of Trustees, at the annual members' meeting in March 2012, the Debtors' Board of Trustees did not elect a slate of new officers.

### e.    *Commencement of Operations*

The Debtor commenced operations in June 2004 when Central Montana Electric assigned to the Debtor the five departing electric distribution cooperative members' share of their power purchase contracts with the Bonneville Power Administration Power Business Line ("**BPA**") and Western Area Power Administration ("**WAPA**"), and open access network transmission rights with NorthWestern Corporation d/b/a NorthWestern Energy ("**NWE**").

## 2.    <u>Highwood Generating Station and SME</u>

As a cooperative organization, the Debtor's mission is to provide cost-based, competitively-priced energy and related services to its members.  In furtherance of this mission, the Debtor determined that an important attribute of its ability to predictably meet the supply needs of the member systems it serves would be to construct what has become known as the Highwood Generating Station ("**HGS**").  HGS was initially planned to be a 250 MW coal-fired power plant.

In November 2007, YVEC advised the Debtor's Board of Trustees that it no longer desired to be a part of the HGS project and that it wished to terminate its membership in and all requirements contract with the Debtor.  The Debtor's Board passed two resolutions on April 17, 2008 in an attempt to honor YVEC's request that it be shielded from any further liability relating to continued development of HGS.  The first resolution fixed all of the Debtor's member's investment and liability in the development of HGS as of May 1, 2008.  The second resolution

recognized those members with a continued interest in the development of HGS and that a new independent entity would be created to carry out any further development. The entity, named SME Electric Generation and Transmission Cooperative, Inc. ("**SME**") and created subsequent to this April 2008 meeting, is comprised of Beartooth, Fergus, Mid-Yellowstone, and Tongue River. Neither YVEC nor the City are or have ever been members of SME.

In November 2008, SME broke ground and began construction of the 250 MW plant, laying concrete and other foundation material. SME was able to complete these activities with the assistance of local financial institutions that granted SME lines of credit guaranteed by SME's members.

In early 2009, construction activity for HGS ceased until SME could secure long term financing. In addition, a decision was made in early 2009 to curtail plans to construct the 250 MW plant primarily due to opposition by environmentalists and the federal government's lack of support for new coal-fired plants (and the uncertainty associated therewith). The members of SME worked to modify the plans for the construction of a 120 MW natural gas-fired, combined cycle combustion turbine electric generation facility.

The creation of SME did not prove to be a viable option for financing HGS. Lenders were not interested in loaning funds to SME because, other than its investment in HGS, it had no assets. Lenders wanted additional collateral, and the only other available collateral were the all requirements contracts between the Debtor and its members. Thus, incident to the financing of HGS in February 2010 (as described below), SME's assets were transferred to the Debtor in exchange for an assumption by the Debtor of SME's indebtedness. More specifically, during January 2010, SME sent out a notice of a proposed disposition of property by SME to the Debtor to all of the Debtor's members. At a special Debtor membership meeting on February 19, 2010, the Debtor's Board passed a resolution authorizing the acquisition of substantially all of SME's tangible and intangible personal property relating to the development of HGS for the approximate value of $14,385,000.

Once decisions were made to move forward with plans for a gas-fired facility and financing was obtained in February 2010, the Debtor began the process of procuring construction and equipment contracts for HGS. After some preliminary work at the site, construction recommenced in the fall of 2010.

HGS was intended to be placed in service in two phases to allow for production commensurate with construction milestones. The first phase would be the simple cycle portion of the HGS with a commercial operation date scheduled to be in January 2011. This goal was essentially completed by the Petition Date and resulted in the current natural-gas 46 MW combustion turbine electric generating facility becoming operational in February 2012. The second phase, which has yet to be completed, is the combined cycle portion of HGS with a commercial operation date that was scheduled to be in January 2012.

-21-

The cost of Phase I of HGS was estimated at $64,442,000; to date, construction costs for Phase I are approximately $68,531,000. The last estimate for construction and equipment costs for Phase II (provided by the Debtor's engineering consultants at a September 2011 board meeting) was $176,000,000. This estimate did not include any costs for financing, closing, legal, or interest during construction. The only costs accrued for Phase II have been those associated with preliminary engineering, which total $230,760.

HGS is located site east of Great Falls, Montana on about 197 acres, which is real property that the Debtor owns.

### 3.  Other Assets

In addition to HGS and real property related to it, as of the Petition Date and as disclosed in the Schedules, the Debtor owned, among other things: (i) real property related to a substation interconnecting to HGS; (ii) transmission line easements; (iii) gas line easements; (iv) cash; (v) security deposits; (vi) accounts receivable; (vii) claims against the City and YVEC; (viii) transmission rights; (ix) prepaid transmission costs; (x) vehicles; (xi) office equipment; (xii) telemetry equipment; (xiii) a tie line[5]; (xiv) prepaid dues, subscriptions, and regularity assessments; (xv) prepaid insurance premiums; (xvi) investments in associated organizations; and (xvii) patronage capital in Basin Electric. The Debtor also owns approximately a 19-mile gas pipeline connecting HGS to Great Falls. Under a Purchase Option Agreement dated September 29, 2011, Energy West Montana has an option to purchase the pipeline for the lesser of $4,905,867.46 or the average of three appraisals.

### 4.  Prepetition Indebtedness

#### a.  *The Primary Secured Debt - HGS*

To construct HGS and its related facilities, on or about February 26, 2010, the Debtor entered into that certain *Indenture of Mortgage, Security Agreement and Financing Statement* (the "**Indenture**"), among the Debtor as grantor, U.S. Bank National Association as trustee (the "**Indenture Trustee**"), Bank of New York Mellon Trust Company, N.A. as collateral agent, and the guarantors from time to time party thereto, pursuant to which the Debtor incurred indebtedness

---

[5]      Before the Debtor was formed, YVEC and Central Montana Electric agreed to construct the Huntley Tie Line, located within YVEC's service area, near the town of Huntley. This tie line provided interconnection with BPA and WAPA's power supply (each discussed herein). YVEC constructed the tie line and Central Montana Electric contributed in aid of construction. After some of the members split from Central Montana Electric, forming the Debtor, the original agreement between YVEC and Central Montana Electric was assigned to the Debtor.

to certain holders consisting of Prudential Insurance Company of America, Universal Prudential Arizona Reinsurance Company, Prudential Investment Management, Inc. as successor in interest to Forethought Life Insurance Company, and Modern Woodmen of America (the "**Noteholders**"; the Noteholders and the Indenture Trustee are, collectively, the "**Prepetition Secured Parties**") for (i) the Senior First Mortgage Notes, Series 2010A, due February 26, 2040 in the aggregate principal amount of $75,000,000 (the "**Series 2010A Notes**"); and (ii) the Senior First Mortgage Notes, Series 2010B, due February 26, 2026 in the aggregate principal amount of $10,000,000 (the "**Series 2010B Note**"; the Series 2010B Note and the Series 2010A Notes are, collectively, the "**Notes**").

In addition to the Indenture, on or about February 26, 2010, the Debtor entered into that certain *Collateral Agency Agreement*, dated as of February 26, 2010, among the Debtor, the guarantors from time to time party thereto, and the Indenture Trustee (the *Collateral Agency Agreement*, the Indenture, and any related documents are, collectively, the "**Prepetition Loan Documents**").

To secure the obligations under the Indenture,  the Debtor granted the Indenture Trustee, on behalf of the Noteholders, valid first priority liens (the "**Prepetition Liens**") upon and in substantially all of the Debtor's assets, and all proceeds and products of such assets (the "**Prepetition Collateral**") in accordance with the terms of the Prepetition Loan Documents.  The Prepetition Collateral includes, among other things, HGS and the all requirements contracts between the Debtor and its members, other than YVEC – which was excluded from the collateral pool.

The following table sets forth the all requirements contracts between the Debtor and its members that were, as noted in footnotes 2 and 3 below, either expressly included in or excluded from the Prepetition Collateral:[6]

| MEMBER | CONTRACT EXECUTION DATE | CONTRACT TERMINATION DATE |
|---|---|---|
| YVEC[7] | 5/28/2004 | 12/31/2030 |
| Tongue River | 4/19/2007 | 12/31/2048 |
| Fergus | 3/29/2007 | 12/31/2048 |

[6]    All of the Debtor's all requirements contracts, except the YVEC contract, are included in the Prepetition Collateral.  In 2008, Tongue River, Fergus, Mid-Yellowstone, and Beartooth executed amended and restated contracts and are arguably included in the Prepetition Collateral through after-acquired property provisions in the Prepetition Loan Documents.

[7]    YVEC's all requirements contract was expressly excluded from the Prepetition Collateral.

-23-

| Mid-Yellowstone | 3/27/2007 | 12/31/2048 |
| Beartooth | 4/13/2007 | 12/31/2048 |
| City of Great Falls | 10/2/2007 | 12/31/2048 |

As of the Petition Date, the Debtor was liable to the Prepetition Secured Parties in respect of obligations under the Indenture for (i) the aggregate principal amount of not less than $85 million on account of the Notes issued under the Indenture (plus accrued and unpaid interest thereon); and (ii) unpaid fees, expenses, disbursements, indemnifications, obligations, and charges or claims of whatever nature, whether or not contingent, whenever arising, due or owing under the Prepetition Loan Documents or applicable law (collectively, the "**Obligations**").

On July 13, 2012, the Indenture Trustee filed Proof of Claim No. 69 in the amount of $131,949,294.56. This amount appears to be based on the $75,000,000 Series 2010A Notes, $10,000,000 Series 2010B Note, and that certain Make-Whole Amount of approximately $46,000,000 provided for and calculated pursuant to Section 1.6 of the First Supplemental Indenture. Under the Trustee's proposed settlement with the Noteholders, the Noteholders are waiving any current entitlement to a Make-Whole Amount based on confirmation of the Plan and the treatment of their claims therein.

### b.    *PPL*

As discussed below, the Debtor and PPL were parties to an energy purchase contract. The Trustee rejected this contract, with PPL's consent. PPL filed Proof of Claim No. 50 in the amount of $374,863,708.19, of which about $2.5 million has been determined by the Bankruptcy Court to have priority pursuant to section 503(b)(9) of the Bankruptcy Code and $13 million allegedly arises on a postpetition basis. The balance purportedly arises out of the rejection of the contract. Also as discussed below, the section 503(b)(9) claim was allowed by order of the Bankruptcy Court but was settled at a 10% discount while on appeal. PPL's allowed section 503(b)(9) claim under the settlement in the amount of $2,243,170.80 has been paid in full and the appeal has been dismissed. As disclosed elsewhere herein, if PPL's unsecured claim is Allowed in the amount filed and approximately $2.1 million is available for distribution to Class 6 creditors, they stand to receive approximately $0.0054 for every $1.00 of Allowed Claim.

### c.    *NWE*

Pursuant to Proof of Claim No. 24, NWE asserts a $7,284,877 general unsecured claim against the Debtor for natural gas transmission.

### d.    *National Rural Utilities Cooperative Finance Cooperative*

-24-

On or about May 24, 2011, the Debtor and National Rural Utilities Cooperative Finance Cooperative ("**CFC**") entered into a $5 million revolving line of credit.  In conjunction with it, the Debtor provided CFC with a cash collateral deposit in the amount of $1,003,500.  CFC advanced the $5 million. CFC filed Proof of Claim No. 27 in the amount of $5,005,523.21, $1,003,500 of which is allegedly secured by the deposit and the balance is unsecured.

    **e.**  *First Interstate Bank*

First Interstate Bank filed Proof of Claim No. 11 in the amount of $1,862,139.71, $604,536.98 of which is allegedly secured and the balance is unsecured.  This claim arises out of two notes that the Debtor executed.  The first note is dated March 17, 2011 in the principal amount of $1,250,000; it is not secured by the Debtor's property, but is fully guaranteed by the Debtor's existing members.  The second note is dated August 30, 2011 in the principal amount of $600,000; it is allegedly secured by a September 9, 2011 mortgage recorded in Cascade County, Montana, as Document No. R0239406 MG.

    **f.**  *Construction Lien Claims*
.

Prior to the Petition Date, certain entities recorded alleged construction liens against the HGS facility and/or other real property of the Debtor, purportedly in accordance with Montana statutes and case law.  Such entities may claim valid, properly perfected, and enforceable construction liens under and in accordance with applicable Montana law.  The Trustee has not yet concluded his review and legal analysis of such potential Secured Claims or the priority of any such Claims even if Allowed in relation to other secured creditors against the HGS facility, including, without limitation, the Prepetition Secured Creditors.  To the extent that such Claims are valid, properly perfected, and enforceable Allowed Secured Claims, they shall be treated in accordance with Class 5 of the Plan.  In the event that such Claims are not valid, properly perfected, and enforceable Secured Claims, they shall, to the extent Allowed, be treated as Class 6 General Unsecured Claims.  Based upon the Debtor's Schedules and title work that the Trustee has reviewed, the potential Construction Lien Claims include, without limitation, the following entities asserted amounts:

| ENTITIES | AMOUNT |
|---|---|
| Graybar Electric | $167,000 |
| Yellowstone Electric Co. | $371,410.06 |
| Corval Constructors, Inc. f/n/a NewMech Companies, Inc. | $870,202.30 |
| Falls Construction | $271,740.22 |
| Grass Man Tractor Services | $20,387.97 |
| Thermal Mechanical Insulation | $58,551.70 |
| EPC Services Company | $1,858,773.31 |

-25-

| | |
|---|---|
| The Energy Corporation | $532,553.13 |
| Land Supply, Inc. | $180,351.50 |
| **TOTAL** | **$4,330,970.19** |

The Construction Lien Claims are the subject of an adversary proceeding as described below.  The Trustee's preliminary analysis has led him to conclude that certain of the foregoing claims are duplicates in that the same claims were filed  by both the subcontractor and general contractor.  The net amount of the claims appears to be on the order of $3.5 million.

The Committee of Unsecured Creditors in its objection to the Disclosure Statement contends that if the Construction Lien claimants prevail in the adversary proceeding, then under the Prompt Payment Act (M.C.A. §§ 28-2-2104 and 2105), they would be entitled to their attorneys' fees and interest at 18%, and that the Plan fails to account for these potential amounts. As discussed below, the Trustee believes that the Plan provides for appropriate treatment of any Allowed Claims of the Construction Lien Claims (including any fees or interest that such claimants may be entitled to receive should they have Allowed Claims) and, accordingly, the Trustee does not believe that the outcome of the litigation will detract from his ability to achieve confirmation of the Plan.

### g.  *The Members*

The Debtor's prior and current members have all filed proofs of claim, all of which other than YVEC filed multiple proofs of claim.  The following chart summarizes these Claims:

| CREDITOR | PROOF OF CLAIM NO. | AMOUNT | TYPE OF CLAIM | BASIS |
|---|---|---|---|---|
| **YVEC** | 66 | $1,302,471.72 | Class 6 | Reserve fund |
| **YVEC** | 66 | $5,973,998.33 | Class 8 | interest in HGS ($2,056,000); Debtor patronage ($3,713,120.69); Basin Electric patronage ($204,877.64); includes other unliquidated claims |
| **Tongue River** | 51 | $1,250,000 | Class 8 | Guarantee agreements related to First Interstate Bank |
| | 52 | Not stated | Class 8 | Contribution/indemnification |
| | 53 | $489,900.40 | Class 6 | Reserve fund |
| | 54 | $1,470,499.30 | Class 8 | Debtor patronage |

-26-

| CREDITOR | PROOF OF CLAIM NO. | AMOUNT | TYPE OF CLAIM | BASIS |
|---|---|---|---|---|
| | | | | ($1,364,016.94); Basin Electric patronage ($106,482.36) |
| | 55 | $1,878,116.68 | Class 8 | Interest in HGS |
| | 56 | $1,413,900 | Class 8 | Deposit related to CFC ($119,900); guaranty of Debtor's obligation to CFC ($1,294,000) |
| Fergus | 31 | $1,114,563.38 | Class 6 | Reserve fund |
| | 32 | $1,649,437.40 | Class 8 | Debtor patronage ($1,540,938.07); Basin Electric patronage ($108,499.33) |
| | 33 | $2,689,831.81 | Class 8 | Interest in HGS |
| | 34 | $2,516,681 | Class 8 | Deposit related to CFC ($213,700); guaranty of Debtor's obligation to CFC ($2,302,981) |
| | 37 | Not stated | Class 8 | Contribution/indemnification |
| | 40 | $1,250,000 | Class 8 | Guarantee agreements related to First Interstate Bank |
| Mid-Yellowstone | 57 | $150,770.22 | Class 6 | Reserve fund |
| | 58 | Not stated | Class 8 | Contribution/indemnification |
| | 59 | $532,700 | Class 8 | Deposit related to CFC ($36,700); guaranty of Debtor's obligation to CFC ($496,000) |
| | 60 | $1,250,000 | Class 8 | Guarantee agreements related to First Interstate Bank |
| | 61 | $460,520.49 | Class 8 | Debtor patronage ($428,664.26); Basin Electric patronage ($31,770) |
| | 62 | $1,147,437.70 | Class 8 | Interest in HGS |

-27-

| CREDITOR | PROOF OF CLAIM NO. | AMOUNT | TYPE OF CLAIM | BASIS |
|---|---|---|---|---|
| **Beartooth** | 35 | $372,081.40 | Class 6 | Reserve fund |
|  | 36 | $1,067,614.13 | Class 8 | Debtor patronage |
|  | 38 | $1,361,151.83 | Class 8 | Interest in HGS |
|  | 39 | $93,000 | Class 8 | Deposit related to CFC |
|  | 41 | $80,566.32 | Class 8 | Basic Electric patronage |
|  | 42 | Not stated | Class 8 | Contribution/indemnification |
|  | 43 | $1,250,000 | Class 8 | Guarantee agreements related to First Interstate Bank |
| **Great Falls** (unless otherwise stated) | 20 | $1,400,560 | Class 8 | Liquidation of certificates of deposit related to First Interstate Bank |
|  | 44 | 866,520.59 | Class 6 | Reserve fund |
|  | 45 | Not stated | Class 8 | Contribution/indemnification |
|  | 46 | Not stated | Class 8 | Water agreements |
|  | 47 | $42,226.96 | Class 8 | Debtor patronage |
|  | 48 | $1,144,390.31 | Class 8 | Interest in HGS |
|  | 63 | Not stated | Class 8 | Claims related to all requirements contract (Great Falls) |
|  | 64 | $107,750 | Class 8 | Deposit related to CFC |
|  | 65 | Not stated | Class 8 | Claims related to all requirements contract (ECP) |
|  | 67 | $10,000,000 | Class 6 | Breach of contract, breach of implied covenant of good faith and fair dealing, tortious interference, and breach of fiduciary duty (Great Falls and ECP) |

Pursuant to the settlement agreements discussed below, all the claims filed by YVEC and the City have been withdrawn (Dkt. Nos. 950 (YVEC) and 888 (City)).

### 5.    Power Purchase/Electricity Transmission/Gas Transmission Agreements

-28-

To supply the Debtor's members with their energy needs, the Debtor entered into power purchase agreements with BPA, WAPA and PPL. BPA's contract terminated on September 30, 2011. WAPA's contract continues through 2020. The PPL contract was set to continue through 2019, but, as explained below, the Trustee rejected the contract, effective March 27, 2012.

In addition, as of the Petition Date, the Debtor was under long-term contracts for transmission of electricity to its member systems and customers with NWE and WAPA.

Also, as of the Petition Date, the Debtor contracted with various parties for gas supply and gas transmission services, all being essential to operate HGS. Co-parties include (i) EnergyWest Resources, LLC ("**EWR**") to schedule and purchase gas the Debtor would need for operation of HGS, and to manage and operate the Debtor's approximately 19 miles of natural gas pipeline to HGS; and (ii) NOVA Gas Transmission, LTD ("**NOVA**") and Energy West Montana ("**EWM**"), an affiliate of EWR, with respect to various segments of the gas transmission facilities to EWM's facilities near Great Falls (including the 19 miles of pipeline). The NOVA agreement has been rejected by the Trustee with the Bankruptcy Court's approval pursuant to 11 U.S.C. § 365, and NOVA subsequently filed a rejection damages claim in the amount of $2,616,600.

### 6. Regulatory Oversight of the Debtor

The Energy Policy Act of 2005 requires that the Federal Energy Regulatory Commission ("**FERC**") approve and enforce standards to protect and improve the reliability of the United States's Bulk Power System. Under this statutory framework, standards are proposed by an Electric Reliability Organization, a function currently held by the North American Electric Reliability Corporation ("**NERC**"). NERC can further delegate compliance monitoring and enforcement authority to various Regional Entities. Mandatory compliance with the first set of NERC Reliability Standards approved by FERC came into effect on June 18, 2007. The Debtor's assets located in the United States must comply with all requirements of the FERC-approved reliability standards applicable to its current NERC Compliance Registry NCR05399 registered function(s).

In addition, the Montana and Federal Clean Air Acts require that stationary sources of air pollution receive and comply with air quality permits to protect human health and the environment. Under the authority of these statutes, the Montana Department of Environmental Quality has issued both a pre-construction (AQP#4429-01) and an operating permit (#OP4429-00) for HGS, which establish emissions limits and requirements, and require regular monitoring and reporting. Although HGS has only operated for very limited time periods, it is subject to air quality permit requirements and has ongoing semiannual reporting and compliance certification requirements to which it is complying. HGS is also subject to the Federal and State Clean Water Acts, and has been issued a General Storm Water Construction Permit (#MTR100000), which

currently requires ongoing inspections and monitoring of the facility. A number of other local and state environmental requirements are applicable and have been addressed/or will be triggered by further operation of HGS.

### 7.    Prepetition Business Operations

After commencing business operations in 2004, the Debtor operated as a "paper G & T" in that it did not own any generation or transmission facilities. Rather, the Debtor provided electric power and energy to its members through the power purchase agreements with BPA, WAPA, and PPL, as described above, and provided transmission services through an agreement with NWE. As also described above, shortly after it commenced business operations, the Debtor began to build a generation facility of its own in the form of HGS. Although Phase I of HGS was substantially completed before the Petition Date, it was never used to supply the members with their power and energy needs.

Since the Petition Date, HGS was certificated for compliance with environmental laws and regulations through testing performed on February 6-8, 2012, and was recertified through testing on June 17 and 18, 2013. In the summer of 2013, HGS was operated from time to time to troubleshoot the plant and to prove out its operability. Although problems were encountered with certain controls, pumps, and the like, those issue have been resolved or are in the process of being resolved. The cost of resolving these issues has been fairly modest (approximately $75,000). During the summer of 2013, HGS generated 1,800,700 kWh of power which was sold on the imbalance market or to MSCGI. In addition to the proceeds from these sales, the Debtor received a credit from NWE for every MWh of power that was transmitted from HGS.

The Trustee is not aware of any major expenditures that will be required to keep HGS operational and capable of generating power. If Reorganized Southern were to find it desireable for HGS to acquire a rapid start capability (10 minutes or less) certain modifications would be required and those modifications may cost several million dollars. The Trustee does not believe that a rapid start capability is necessary, and MSCGI, which will dispatch HGS post-confirmation, has not requested that any such modifications be made.

With respect to property taxes, for the year 2013, the Montana Department of Revenue has appraised HGS for property tax purposes, as having a value of $23,189,000. The Trustee's appraiser, MR Valuation Consultants, LLC ("**MRV**"), has calculated that the property tax for 2013 based on that value should be approximately $340,000. The other costs of retaining HGS are set forth in the pro forma financial projections attached to the Disclosure Statement.

### 8.    The Debtor's Prepetition Rates to Its Members

Although the Debtor executed confirmations with PPL in June 2009, it was not scheduled to receive any significant quantities of power from PPL until after the BPA contract expired in

September 2011.  Also, although the financing with the Noteholders closed in February 2010, payments of principal were not due to be paid until after the Petition Date and interest payments through the Petition Date were funded from an interest reserve that had been established at the closing.  Despite not having to make any significant payments to PPL or any principal or interest payments to the Noteholders, between January 1, 2009 and June 2011, the Debtor's rates to its members increased significantly, a total of 53.1% in just two years and four months (in contrast, under the Plan, assuming a January 1, 2014, effective date, the Debtor's rates to its members have and will remain frozen for three years and six months).  The effective dates and amounts of those rate increases were as follows:

| DATE | RATE INCREASE (%) |
|------|-------------------|
| February 18, 2009 | 8 |
| June 16, 2009 | 4 |
| September 16, 2009 | 5 |
| October 16, 2009 | 7.5 |
| January 15, 2010 | 3 |
| June 15, 2010 | 3 |
| January 17, 2011 | 4.5 |
| May 17, 2011 | 4.5 |
| June 17, 2011 | 4.2 |

From June 2011 through and including the present, the Debtor's rates to its members have remained the same, meaning that the members have not had a rate increase in over two years.  If the Trustee's Plan is confirmed, the Debtor's rates to its members for at least the first year after the Effective Date will remain the same as they were in June 2011.  Thus, if the Effective Date were to be in December 2013, the Debtor and its members will enjoy the benefits of a 3½ year rate freeze, a dramatic shift from the total of 53.1% rate increases from January 2009 through June 2011.

### 9.   The Debtor's Prepetition Projections of Rates through 2021 as Compared to the Debtor's Projected Rates under the Trustee's Plan

In December 2009, two months before the closing on the financing for the construction of HGS, the Debtor's accountants, Douglas Wilson & Co. P.C., prepared a Financial Forecast for the period from December 31, 2009 through December 31, 2021.  Copies of the Financial Forecast are available from the Trustee's counsel, John Cardinal Parks at jparks@hblegal.net or (303) 996-8609 on request.  Set forth below is a comparison of the Debtor's projected rates in that forecast as compared with the projected rates under the Trustee's Plan.

| YEAR | PROJECTED RATES UNDER 2009 FORECAST (PER MWH) | PROJECTED RATES UNDER PLAN (PER MWH) |
|------|-----------------------------------------------|--------------------------------------|

| | | |
|---|---|---|
| 2014 | $79.97 | $70.43 |
| 2015 | $79.88 | $75.42 |
| 2016 | $87.22 | $79.60 |
| 2017 | $94.57 | $80.94 |
| 2018 | $94.55 | $82.12 |
| 2019 | $94.55 | $86.90 |
| 2020 | $94.55 | $87.10 |
| 2021 | $94.56 | $87.28 |
| 2022 | N/A | $88.47 |
| 2023 | N/A | $89.66 |
| 2024 | N/A | $91.78 |
| 2025 | N/A | $93.65 |

As is readily apparent, the rates under the Debtor's December 2009 forecast are much higher than the projected rates under the Trustee's Plan. Thus, the Debtor's members and, hence, their members as the ultimate rate payers, are significantly benefitted by the Trustee's Plan.

When customers, such as the Members, have signed all requirements contracts that bind them to purchase all of their power from a single seller, the Trustee contends that it makes little sense to compare the rates that they pay the seller with "market" rates since buying power on the market would be a breach of their all requirements contracts. Nonetheless, to assure the Plan and the rates thereunder are reasonable and  fair to the Members, the Trustee compares the rates under the Plan with the wholesale rates for power and energy of other electric cooperative and electric utilities in the same geographic area served by the Debtor.

First, the transmission component of the Debtor's "all-in" rate to its Members is simply a pass through of what NWE charges the Debtor to transmit power to the Members' systems. Currently approximately $9.00 of the current "blended rate" in the amount of approximately $70.00/MWh is attributed to transmission. The remaining $61.00 is for demand (MW) and energy (MWh). Comparing that $61.00/MWh for power with other sellers of wholesale power in the area reveals that it is at the "market" rate for wholesale power. For example, in 2012, NWE's wholesale rate for power was $65.00/MWh. Tri-State Generation and Transmission Association, Inc, a "G & T" electric cooperative with members in Wyoming, Colorado, Nebraska, and New Mexico, sells power to its members for $62.00/MWh. Basin Electric, based in Bismark, North Dakota, is a "super G & T" and sells power to other G & T's, including Tri-State, Central Montana Electric, and Upper Missouri G & T Electric Cooperative, Inc. In 2013, Basin's "Class A" rate, that is, the rate at which it sells power to its Class A members such as

-32-

Tri-State, Central Montana Electric, and Upper Missouri, was $54.00/MWh.  In responding to the Trustee's RFP, Basin advised the Trustee that it was willing to sell power to the Debtor's Members (provided they were released from their All Requirements Contracts) through one of its Montana Class A members (that is, Central Montana Electric or Upper Missouri) at a premium of $6.00/MWh above its Class A rate.  Although that would appear to result in a rate of $60.00 MWh, Basin's Class A rate is based on an assumed "load factor" of 70%.  The Debtor's Members have load factors on the order of 50%.  Taking into account the Members' load factors, ACES estimated that Basin's rate for power to the Debtor's Members would average approximately $68.00/MWh.

Reorganized Southern's rate for power to its Members will start at the current rate of $61.00/MWh, will continue at that rate for one year following confirmation of the Plan, and will then increase over the next 11 years at the rate of inflation.  Comparing those rates not only with the 2009 Forecast as well as the wholesale rates for power charged by NWE, Tri-State, and Basin, leads the Trustee to conclude that the rates under the Plan are fair and reasonable.

In its objection to this Disclosure Statement, Fergus repeatedly expressed the view that the projected rates under the Plan are "above-market."  Although the other three Members did not expressly state that in their objections to the Disclosure Statement, Beartooth has openly complaining that the rates under the plan are not "affordable, and the Trustee assumes that Mid-Yellowstone and Tongue River also believe that the rates under the Plan are too high.

### 10.   **Prepetition Employee Matters**

#### a.   *Description of Workforce*

Prior to the Petition Date, the Debtor employed 11 employees: three at the Debtor's operations office in Billings and eight at HGS near Great Falls.  For the Debtor's operations, it employed a general manager, a power scheduler/engineer, and an accountant.  At HGS, it employed a plant superintendent, three operators, one electronic, instrumentation and controls technician, an administrative assistant, and two night watchmen.

#### b.   *Employee Benefits and Benefit Plans*

The Debtor's benefit package includes employer-paid health insurance premiums (including a prescription plan), basic group term life insurance (with a benefit level of two times employee's base annual earnings), business travel accident insurance, short-term disability insurance, and one half of the premiums of long-term disability insurance.  Employees were responsible for the remaining one half of the long-term disability insurance premiums, as well as vision, dental, and any other supplemental insurance policies that are offered.  Additionally, the Debtor established a 401(k) plan, administered by National Rural Electric Cooperative Association ("**NRECA**").  Employees were required to contribute 2% of their compensation to

-33-

receive the employer's base contribution of 4%. The Debtor had also adopted a Retirement Security Plan, also administered by NRECA, where the Debtor made contributions to the plan without any requirement of employee contributions. There is a one-year waiting period of eligibility for both the 401(k) and Retirement Security Plans.

The Debtor allowed full-time regular employees to begin earning vacation from the date of hire at the accrual rate as set forth in the policy manual. There was a six-month probationary period from the date of hire before the employee was eligible to use vacation time. Any unused vacation time would be paid out if an employee was laid off or resigned. The employees also accrued one day of sick leave per month and regular pay for each hour or workday of sick leave. Any unused sick leave would not be paid out in the event of layoff, resignation, or discharge.

The Debtor also maintained a Workers' Compensation and Employers' Liability Policy.

C.   SIGNIFICANT ADDITIONAL EVENTS LEADING TO THE CHAPTER 11 CASE

The financing and construction of HGS did not lead to the filing of the Chapter 11 Case. As noted earlier, all of the prepetition interest payments were paid from an interest reserve that had been established at the closing and no principal payment were yet due when the Debtor filed its petition. Thus, HGS did not force the bankruptcy filing.

Mid-Yellowstone contends that the events that led to the Debtor's formation in 2003 and bankruptcy in 2011 took place in 1997, when the electric utility industry in Montana was deregulated. Much has been written in the popular press and discussed in other media about that the deregulation and how it affected the former Montana Power Company and Montanans generally. There is simply not enough space in the Disclosure Statement to cover this subject, but parties in interest are invited to conduct their own internet research should they choose to do so. See, for example, the article appearing at http://www.cbsnews.com/8301-18560_162-539719.html.

The Trustee believes that the events that led up to the filing of the Chapter 11 Case began in 2007 when the Debtors members prepared what turned out to be overly optimistic forecasts of their future load growth. When the Debtor elected to go forward with HGS as a gas-fired generation facility and to execute confirmations under the PPL contract in June 2009, it does not appear that the 2007 load growth forecast was ever adjusted to take into account the worst global economic downturn since the Great Depression: the Great Recession, the effects of which are still being felt to this day. As a result, the blocks of power (185 MW during heavy load hours and 125MW during light load hours) that the Debtor had contractually obligated itself to purchase from PPL greatly exceeded the amount of power that it needed to serve its members. The additional capacity provided by HGS when construction was completed in September 2011 only compounded the situation. The Debtor was long on power and HGS only made it longer.

-34-

None of this likely would have been a problem had the Debtor's prediction that power prices would increase after 2009 and continue to increase. Under the initial confirmation with PPL, the Debtor was purchasing power at $50.70/MWh. If the market price for power had increased from 2009 to 2011 to, say, $60/MWh, the PPL contract would have been "in the money" and the Debtor could have made a margin by selling to the power market any power that it did not need under the PPL contract. Prices for power, however, declined, and the Debtor was caught in the bind of having too much power at over-market prices. The Debtor did what it could to mitigate its losses, for example, by selling excess PPL power into the "imbalance market" at a loss, but nothing, short of a dramatic increase in market prices (which has not yet occurred), could change the fact that the Debtor was going to have to pay as much as $1 million per month to PPL for power that it did not need.

To add insult to injury, in July 2011, a pilot program under which residents of the City were given the option to purchase power from the City rather than another power supplier (such as PPL or NWE) expired. Many of its customers elected not to continue to participate in the program and stopped buying power from the City. In addition, whether rightly or wrongly, the City began losing customers in the summer and fall of 2011 and, in due course, its load was reduced from approximately 20 MW to approximately 5 MW. This only served to exacerbate the Debtor's problem of having too much power at above-market prices.

The decision to file a petition for reorganization was made at a meeting of the Debtor's Board of Trustees on October 21, 2011. There are no minutes, approved or otherwise, for that board meeting, so exactly what happened may depend on who one asks. In the first section 341 Meeting of Creditors in this Case, Tim Gregori, the Debtor's General Manager at the time, gave some testimony about the meeting. Mr. Gregori testified that a dispute arose over whether to seat the new Board member from Beartooth. This dispute and perhaps others caused three of the Trustees, those from Beartooth, YVEC, and the City, to walk out of the meeting. The remaining members apparently believed that because there was a quorum when the meeting started, they could proceed and eventually voted in favor of filing a petition for reorganization that very day. In his testimony, Mr. Gregori said nothing about the debt to the Noteholders as being one of the precipitating causes of the Chapter 11 filing. In fact, Mr. Gregori gave the following testimony: "[T]he best course of action of Southern Montana was to restructure its contract with PPL. And in the wake of a restructured contract with PPL, filing Chapter 11 would have been necessary." Page 41, lines 11-15.

One of the first things that the Trustee did after being appointed was to attempt to renegotiate the PPL contract. When that failed, the Trustee then started purchasing power for the Debtor at market prices and eventually rejected the PPL contract under section 365 of the Bankruptcy Code.

Nonetheless, certain of the Members, if not all of them, contend that HGS and its financing were among the reasons why the Debtor filed for relief under Chapter 11.

-35-

The dissention and disagreement among the Members was not limited to the October 21, 2011 Board meeting. As noted below, YVEC had been trying to exit the Debtor since November 2007 and had even filed suit in an attempt to get out of its All Requirements Contract. After it began losing money by selling electricity, the City asked to be let go in March 2011. When the Debtor refused, as discussed below, the City sued the Debtor to attempt to get out of its contract and terminate its membership in the Debtor. After the filing of this Case, Beartooth advised, in clear and uncertain terms, that it no longer wished to be a member of the Debtor and wanted out of its contract. As a result, Beartooth has been one of the most vocal advocates against the Trustee's reorganization efforts. While the other three remaining members had been cooperating with the Trustee in his efforts to reorganize, after the Trustee announced that he had reached a settlement with the Noteholders in late June 2013, Fergus and Mid-Yellowstone began opposing the reorganization of the Debtor and joined in a motion to convert the case to Chapter 7. From the tenor and tone of Tongue River's objection to the Disclosure Statement, it appears that it too may no longer favor reorganization.

In addition to the foregoing business circumstances, the Debtor was a party to several court cases as described below.

### 1.    The YVEC Litigation

On December 12, 2008, YVEC filed a complaint in District Court in Billings, Montana, Cause No. DV 08-1797, against the Debtor, SME, and other members of the Debtor and SME (the "**YVEC State Court Litigation**"). YVEC amended the complaint in July 2010, and asserted various claims, including oppression, breach of contract, and breach of the implied covenant of good faith and fair dealing. YVEC requested that its membership be terminated along with its all requirements contract with the Debtor and that the Debtor refund the amounts YVEC paid to develop HGS, and all deposits and equity contributions made by YVEC and assign to YVEC portions of certain power supply contracts that the Debtor holds with third parties. The Debtor filed a counterclaim on January 13, 2009 alleging that YVEC had not posted its required reserve amount with the Debtor, and that YVEC had not paid its contractual liability associated with the development of HGS and was not paying its power bills to the Debtor in a timely manner. The Debtor requested relief that the all requirements contract is valid and binding. This action was set for a jury trial on November 9, 2011, but the Debtor's bankruptcy filing stayed the case.

### 2.    The Great Falls/ECP Litigation

In March 2011, Great Falls requested by letter that it be relieved of its obligations to the Debtor under its all requirements contract, threatening to withdraw from the Debtor's membership by March 18, 2011. Following at least two communications from the Debtor in response, on March 15, 2011, the City filed a complaint in District Court in Great Falls,

Montana, Cause No. CDV 11-0256, against the Debtor and SME.  The City sought numerous declarations such as the City's contracts and other obligations to the Debtor are void or voidable, including the all requirements contract between the Debtor and Great Falls dated October 2, 2007, with a term through 2048.

On April 29, 2011, the Debtor counterclaimed for (i) declaratory judgment (requesting declarations that the City must purchase and receive from the Debtor all electric energy required by the City customers through 2048, and that the City violated and/or repudiated the all requirements contract, thus entitling the Debtor to specific performance and damages); (ii) injunctive relief (requiring the City to honor its obligations under the all requirements contract); (iii) specific performance; (iv) breach of contract; and (v) bad faith breach of contract.

The Debtor's bankruptcy petition stayed this action.

### 3.     The Billings Gazette Litigation

On June 21, 2010, the Billings Gazette (the "**Gazette**") filed a complaint in District Court in Billings, Montana, Cause No. DV 10-1095, against the Debtor seeking a declaration that the Debtor's board meetings are subject to Montana's Open Meeting Law.  In addition, it sought to void all action taken at a meeting held on June 18, 2010 and also sought a preliminary injunction precluding the Debtor from closing its meetings while this issue is being litigated.  The Debtor's Board of Trustees adopted a resolution at its meeting on July 23, 2010 that authorized the Debtor's counsel to execute a stipulation regarding the Gazette's attendance at the monthly board meetings while the issue is in litigation.  Additionally, the resolution authorized a representative from the Gazette be permitted to attend the monthly board meetings.

This matter was also pending when the Debtor filed its bankruptcy petition.

The Trustee does not believe that the Debtor's bankruptcy filing was caused, or motivated, by any of the foregoing litigation.

## IV.     THE CHAPTER 11 CASE

The following is a brief description of some of the significant events that have occurred during the Debtor's Chapter 11 Case.  This review is not exhaustive; the Trustee refers interested parties to the Debtor's docket with the Bankruptcy Court and the filings set forth therein for each filing in the Chapter 11 Case.

### A.     PETITION DATE

On October 21, 2011, the Debtor filed its chapter 11 voluntary petition for relief in the Bankruptcy Court.

### B.   THE DEBTOR'S APPLICATIONS TO EMPLOY PROFESSIONALS; COMPENSATION

At the outset of the Chapter 11 Case, the Debtor filed applications to employ three professionals.  First, on October 26, 2011, the Debtor applied to retain Jon E. Doak and the law firm Doak & Associates, P.C. as its lead bankruptcy counsel (Dkt. No. 12).  On November 8, 2011, YVEC objected to this application (Dkt. No. 39), andBeartooth joined the objection on January 6, 2012 (Dkt. No. 191).  On January 11, 2012, the Trustee and Mr. Doak and his firm stipulated to the withdrawal of the retention application and waiver of any postpetition compensation (Dkt. No. 198), which stipulation the Bankruptcy Court approved on January 12, 2012 (Dkt. No. 200).

Second, on October 31, 2011, the Debtor sought to retain Malcolm H. Goodrich and the law firm Goodrich Law Firm, P.C. to serve as co-counsel with Mr. Doak's firm (Dkt. No. 16); on November 14, 2011, the Bankruptcy Court approved this application (Dkt. No. 50).  On December 1, 2011, the Debtor's co-counsel filed its final fee application (Dkt. No. 118), seeking fees in the amount of $25,841 for services rendered from November 1, 2011 to November 29, 2011; the Bankruptcy Court granted this fee application by order dated December 21, 2011 (Dkt. No. 163).

Third, on November 4, 2011, the Debtor applied to retain Randal J. Boysun, C.P.A. and Michelle M. Klundt, C.P.A. and the accounting firm Douglas Wilson and Company, PC (Dkt. No. 26); the Bankruptcy Court denied this application by order dated December 23, 2011 (Dkt. No. 171).

### C.   THE SCHEDULES AND STATEMENT OF FINANCIAL AFFAIRS

On November 4, 2011, the Debtor filed its initial Schedules (as amended for time to time, the "**Schedules**") and Statement of Financial Affairs (the "**SOFA**") (Dkt. No. 29).  On April 27, 2012, the Trustee filed amendments to the Schedules (Dkt. No. 410).

### D.   THE § 341 MEETING OF CREDITORS

The initial meeting of creditors pursuant to section 341 of the Bankruptcy Code was scheduled to be on November 17, 2011 (Dkt. No. 10).  On November 10, 2011, the United States Trustee continued the meeting to December 2, 2011 (Dkt. No. 46), on which date the meeting concluded.

### E.   STIPULATION FOR APPOINTMENT OF TRUSTEE; APPOINTMENT OF TRUSTEE

On November 14, 2011, the United States Trustee and the Debtor stipulated to the appointment of a chapter 11 trustee (Dkt. Nos. 55 and 56), which the Bankruptcy Court approved by order dated November 22, 2011 (Dkt. No. 96).

On November 28, 2011, the United States Trustee moved to appoint the Trustee (Dkt. No. 112), which the Bankruptcy Court granted by order dated November 29, 2011 (Dkt. No. 113).

**F.    THE TRUSTEE'S APPLICATIONS TO EMPLOY PROFESSIONALS**

Since the Trustee's appointment, he has employed several Estate professionals pursuant to section 327 of the Bankruptcy Code as set forth in the following table:

| PROFESSIONAL | TYPE | APPLICATION DATE AND DOCKET NUMBER | ORDER DATE AND DOCKET NUMBER |
|---|---|---|---|
| Waller & Womack, P.C. | Local bankruptcy counsel | 12/12/11; Dkt. No. 129 (supplemented 9/13/12; Dkt. No. 528) | 12/13/11; Dkt. No. 131 (supplement approved 9/13/12; Dkt. No. 529) |
| Horowitz & Burnett, P.C. | Lead bankruptcy counsel | 12/12/11; Dkt. No. 130 (supplemented 1/29/13; Dkt. No. 664) | 12/13/11; Dkt. No. 132 (supplement approved 2/19/13; Dkt. No. 691) |
| Katten & Temple, LLP | Investigation counsel | 1/3/12; Dkt. No. 184 | 1/4/12; Dkt. No. 185 |
| Eide Bailly LLP | Audit and tax accountants; ESI preservation; forensic accounting | 3/6/12; Dkt. No. 296 (first supplement 9/7/12; Dkt. No. 522); (second supplement 3/22/13; Dkt. No. 751); (third supplement 5/7/13; Dkt. No. 841); (fourth supplement 6/25/13; Dkt. No. 910) | 3/7/12; Dkt. No. 297 (first supplement approved 9/10/12; Dkt. No. 526); (second supplement approved 3/22/13; Dkt. No. 752); (third supplement approved 5/8/13; Dkt. No. 842); (fourth supplement approved 6/25/13; Dkt. No. 912) |
| Hein & Associates LLP | Financial accountants | 3/29/12; Dkt. No. 351 | 3/30/12; Dkt. No. 352 |
| Harper Lutz Zuber Hofer and Associates, LLC | Valuation Consultant | 5/3/12; Dkt. No. 414 (supplemented 11/14/12; Dkt. No. | 5/3/12; Dkt. No. 415 (supplement approved 11/14/12; Dkt. No. |

| PROFESSIONAL | TYPE | APPLICATION DATE AND DOCKET NUMBER | ORDER DATE AND DOCKET NUMBER |
|---|---|---|---|
| (named changed to Harper Hofer and Associates, LLC (Dkt. No. 448)) | | 587) | 588) |
| Kroll Ontrack Inc. | Electronic discovery vendor | 1/4/13; Dkt. No. 631 | 1/7/13; Dkt. No. 634 |
| MR Valuation Consulting LLC | Power plant appraiser | 1/8/13; Dkt. No. 638 (first supplement 5/20/13; Dkt. No. 850); (second supplement 8/9/13; Dkt. No. 980) | 5/21/13; Dkt. No. 851 (first supplement approved 5/21/13; Dkt. No. 851); (second supplement approved 8/9/13; Dkt.No. 981) |

### G.   THE APPOINTMENT OF OFFICIAL COMMITTEE OF UNSECURED CREDITORS; APPLICATION TO EMPLOY PROFESSIONAL

On November 29, 2011, the United States Trustee appointed a Committee of Unsecured Creditors (the "**Committee**") (Dkt. Nos. 109 and 111), consisting of PPL, NWE, LS Jensen Construction, Stanley Consultants, and Electrical Consultants, Inc.

On January 6, 2012, the Committee applied to retain Harold Dye and Dye & Moe, PLLP as its counsel (Dkt. No. 192), which the Bankruptcy Court approved by order dated January 9, 2012 (Dkt. No. 194).

### H.   THE MONTHLY COMPENSATION PROCEDURES

On January 19, 2012, the Bankruptcy Court entered an order (Dkt. No. 210) granting the January 4, 2012 *Motion to Establish Interim Compensation Procedure for Professionals Retained Pursuant to 11 U.S.C. § 327* (Dkt. No. 186). Generally, that order permits, in relation to professionals employed pursuant to section 327 of the Bankruptcy Code, monthly compensation of 85% of fees and reimbursement of 100% of expenses, subject to certain notice and objection procedures, and fee applications and the Bankruptcy Court's orders related to same. The Trustee has been authorized to utilize the foregoing procedures as well pursuant to a May 15, 2012 motion (Dkt. No. 424) granted by order dated June 4, 2012 (Dkt. No. 446).

### I.   PAYMENTS TO PROFESSIONALS EMPLOYED PURSUANT TO SECTION 327; PAYMENTS TO THE PREPETITION SECURED PARTIES' PROFESSIONALS

-40-

With regard to the professionals employed by the Trustee and the Committee pursuant to section 327 of the Bankruptcy Code, the Trustee has paid and reimbursed the following fees and costs through September 17, 2013 pursuant to the monthly compensation procedures and fee applications and their related orders:

| PROFESSIONAL/TRUSTEE | AGGREGATE AMOUNT PAID |
|---|---|
| Waller & Womack, P.C. | $9,768.17 |
| Horowitz & Burnett, P.C. | $1,963,801.70 |
| Katten & Temple, LLP | $0.00 |
| Eide Bailly LLP | $87,464.93 |
| Hein & Associates LLP | $0.00 |
| Harper Hofer and Associates, LLC | $184,845.87 |
| Kroll Ontrack Inc. | $14,428.61 |
| MR Valuation Consulting LLC | $183,925.38 |
| Dye & Moe, PLLP | $44,495.88 |
| Lee A. Freeman, Trustee | $579,775.45 |

The Prepetition Secured Parties' professionals have also been subject to filing fee applications in the Chapter 11 Case. Through September 17, 2013, the Trustee has paid and reimbursed these professionals $2,661,258.80.

**J.     ADEQUATE ASSURANCE TO UTILITIES**

On November 10, 2011, the Debtor filed a motion prohibiting utilities from altering, refusing or discontinuing service, approving the Debtor's proposed adequate assurance of payment for future utility services, and approving procedures for resolving requests for additional adequate assurance (Dkt. No. 47). On November 14, 2011, the Bankruptcy Court granted this motion on an interim basis (Dkt. No. 52).

Soon thereafter, PPL, NWE, and WAPA entered into stipulations with the Debtor (Dkt. Nos. 87, 89, and 97, respectively) to address specific concerns they each had under the utility motion and interim order granting same. The Bankruptcy Court approved each of these stipulations by orders dated November 21, 2011 (Dkt. Nos. 90 (PPL) and 91 (NWE)) and November 22, 2011 (Dkt. No. 98 (WAPA)).

Following the Trustee's appointment, he entered into several related stipulations, which were all approved by the Bankruptcy Court, as follows:

| CREDITOR | STIPULATION | STIPULATION ORDER |
|---|---|---|
| WAPA | 12/19/2011; Dkt. No. 155 | 12/21/2011; Dkt. No. 166 |

| | | |
|---|---|---|
| PPL | 12/19/2011; Dkt. No. 156 | 12/21/2011; Dkt. No. 164 |
| NWE | 12/20/2011; Dkt. No. 159 | 12/21/2011; Dkt. No. 165 |
| PPL | 12/23/2011; Dkt. No. 170 | 12/23/2011; Dkt. No. 173 |
| WAPA | 1/19/2012; Dkt. No. 211 | 1/23/2012; Dkt. No. 217 |
| NWE | 1/23/2012; Dkt. No. 218 | 1/23/2012; Dkt. No. 219 |
| NWE | 2/13/2012; Dkt. No. 260 | 2/13/2012; Dkt. No. 261 |
| NWE | 3/12/2012; Dkt. No. 309 | 3/13/2012; Dkt. No. 311 |
| NWE | 4/13/2012; Dkt. No. 376 | 4/16/2012; Dkt. No. 379[8] |

### K.    USE OF CASH COLLATERAL

On November 17, 2011, the Debtor filed an emergency motion to use cash collateral and provide adequate protection (Dkt. No. 76).  On November 21, 2011, the Debtor and the Prepetition Secured Parties entered into a stipulation for, among other things, interim use of cash collateral (Dkt. No. 92), which the Bankruptcy Court approved by order dated November 22, 2011 (Dkt. No. 94).

The Trustee and the Prepetition Secured Parties entered into additional stipulations andagreed orders for interim use of cash collateral: (i) stipulation filed December 19, 2011 (Dkt. Nos. 157 and 158), approved by order dated December 21, 2011 (Dkt. No. 167); (ii) stipulation filed January 23, 2012 (Dkt. No. 220), approved by order dated January 24, 2012 (Dkt. No. 222); (iii) stipulation filed February 10, 2012 (Dkt. No. 256), approved by order dated February 13, 2012 (Dkt. No. 258); and (iv) agreed order filed March 12, 2012 (Dkt. No. 308), approved by order dated March 13, 2012 (Dkt. No. 314), as amended pursuant to the Trustee's April 13 and 17, 2012 motions to amend (Dkt. Nos. 373 and 380) and the April 13 and 19, 2012 orders granting the motions (Dkt. Nos. 375 and 393).

After several amendments, on April 23, 2012, the Trustee filed a final proposed cash collateral order (Dkt. No. 403), which the Bankruptcy Court approved by order dated May 1, 2012 (Dkt. No. 413).  This order, among other things, provided for use of cash collateral until October 31, 2012.  The October 31st deadline was extended to January 31, 2013 (Dkt. Nos. 564, 565, and 582).  The January 31, 2013 deadline was extended to April 30, 2013 (Dkt. Nos. 662

---

[8]    Regarding this last stipulation between the Trustee and NWE, the parties agreed that so long as the Debtor made timely payments, a deposit in the amount of $1,250,000 provides NWE adequate assurance of payments going forward.  The parties further agreed in this stipulation that "[u]pon confirmation of a plan in this case and payment of NWE's final invoice for services during the pendency of this case, the deposit of $1,250,000.00 will be returned to Debtor."

and 690).  The April 30, 2013 deadline was extended to August 31, 2013 (Dkt. Nos. 825 and 847).  And the August 31, 2013 deadline was extended to December 31, 2013 (Dkt. Nos. 987 and 988).

Under the Cash Collateral Order, as a condition of the Debtor's continued use of the Noteholders' cash collateral, the Debtor is obligated to pay monthly adequate protection payments to the Noteholders and to pay the Noteholders' reasonable fees and expenses.[9]  The Cash Collateral Order also served as a final determination as to the validity of the Noteholders' liens on substantially all of the Debtor's assets and included, among other things, a waiver of any right to surcharge the Noteholders under section 506(c) of the Bankruptcy Code.

### L.    LIMITING NOTICE

On January 11, 2012, the Trustee moved to limit notice in the Bankruptcy Case (Dkt. No. 197), which the Bankruptcy Court granted by order dated January 31, 2012 (Dkt. No. 235).

### M.    ASSUMPTION/REJECTION OF EXECUTORY CONTRACTS

#### 1.    __The Lease and the Sublease__

On February 20, 2008, the Debtor and an affiliate of Electric Consultants, Inc. ("**ECI**"), Tech Properties Development, LLC, entered into the *Office Lease Agreement*, leasing non-residential real property located at 3521 Gabel Road, Billings, MT as the Debtor's headquarters for some 10 years.

Postpetition, the Trustee and ECI entered into that certain *Office Sublease Agreement*, dated December 30, 2011.  Also on December 30, 2011, the Trustee and ECI filed a stipulation with the Bankruptcy Court (Dkt. No. 182), seeking approval of the sublease.  In the stipulation, the Trustee and ECI agree that the sublease is a substitute for the lease, replacing it with the sublease.  Generally, the sublease provides for the Debtor's relocation of its headquarters to 7250 Entryway Drive, Billings, MT for a shorter term (about 15 months, plus some options vs. about seven remaining years under the lease), at a cheaper monthly rent.

On January 25, 2012, the Trustee moved to assume the sublease (Dkt. No. 223), which the Bankruptcy Court granted by order dated February 14, 2012 (Dkt. No. 264).

On April 4, 2013, the Trustee moved to enter into a month-to-month sublease with ECI (Dkt. No. 779), which the Bankruptcy Court approved on April 23, 2013 (Dkt. No. 821).

---

[9]    Under the Plan, however, those fees and expenses would be recharacterized and applied to principal repayment as of the Effective Date.

### 2.       The PPL Stipulation and Its Claim

The Debtor and PPL were parties to a *Power Purchase and Sales Agreement*, dated September 17, 2004.  On March 26, 2012, the Trustee and PPL stipulated, among other things, to the rejection of this contract pursuant to section 365(a) of the Bankruptcy Code (Dkt. No. 343).  The Bankruptcy Court approved this stipulation by order dated March 27, 2012 (Dkt. No. 346).  On July 13, 2013, PPL filed Proof of Claim No. 50 in the amount of $374,863,708.19, about $353.8 million of which is for purported rejection damages.

### 3.       The Pitney Bowes Lease

On or about September 29, 2008, the Debtor entered into a lease with Pitney Bowes Global Financial Services LLC pursuant to which the Debtor leased certain postage meter equipment for 63 months with $283 due every quarter until expiration of the lease.

On March 26, 2012, the Trustee moved to reject this lease (Dkt. No. 342), which the Bankruptcy Court granted by order dated April 13, 2012 (Dkt. No. 371).

### 4.       The NWE Energy Stipulation

The Debtor and NWE were parties to Natural Gas Intrastate Transportation Service Agreement, dated December 29, 2010.  The Debtor had provided a prepetition deposit to NWE of $336,800 in connection with this agreement.  On May 31, 2012, the Trustee and NWE stipulated to the rejection of the agreement and the offset and recoupment of a portion of its damages by NWE keeping the deposit (Dkt. No. 443), which the Bankruptcy Court approved by order dated June 1, 2012 (Dkt. No. 444).

### N.       THE YVEC MOTIONS

### 1.       Determination that Automatic Stay Does Not Apply

On January 30, 2012, YVEC moved the Bankruptcy Court for a determination that a proposed recoupment does not violate section 362 of the Bankruptcy Code (Dkt No. 230).  More specifically, YVEC argued that it was entitled to the recoupment of sums from future bills for power that YVEC owed to the Debtor because claimed the recoupment is part of the same transaction as the amount YVEC will pay to BPA, as a guarantor of the Debtor's obligations, for power acquired and supplied by the Debtor to YVEC.  YVEC proposed that it exercise its recoupment rights by reducing its power bill owed to the Debtor by the amount YVEC is being forced to pay to BPA – $564,102.64.

-44-

On February 17, 2012, the Bankruptcy Court granted YVEC's motion and also approved a related February 6, 2012 stipulation (Dkt. No. 241) wherein YVEC agreed to delay exercising its right to recoupment until the due date for payment to the Debtor of YVEC's April 2012 monthly power bill (Dkt. No. 272).

### 2. Relief from Stay/Abstention

On February 17 and 21, 2012, YVEC moved the Bankruptcy Court to abstain from hearing any issues or proceedings concerning the YVEC State Court Litigation and for relief from stay to continue that litigation (Dkt. Nos. 274 and 278). On May 15, 2012, the Bankruptcy Court denied the motion (Dkt. No. 422). YVEC appealed this order (Dkt. No. 433) to the United States District Court for the District of Montana. However, as discussed below, the Trustee and YVEC subsequently entered into a comprehensive settlement agreement, which resulted in the appeal being dismissed with prejudice on May 20, 2013 (Dkt. No. 849).

### O. ORDINARY COURSE PROFESSIONALS

On March 22, 2012, the Trustee filed the *Amended Motion by Trustee for Authority to Employ and Compensate Professionals for Specific Services Rendered in the Ordinary Course of Business* (Dkt. No. 335), which the Bankruptcy Court granted by order dated April 25, 2012 (Dkt. No. 406). Generally, this order permits the Trustee to retain and compensate certain professionals in the ordinary course of business without Bankruptcy Court approval of their employment or their compensation. Ordinary course professionals within the confines of this process include (i) ACES Power Marketing; (ii) Anderson-Montgomery Consulting Engineers; (iii) Atkins; (iv) Bison Engineering, Inc.; (v) Covington & Burling LLP; (vi) Proven Compliance Solutions, Inc.; (vii) Ugrin, Alexander, Zadick & Higgins; (viii) Marra, Sexe, Evenson & Bell, P.C.; (ix) Lotus Group USA, Inc.; and (x) The Energy Corporation.

### P. ADVERSARY PROCEEDINGS

### 1. The Beartooth Adversary Proceeding

On April 13, 2012, Beartooth commenced an adversary proceeding against the Debtor, bearing Adv. No. 12-00017 (Dkt. No. 374), asserting five alleged declaratory judgment claims.

On June 7, 2012, the Trustee moved to dismiss all of the complaint's claims (Adv. Dkt. No. 8), which the Bankruptcy Court granted in part by order dated December 20, 2012 (Adv. Dkt. No. 16), dismissing the second, fourth, and fifth claims. The remaining first claim requests a declaration that Beartooth's 2008 all requirements contract is void (Beartooth does not seek any relief with respect to the all requirements contract that it executed in 2007), and the remaining third claim requests a declaration that the pledge of Beartooth's all requirements contract as collateral to the Prepetition Secured Parties is void.

-45-

On January 3, 2013, the Trustee answered the complaint (Adv. Dkt. No. 18).

On January 6, 2013, the Bankruptcy Court entered on order setting a pretrial scheduling conference for March 6, 2013 (Adv. Dkt. No. 20).

On February 12, 2013, Fergus, Mid-Yellowstone, and Tongue River moved to intervene as party defendants in this action (Adv. Dkt. No. 21). The motion to intervene was granted by the Bankruptcy Court.  The trial is scheduled to commence whenever the confirmation hearing on the Trustee's Plan is held.

On April 23, 2013, Beartooth filed a motion to add the Noteholders as parties, which the Bankruptcy Court granted (Adv. Dkt. Nos. 29 and 31).

The Trustee believes that the Beartooth complaint has no merit and, accordingly, that the litigation will not impair the Trustee's ability to achieve confirmation of the Plan.  The Trustee's belief is strengthened by a motion to dismiss filed by the Noteholders on September 19, 2013 (Adv. Dkt. No. 40).

Lastly, it is important to note the the Beartooth adversary proceeding does not seek to void the All Requirements Contracts.  Rather the sole claim for relief is for the avoidance of the Noteholders' securty interest in the All Requirements Contracts.  Even if Beartooth were to prevail, the Trustee is certain that the Noteholders would appeal that decision.  Because the Trustee's settlement with the Noteholders took into account the Beartooth adversary proceeding, if the Bankruptcy Court approves the settlement, the Trustee believes that the Plan is still confirmable.  The Trustee assumes that the Members disagree.

## 2.    The City Adversary Proceeding

On July 17, 2012, the City commenced an adversary proceeding against the Debtor, bearing Adv. No. 12-00035 (Dkt. No. 495), asserting 10 alleged declaratory judgment claims. Generally, like its prepetition litigation against the Debtor, the City sought to relieve itself of its responsibilities under its all requirements contract with the Debtor.  The Debtor also sought to void a water services agreement, pursuant to which the City agreed to provide water for HGS (ultimately developed as a gas-fired generation facility).  The Debtor asserted 21 enumerated defenses to the City's claims.

On September 24, 2012, the Trustee answered the complaint and counterclaimed against the City, requesting seven declarations, specific performance, and injunctive relief, and asserting three breach of contract claims including bad faith (Adv. Dkt. No. 10).  The Trustee's breach of contract claims concern the all requirements contract with Great Falls, the water services agreement, and an October 22, 2004 agreement pursuant to which the Debtor agreed to reduce its

initial rates and accept a credit from the City against anticipated future raw water purchases by the Debtor (equal to $1,186,061.83). The City asserted 18 enumerated defenses to the Trustee's claims.

On January 9, 2012, the Bankruptcy Court held a pretrial scheduling conference and set a variety of pretrial deadlines as well as a 10-day trial commencing February 24, 2014 (Adv. Dkt. No. 22).

The Trustee and the City participated in two mediations before the Honorable Justice James Regnier on August 1, 2012 and November 13, 2012. These efforts did not result in any settlement. In due course, however, the City and the Trustee agreed upon the terms of a settlement. Under the settlement, the City agreed to pay the Estate $3,250,000 in consideration of being released from its all requirements contract with the Debtor and other consideration. The first installment in the amount of $2,500,000 was paid and delivered to the Noteholders as proceeds of their collateral. The second installment in the amount of $750,000 is due on or before December 31, 2013. The Trustee filed a motion for approval of the settlement on May 8, 2013, which the Bankruptcy Court granted (including by authorizing the paydown of the Noteholders) on May 29, 2013 (Dkt. Nos. 843 and 865).

### 3.    The Construction Lien Adversary Proceeding

On May 10, 2013, EPC Services Company ("**EPC**") commenced an adversary proceeding against the Noteholders, the Trustee, and certain parties purporting to have perfected construction liens against HGS, bearing Adv. No. 13-00016 (Dkt. No.844). In this adversary proceeding, EPC seeks a judicial determination of the nature, extent, and priority of the liens asserted against HGS. The Trustee and the other parties have filed answers to the adversary complaint and, in some cases, cross-claims against other parties. Discovery is ongoing in this proceeding, and a pretrial conference is scheduled for September 4, 2013. The Plan provides for appropriate treatment of any Allowed Claims of EPC or other parties asserting construction liens and, accordingly, the Trustee does not believe that the outcome of the litigation will detract from his ability to achieve confirmation of the Plan.

Continuation of the adversary proceeding (as opposed to settlement or acceptance of the proposed Plan treatment) presents risks and potential benefits to the Noteholders and the Construction Lien claimants. In particular, should the Construction Lien claimants be successful in the litigation, then their Claims could be found to be valid, properly perfected, and enforceable, and potentially of a higher priority than the Noteholders' Allowed Secured Claims. In such event, such Claims would be treated in accordance with Class 5 of the Plan as Allowed Secured Claims. Further, in such circumstance, the Construction Lien claimants would need to analyze whether they believe voting against the Plan, as opposed to Class 5 treatment, with the potential dismissal or conversion of the Case should the Plan not be confirmed, would be in their best interests. For the reasons set forth below in this Disclosure Statement, the Trustee does not

believe dismissal or conversion of the Case is in the best interest of any Claim holder.  Should the Construction Lien claimants not be successful in the litigation (or a settlement cannot be reached), and such Claims are found to not be valid, properly perfected, or enforceable Secured Claims, they would hold, at best, Allowed Class 6 General Unsecured Claims.  Further, if the Construction Lien claimants vote against the Plan and continue the adversary proceeding, and are unsuccessful in the litigation, there is potential risk that the Bankruptcy Court finds that one or more such claimants do not even hold vaild Claims in any amount or in significantly reduced amounts.

### Q.    CLAIMS PROCESS AND BAR DATE

On November 4, 2011, the Debtor filed the Schedules and SOFA; they reflect all of the Debtor's known assets and liabilities at the time of preparation based on the books and records available at that time.

On May 14, 2012, the Trustee moved to set a deadline for creditors to file proofs of claim (Dkt. No. 420).  On May 15, 2012, the Bankruptcy Court granted this motion (Dkt. Nos. 425 and 426), establishing July 16, 2012 as the deadline (the "**Bar Date**") for filing proofs of claim against the Debtor.  On May 22, 2012, the Trustee served written notices of the Bar Date to all known creditors (Dkt. No. 432-3) and appropriately published notice of the Bar Date (Dkt. No. 483).  The time within which to file claims against the Debtor has expired.

Seventy-one proofs of claim asserting claims against the Debtor had been filed with the Bankruptcy Court.  The Trustee's review of the proofs of claim is ongoing, and he anticipates that in due course he will be filing objections to the allowance of certain claims.

### R.    THE PLAN PROCESS

Pursuant to section 1121 of the Bankruptcy Code, only a debtor may file a plan of reorganization during the 120-day period following the commencement of a chapter 11 case.  If a debtor files a plan of reorganization during such time, the debtor will have an additional 60 days to solicit acceptances of its plan, during which time no other party in interest may file a plan.  Pursuant to section 1121(c)(1) of the Bankruptcy Code, however, the appointment of the Trustee terminated these exclusivity periods.

### 1.    Reorganization Proposals and Choosing One

On June 15, 2012, the Trustee filed the *Motion by Trustee to Establish Procedure for Submission of Reorganization Proposals* (the "**RFP Motion**"; Dkt. No. 458), pursuant to which he requested that the Bankruptcy Court set September 17, 2012 as the deadline for interested parties to submit to him reorganization proposals in writing and in compliance with the conditions set forth in a *Request for Proposals* form.  The Trustee would then share the proposals

-48-

with certain parties and use his best efforts, through October 15, 2012, to negotiate and/or discuss the qualified proposals, following which the Trustee could select one or more proposals to form as the basis of a plan of reorganization.  On July 3, 2012, the Court granted the RFP Motion (Dkt. No. 473).

Thereafter, the Trustee solicited proposals from interested parties and received several by the September 17, 2012 deadline.

On October 2, 2012, the Trustee moved to extend the October 15, 2012 deadline to select a proposal to form as the basis for his plan of reorganization to November 16, 2012 (Dkt. No. 556).  The Bankruptcy Court granted this motion by order dated October 22, 2012 (Dkt. No. 573).  On October 26, 2012, the Trustee filed a motion to extend the November 16, 2012 deadline to December 14, 2012 as the result of, among other reasons, needing more time to thoroughly vet all of the received proposals with the various constituents in this case, as well as consider other reorganization scenarios (Dkt. No. 577).  The Bankruptcy Court granted this motion by order dated November 14, 2012 (Dkt. No. 586).

On December 14, 2012, the Trustee filed a notice of his selection of the proposals received (Dkt. No. 615), advising:

> The Trustee intends to file a plan of reorganization pursuant to which Southern will be reorganized and will emerge from Chapter 11 as an ongoing business entity.

> Under the Trustee's plan of reorganization, Southern will retain ownership of Highwood Generating Station and the Wholesale Power Contracts between Southern and its members will be assumed pursuant to 11 U.S.C §§ 365 and 1123, unless other satisfactory arrangements are agreed to by the Trustee and any of the members and approved by the Court.

> Also, under the Trustee's plan of reorganization, Southern will enter into a long-term power purchase agreement with one of three entities: Morgan Stanley Capital Group, Inc. ("**MSCGI**"), Shell Energy North America (US), L.P. ("**Shell Energy**"), or PPL EnergyPlus, LLC ("**PPL**").  To date, MSCGI, Shell Energy, and PPL have submitted only indicative pricing under proposed long-term power purchase agreements with Southern.  The Trustee cannot and will not make a final decision regarding the counterparty to a long-term power purchase agreement with Southern until he receives from MSCGI, Shell Energy, and PPL firm pricing, the terms under which such firm pricing would be either fixed or adjusted between the date of the filing of his plan of reorganization for Southern and the date of the confirmation of such plan, and all of the other material terms and conditions of a proposed long-term power purchase agreement.  After the Trustee

-49-

has received such information and has negotiated the final terms of a proposed power purchase agreement, the Trustee will select either MSCGI, Shell Energy, or PPL as the long-term power provider for Southern.

Finally, under the Trustee's plan of reorganization for Southern, the Contract for Firm Electric Service to Southern Montana Electric Generation and Transmission Cooperative, Inc. between Southern and the Western Area Power Administration ("**Western**") will be assumed or assumed as modified, subject to Western's consent, unless other satisfactory arrangements are agreed to by the Trustee and Western and, possibly, one or more of Southern's members, and approved by the Court.

The Trustee selected a modified proposal submitted by MSCGI, which proposal will, as indicated, be the cornerstone of the Plan - a 10-year all requirements power supply agreement between the Reorganized Southern and MSCGI. The MSCGI Agreement, under which all of the Reorganized Southern's power and energy needs will be at market-based prices that are, in real dollars, at historical lows. The MSCGI Agreement replaces a pre-petition, long-term power supply agreement with PPL that required the Debtor to purchase quantities of power that greatly exceeded its needs and at prices that turned out to be significantly over market. The MSCGI Agreement will not become effective unless and until the Plan has been confirmed by the Bankruptcy Court.

Fergus contends that without the Members' consent, the MSCGI Agreement violates the bylaws and the very purpose and existence of the Debtor, rendering such agreement void. In other words, Fergus contends that no plan of reorganization can be confirmed without its consent. Mid-Yellowstone also contends that the Plan is not confirmable without the Members' support. The Trustee disputes this for, if true, it would engraft a confirmation requirement to section 1129 of the Bankrutpcy Code to the effect, in the case of cooperatives, a plan cannot be confirmed unless the members consent.

## 2.   Fixing Date to File Plans and Disclosure Statements and Establishing Related Requirements

On November 5, 2012, the Trustee filed a motion for entry of an order fixing February 15, 2013 as the date for the Trustee and all other interested parties with standing to file plans of reorganization and disclosure statements in this case and establishing related requirements (Dkt. No. 585). This motion drew objections from the City, YVEC, and Beartooth (respectively, Dkt. Nos. 592, 593, and 594).

On December 19, 2012, the Bankruptcy Court granted the motion in part and ordered the Trustee, and no other interested parties, to file a disclosure statement and chapter 11 plan by February 15, 2013 (Dkt. No. 620).

-50-

### 3.  Filing of Trustee's Initial Plan and Disclosure Statement

On February 15, 2013, the Trustee filed his initial plan of reorganization (Dkt. No. 687) and disclosure statement (Dkt. No. 688).  The hearing on the adequacy of the disclosure statement was originally scheduled for March 26, 2013, but it was continued pending a ruling on the April 19, 2013 motion by the Trustee to value the Noteholders' security (the "**Valuation Motion**") (Dkt. 816) and the Trustee's limited objection to Proof of Claim No. 69 (the "**Limited Objection**") (Dkt. No. 818), as was the confirmation hearing on the Trustee's plan of reorganization.  As discussed below, the Valuation Motion and the Limited Objection have been settled, which settlement is incorporated into the Plan.

### S.  THE PPL ADMINISTRATIVE EXPENSE CLAIM

On July 13, 2012, PPL filed its *Application of PPL EnergyPlus, LLC for Allowance and Payment of Administrative Claim Pursuant to 11 U.S.C. § 503(b)(9)* (Dkt. No. 490), seeking allowance of a $2,492,412 administrative expense pursuant to section 503(b)(9) of the Bankruptcy Code.

On August 6, 2012, the Bankruptcy Court entered its *Order Granting Application of PPL EnergyPlus, LLC for Allowance and Payment of Administrative Claim Pursuant to 11 U.S.C. § 503(b)(9)* (the "**Administrative Expense Order**") (Dkt. No. 499), allowing PPL an "administrative expense claim pursuant to 11 U.S.C. § 503(b)(9) in the amount of $2,492,412.00."

On August 9, 2012, the Trustee, the Committee, and the Prepetition Secured Parties jointly moved to vacate the Administrative Expense Order (Dkt. No. 503).  PPL opposed the motion (Dkt. No. 511).

The Bankruptcy Court ultimately denied the motion to vacate by order dated January 8, 2013 (Dkt. No. 635).  On January 18, 2013, the Trustee, the Committee, and the Prepetition Secured Parties moved for reconsideration of this order (Dkt. No. 651).  PPL objected to the motion (Dkt. No. 673), and the motion was argued and heard on February 26, 2013.  On April 3, 2013, the Bankruptcy Court denied the motion for reconsideration (Dkt. 778), and on April 10, 2013, the Trustee appealed (Dkt. 810).  During the pendency of the appeal, the Trustee and PPL settled the dispute, and on May 21, 2013 the Trustee filed a motion seeking Bankruptcy Court approval of the settlement, which the Bankruptcy Court approved on June 11, 2013 (Dkt. Nos. 855 and 874).

Under the settlement, PPL agreed to reduce its allowed administrative expense claim by 10% in exchange for immediate payment of the claim in the reduced amount of $2,243,170.80.

-51-

That amount has been paid to PPL from the Debtor's unencumbered funds, and the appeal has been dismissed.

### T.   THE YVEC SETTLEMENT

On January 18, 2013, the Trustee moved the Bankruptcy Court to approve a comprehensive settlement agreement with YVEC (Dkt. No. 652) intended to resolve the YVEC State Court Litigation, the pending appeal of the Bankruptcy Court's order denying YVEC's motion to the Bankruptcy Court to abstain from hearing any issues or proceedings concerning the YVEC State Court Litigation and for relief from stay, and YVEC's Proof of Claim No. 66 in the Debtor's bankruptcy case in the amount of $7,276,470.05, plus certain alleged undetermined amounts.  Generally, this settlement, as amended, proposed that YVEC would pay the Estate $2,500,000; YVEC and the Debtor will release each other; YVEC would withdraw its Proof of Claim with prejudice and YVEC would not file any other claim; YVEC would cease to be a member of the Debtor, a creditor of the Debtor, or a party in interest in this Chapter 11 Case; the appeal would be dismissed with prejudice; the YVEC State Court Litigation would be dismissed with prejudice; the YVEC all requirements contract with the Debtor would be terminated; and the power contract with WAPA would be assumed and partially assigned to YVEC (approximately 9 MW of the 21.5 MW annual average, subject to the approval of WAPA's Administrator).  The Members were not involved in the settlement negotiations between YVEC and the Trustee.  Mid-Yelowstone contends that the Members were adversely affected by the YVEC settlement.  The Trustee disputes this contention.

The Bankruptcy Court considered the motion at a hearing on March 26, 2013, and on April 5, 2013 granted it (Dkt. Nos. 783 and 784).  The settlement has been fully consummated.

Unlike YVEC and the City, there was never any agreement, resolution, or understanding that the other four Members' rates would not include principal and interest payments to the Noteholders.  Granted, the proceeds of the Trustee's settlement with the City went to the Noteholders, but that was only because the City, unlike YVEC, did not object to the granting of a security interest in the Debtor's rights in its All Requirements Contract.  Also, unlike YVEC and the City, the other four Members have never articulated any grounds for them to get out of their All Requirements Contracts, other than the arguments that they cannot be assumed under the Plan and that they do not want to pay the allegedly high rates under the Plan.  The other four Members can, however, "buy out" of their All Requirements Contracts by paying to Estate or Reorganized Southern the present value of their load ratio share of the Debtor's "G & A" (the fixed expenses of operating the company), and their load ratio share of the remaining debt to the Noteholders.  The Trustee understands that discussions have taken place between Beartooth and the Noteholders along these lines, but is not aware if any progress was made.

With respect to the WAPA contract, at one time the 21.5 MW of peak power was shared by all six members, including YVEC and the City.  Before the City started to shed its load in mid-2011, together the City and YVEC comprised approximately 50% of the Debtor's load.  Therefore, the 12.5 MW of WAPA power that the Debtor retained after the YVEC settlement is

actually more WAPA power than the remaining four Members had the benefit of before the settlement.

**U.    THE TRUSTEE'S REPORT**

On January 3, 2012, the Trustee applied to retain Nancy Temple and the law firm Katten & Temple, LLP in the capacity of Trustee's investigation counsel in order to fulfill his fiduciary duties pursuant to, *inter alia*, sections 1106(a)(3) (investigate) and (4) (statement) of the Bankruptcy Code.  Ms. Temple completed her investigation and has submitted drafts of the report regarding the results of her investigation to the Trustee but has not finalized her report.  No material changes are expected to made to her final report.  Copies of the latest draft of Ms. Temple's report will be provided upon request to counsel for the Trustee, John Cardinal Parks, at jparks@hblegal.net or (303) 996-8609.

On May 7, 2013, the Trustee filed an application to expand the scope of his retention of Eide Bailly, LLP to include conducting a forensic accounting of the Debtor so that he may fully discharge his duties under section 1106(a)(3) and (4), which the Bankruptcy Court approved a day later (Dkt. Nos. 841 and 842).  Eide Bailly is in the process of conducting its forensic accounting of the Debtor.  To date, Eide Bailly has documented all of the Debtor's First Interstate Bank bank transactions, which totaled 6,785 separate transactions from January 2008 through October 2011 and compared them to the accounting entries within the Debtor's QuickBooks to identify any discrepancies.  No discrepancies have been noted.  Eide Bailly is in the process of performing additional procedures to identify any anomalies or other indicia of potential fraud and has advised that its investigation and report to the Trustee should be finalized by mid-October.  Once that is completed, based on the preliminary investigations of Ms. Temple and the forensic accounting conducted by Eide Bailly, as well as his own independent investigation, the Trustee will file a statement under section 1106(a)(4).

**V.    THE VALUATION MOTION AND THE LIMITED OBJECTION**

As noted above, the hearings on the adequacy of the Trustee's initial disclosure statement and initial plan of reorganization were postponed pending the Bankruptcy Court's determination of the Valuation Motion and the Limited Objection.  In the Valuation Motion, the Trustee sought a judicial valuation of the Noteholders' collateral, which consists primarily of HGS, the Debtor's interest in the All Requirements Contracts (other than the YVEC contract), the Debtor's interest in other contract rights, including the WAPA contract, and all of the Debtor's cash except the proceeds of the YVEC contract.  The keystone of the Trustee's argument was that the All Requirements Contracts against which the Noteholders have liens should be valued at zero dollars because no third party buyer would take assignment of the All Requirements Contracts and, accordingly, they have no market value.  The Noteholders, on the other hand, argued that the All Requirements Contracts had substantial value (to the point where the Noteholders believe

they are oversecured), which could be measured by the amount of value they bring to the estate by funding the Debtor's satisfaction of its indebtedness.

Based on an appraisal of HGS as of January 1, 2013 by MRV, which the Trustee had obtained for property tax purposes, the Trustee initially asserted in connection with the Valuation Motion that HGS had a value of $5.6 million.  The Trustee further asserted that the All Requirements Contracts had no fair market value.  In further support of his valuation of HGS, the Trustee later submitted a fair market value appraisal prepared by MRV as of January 1, 2014 which placed a value of $1,818,000 on HGS; and an orderly liquidation value appraisal prepared by MRV as of January 1, 2014 which estimated the orderly liquidation value to be $14,398,000. In support of his valuation of the All Requirements Contracts, the Trustee submitted an expert report by Harper Hofer & Associates ("**HHA**") in which HHA expressed its opinion that the All Requirements Contracts had no fair market value.  HHA was not asked to value the WAPA contract because the Trustee believed that, since it could not be assigned without WAPA's consent, it had no fair market value.  Further, the Trustee had already received an informal estimate of the value of the WAPA contract to the Debtor in the amount of approximately $10 million in connection with his evalution of the YVEC settlement.  Since the All Requirements Contracts had no value and HGS had a value of approximately $14 million, the Trustee did not believe that the value, if any, of the WAPA contract would render the Noteholders oversecured. The Trustee did not have HHA value the Noteholders' cash collateral because the value of a dollar is a dollar.

In connection with their objection to the Valuation Motion, the Noteholders served upon the parties an Expert Report (the "**Report**") prepared by Alvarez & Marsal Valuation Services, LLC ("**A&M**").  Based upon the materials reviewed and the independent analyses performed by A&M as of the date of the Report, as well as the assumptions set forth more fully in the body of the Report, A&M gave the opinion that, as of May 31, 2013, the fair market value of HGS and associated real estate was $16,500,000, the intrinsic value of the All Requirement Contracts was $125,700,000, and the intrinsic value of the WAPA contract was $7,200,000.  This valuation resulted in an argument that the Noteholders are oversecured.  A&M argues, among other things, that the value of the All Requirement Contracts stems from the cost-savings they provide to the Debtor and the debt service that they allow.  Without such contracts, the Debtor would take on all of the costs to operate and maintain HGS, buy electric energy and related services for resale, transmit power, and service its debt (which it could have never obtained without posting the All Requirement Contracts as security).  The Noteholders also argue that the value of the All Requirement Contracts is dramatized by the fact that in the approximately two years in which this Case has been pending, the Noteholders' collateral will have generated in excess of $25 million of collateral proceeds plus amounts attributable to the operation of the Estate.  In addition, A&M estimates approximately $2,700,000 of cash will be available as of October 31, 2013 as the cash collateral of the Noteholders.  Further, the Noteholders hold a lien on the pipeline that runs to HGS which is believed to have significant value and to be of interest to at least one potential acquirer at the present time.

-54-

Certain parties have inquired how HGS could have such a low current value when the book value of HGS is around $100 million. The answers are found in great detail in the appraisals performed by MRV, copies of which are available upon request from counsel for the Trustee. The short answer is "economic obsolescence," which is the loss of earnings and value due to factors external to the property. Changes in market demand, federal or state law, the economy, and/or any operational constraints external to the asset that are detrimental to the earnings of an asset can be measured by capitalizing the expected losses in the earnings over the period that the condition is expected to exist. As a result of economic obsolescence, HGS will not appreciate in value until market prices for power increase.

In the Limited Objection, the Trustee objected to the allowance of a "Make-Whole Amount" in the amount of approximately $46 million that U.S. Bank, N.A, as Indenture Trustee, had filed on behalf of the Noteholders, alleging, among other things, that the facts and circumstances of the Debtor's Chapter 11 filing had not triggered the Make-Whole Amount under the Indenture. The Noteholders strenuously disagreed, pointing to various provisions of the Indenture and related agreements that they assert entitles them to the Make-Whole Amount.

In response to the Limited Objection, the Noteholders argued that a Make-Whole provision of a loan agreement is a form of alternative performance or liquidated damages designed to compensate the lender for its losses resulting from acceleration or repayment prior to the scheduled maturity of the loan. The Noteholders further described that Make-Whole provisions are market-standard for fixed-rate loans and can generally be avoided if the borrower takes on interest rate risk itself by borrowing at variable rates. The Noteholders asserted that they are entitled to the Make-Whole Amount provided for under the Indenture upon maturity, which is defined to include early maturity by acceleration. Based on current continuing events of default under the Indenture, the Noteholders' notes were accelerated. As a result, the Noteholders argued that they are entitled to the Make-Whole amount. The Noteholders also cited to favorable case law for its argument.

Certain of the Members filed a joinder to the Limited Objection, arguing that the Make-Whole Amount in the Indenture caused the Noteholders to claim a usurious rate of interest in violation of Montana law. Tongue River also submitted an expert report presuming to calculate an effective rate of interest that takes into account the Make-Whole Amount. The Trustee advised Tongue River that the usury argument was, in the Trustee's view, irrelevant because to be usurious the Make-Whole Amount first had to constitute interest. If it was unmatured interest, it would not be recoverable under section 502(b)(2) of the Bankruptcy Code regardless of whether it was usurious. The Trustee also advised Tongue River that the majority of courts that had considered the issue had ruled that make-whole amounts do not constitute interest. Further, the Noteholders had argued that the Make-Whole Amount was not usurious and that they are exempt from Montana's usury statute.

-55-

The Bankruptcy Court entered a scheduling order on the Valuation Motion and Limited Objection (Dkt. No. 808) setting the hearing on both for the week of July 29, 2013, as well as deadlines for filing responses and disclosing expert witnesses.  After the Valuation Motion and Limited Objection had been briefed and expert witnesses had been disclosed, the Trustee entered into a settlement with the Noteholders that was to be included in an amended plan of reorganization.  Thus, on June 28, 2013, the Trustee filed a unopposed motion to adjourn the hearing on the Valuation Motion and the Limited Objection pending the confirmation hearing on the Trustee's amended plan, which the Bankruptcy Court granted on July 1, 2013 (Dkt. Nos. 918 and 922).

## W. THE SETTLEMENT BETWEEN THE TRUSTEE AND THE NOTEHOLDERS

The Trustee's settlement with the Noteholders occurred because of the failure of negotiations between the Noteholders and the Members, negotiations that began in earnest on January 30, 2013.  Five months later, at the end of June 2013, the Members and the Noteholders were still so far apart that the Noteholders advised the Trustee that they were not going to even respond to the Members' latest settlement proposal.  It became apparent to the Trustee that to break the deadlock between the Members and the Noteholders he was going to have to settle with one of them and use that settlement as the basis of a plan.  Because the Trustee believes that under controlling Ninth Circuit authority that he had a duty to maximize values for the benefit of creditors, he chose to settle with the Noteholders instead of joining in the Members' efforts to minimize rates.  The Members did not participate in the negotiations and settlement reached between the Trustee and the Noteholders.  The Trustee, however, intends to invite the Members and the Noteholders to participate in another round of settlement negotiations as it appears that further concessions and accomodations will be required from both sides if there is to be a consensual plan.

There is no written settlement agreement between the Trustee and the Noteholders. There is only a two-page term sheet, a copy of which is available upon request from counsel for the Trustee.

The term of the settlement between the Trustee and the Noteholders are essentially as follows:

- The Debtor will be reorganized as a four member cooperative consisting of Beartooth, Fergus, Mid-Yellowstone, and Tongue River.

- The Noteholders agree to apply all adequate protection payments, payments of professional fees, and the proceeds of the settlement with the City on a pro rata basis to the principal owed on the Series 2010A Notes and the 2010B Note, respectively.  As of October 2013, it is estimated that approximately $25 million of funds could be applied to principal, which would reduce the secured debt

-56-

amount as of that time to approximately $60 million.  In addition, the Noteholders would apply upon the Effective Date any amounts not otherwise dedicated to administrative expenses, operating costs, or unsecured recoveries (as further detailed below) to reduce their secured debt.  Under the Plan, the 2010A Note is amortized over 12 years and the 2010B Note over 10 years.  The Noteholders have agreed to the loan amortization and payment schedules represented in the Plan.  The Noteholders waive their existing make-whole amount claim.  A new make-whole amount could become due, however, in accordance with the terms of the restructured documents upon the occurrence in the future of similar types of events that trigger a make-whole claim in the existing loan documents.

- The Noteholders have agreed to new reduced interest rates priced at 6.00% and 5.25%, respectively, a 200 basis point discount from the rates under the original financing.

- The loan documents will be modified in form and substance satisfactory to the Indenture Trustee, the Noteholders, and the Trustee to accomplish the terms of the restructuring.

- The Noteholders will structure the modified loan documents so as to ensure that the Debtor's rates to its members for the first year after the Effective Date do not exceed the current rates.

- The Noteholders and Indenture Trustee will be released upon the Effective Date and receive the benefit of an exculpation.

- If not done earlier, the Valuation Motion and Limited Objection will be withdrawn with prejudice after the Effective Date.  If the Trustee's amended plan is confirmed, it would settle under Bankruptcy Rule 9019 the dispute between and among the Indenture Trustee and the Noteholders, on one hand, and the Trustee and all other parties in interest, on the other hand.

- The Trustee would select the most attractive 10-year fixed price power supply contract with a third-party supplier, currently the MSCGI Agreement, with any collateral support coming from a cash build-up generated from Member pricing.

- The power sales price charged by the Reorganized Debtor would be the sum of:

  o   the price paid to the third party supplier (capacity and usage);
  o   the differential from Mid-C to NorthWestern Energy connection plus transmission if the differential from Mid-C to the NorthWestern Energy

-57-

connection is not fully included in the quoted price to the NorthWestern Energy connection (what this means is that if it costs $4.50/MWh to trasmit power from the Mid-C to Montana, the Debtor's rates will include this cost. It is not relevant under the MSCGI Agreement because the rate includes all transmission charges to the NWE interface in Montana);

- o    a margin required to support the Reorganized Debtor's organization and HGS; and

- o    a dollar margin sufficient to amortize the secured debt with interest over the selected amortization period.

- •    HGS would continue to be owed by the Debtor, as the Reorganized Debtor.

- •    The wholesale power contracts between the Debtor and the remaining four members will be assumed.

- •    The Trustee's amended plan will pay in full at confirmation all Allowed Administrative Expense Claims and all Cure amounts associated with assumed contracts (with the list of assumed contracts to be agreed to in advance of confirmation).

- •    Priority Non-Tax Claims will be paid in full on the Effective Date.

- •    The Trustee's amended plan will set aside sufficient working capital for the Debtor to emerge from bankruptcy.

- •    Contingent upon Committee support and cooperation, the Noteholders would assign on the Effective Date, chapter 5 claims[10] and claims against directors and

---

[10]    Under the Bankruptcy Code, certain payments made prior to the Petition Date may be subject to recovery as avoidable preferences under section 547 of the Bankruptcy Code ("**Preference Claims**"), and as fraudulent conveyances under sections 544 and 548 of the Bankruptcy Code ("**Fraudulent Conveyance Claims**"). The Estate may hold a variety of Preference Claims and/or Fraudulent Conveyance Claims against parties who received payments prior to the Petition Date.

At the request of the Trustee, Eide Bailly has performed an analyis of potential preference claims. 876 transactions within 90 days of the Petition Date were analyzed to determine whether they might be preferential transfers under section 547 of the Bankruptcy Code, and none were found to be potential candidates. There were three transactions with insiders within one year of the Petition Date, and none were determined to preferences. None of those transactions involved Mr. Gregori. The Trustee's counsel is reviewing a few of the

officers to unsecured creditors and would agree to set aside (or carve out) certain cash in the Estate in an agreed amount to pay a dividend to unsecured creditors (with the Committee waiving any entitlement to any further recoveries).

- The WAPA contract has already been assumed, as modified, by YVEC settlement.

- The Trustee would continue to make adequate protection payments and payments for the Noteholders' professionals' fees to the Noteholders through the Effective Date. However, as with the other payments made to or on behalf of the Noteholders during the Chapter 11 Case, they will be treated as a paydown of principal as of the Effective Date.

- Except as otherwise provided for in the settlement, the treatment of other creditors shall be the same or substantially similar as set forth in the Trustee's initial plan.

The Trustee believes that Noteholders are making significant concessions by agreeing to the currently proposed Plan and have voluntarily offered concessions since the outset of negotiations with the Trustee. In fact, contrasting the amount of money the Noteholders would have received from the Petition Date through maturity of the Notes in the absence of a default with what the Noteholders could receive from the Petition Date through the maturity of the Notes as restructured in accordance with the terms of the Plan (excluding payment of professional fees and costs), the Noteholders have advised the Trustee that they are agreeing to accept approximately $61 million less than they bargained for fewer than two years before the Chapter 11 Case was filed.

Fergus (and possibly other Members) do not agree that the Noteholders are making significant conssessions.

## X.   THE MOTION TO CONVERT

On June 27, 2013, the Committee moved to convert the Chapter 11 Case to a case under chapter 7 of the Bankruptcy Code (Dkt. No. 913). The Committee's motion was joined by several of the Members. The Trustee objected to the motion, as did the Noteholders, and the Indenture Trustee, and two other parties joined in those objections.(Dkt. Nos. 941-943). On July 31, 2013, the Bankruptcy Court denied the Committee's motion without prejudice, ruling that the Committee and other joinder parties had not offered any evidence supporting their claim that conversion was appropriate.

---

transactions within 90 days to determine if they might arguably be preferences, but the amount of those transfers is less than $150,000.

### Y.   POSTPETITION OPERATIONS

The Debtor's monthly operating reports are on file with the Bankruptcy Court, are available for inspection, and are incorporated herein by reference.

The Debtor has eight employees: two at the Debtor's operations office in Billings (power scheduler/engineer and accountant) and six employees at HGS (two operators, an electronics, instrumentation and controls technician, an administrative assistant, and two night watchmen). Currently, the services of the plant superintendent are being contracted out to an outside company. All prepetition benefits and employee policies described above have remained in place for the postpetition period.

No postpetition claims have been threatened or asserted against the Trustee, the Debtor, or persons associated with the Debtor.

### Z.   THE DEBTOR'S RATES TO ITS MEMBERS SINCE THE PETITION DATE

When the Debtor commenced the Chapter 11 Case on October 21, 2011, the most recent rate increase was in June 2011 (the Debtor's Board of Trustees had voted in favor of a 20% rate increase in September 2011, but it was subsequently revoked). Since the Petition Date, the Debtor's rates to its members have remained the same. Thus, as of the date of the filing of this Disclosure Statement, the Debtor's members have enjoyed the benefits of an over two year rate freeze. In contrast, the Debtor's rates to its members increased by 43.7% during the two and one-half year period between January 2009 and June 2011. The Trustee currently has no plans to raise the Debtor's rates to its remaining members during the pendency of the Chapter 11 Case.

The rates (per MWh) paid by each of the four remaining Members, as well as the overall average thereof, and the energy usage of each of those Members, as well as their total usage (in MWh) from August 2012 through July 2013 are set forth in Exhibit 2A.

## V.   THE CHAPTER 11 PLAN

The Plan is attached as Exhibit 1 hereto and forms a part of this Disclosure Statement. Statements as to the rationale underlying the treatment of Claims and Member Interests under the Plan and the description of the Debtor's business and financial affairs are not intended to, and shall not, waive, compromise or limit any rights, claims or causes of action or bind any persons in the event the Plan is not confirmed.

### A.   CONSIDERATIONS REGARDING THE PLAN

The primary focus of the Chapter 11 Case to date has been, first, to stabilize the Debtor's business operations and improve its cash position. At the Petition Date, the Debtor had approximately $76,000 in cash and, even with the cooperation of the Prepetition Secured Parties with respect to cash collateral issues, was dangerously close to running out of cash. By rejecting the PPL contract and buying power at prevailing market prices, the Trustee has been able to accumulate cash reserves totaling in excess of $ 8,676,824 as of July 31, 2013, even after making adequate protection payments to the Prepetition Secured Parties in the amount of approximately $1,041,000 per month since April 2012 and remaining current on the payment of administrative expenses, including full payment of the PPL administrative claim as reduced under the Court-approved settlement. After stabilizing the Debtor's business operations and cash position, the Trustee sought Court-approval of the Request for Proposals process described above. After reviewing the responses to the Request for Proposals and negotiating with the respondents, the Trustee filed the notice of his selection of plan proposal and advised parties in interest of the basic provisions of the plan of reorganization that he intended to file for the Debtor. Although, at present, the Trustee has not yet reached a complete consensus among all parties in interest regarding the terms of the Plan, it is the Trustee's intent to continue to negotiate with and/or mediate between and among all parties in interest hoping formulate a plan to which all parties in interest consent.

The cornerstones of the Plan are the MSCGI Agreement - the 10-year, all requirements power supply agreement between the Reorganized Southern and Morgan Stanley Capital Group, Inc., that will replace the Debtor's prepetition contract with PPL, the Debtor's continued ownership of HGS, and, pursuant to the Trustee's settlement with the Noteholders, the pay down of the HGS debt on restructured terms that will allow the Debtor to charge its members reasonable rates for power, energy, and transmission services.

### B.   CLASSIFICATION AND TREATMENT OF CLAIMS AND MEMBER INTERESTS

See the detailed summary of the classification and treatment of classified and unclassified Claims at section II (A) of this Disclosure Statement.

### C.   IMPLEMENTATION OF THE PLAN

#### 1.   Continuation of Operations

Following the Effective Date, the Debtor's present business shall continue and shall be operated as Reorganized Southern. The only Members of Reorganized Southern as of the Effective Date shall be Beartooth, Fergus, Mid-Yellowstone, and Tongue River. Reorganized Southern will continue to operate as a G & T cooperative, providing electric power, energy, and transmission services to its remaining members through the MSCGI Agreement as well as the WAPA contract as assumed and modified. Transmission services will continue to be provided through the pre-petition arrangement with NWE. Reorganized Southern will continue to own HGS and to maintain it in a ready-to-operate condition. HGS will be dispatched if and when it

makes economic sense to do so and, under the MSCGI Agreement, will receive 90% of the profits from power sales.  Reorganized Southern will have the right to sell HGS at any time after the Effective Date, provided Prudential, Modern Woodmen, the Construction Lienholders, and MSCGI are willing to release their liens on HGS.  The Trustee has been informed that the Members currently disagree over the retention and disposal of HGS.

## 2.   Post-Effective Date Rates

The rates of Reorganized Southern to its members are set forth on the redacted Pro Forma Financial Projections for Reorganized Southern attached as **Exhibit 2** hereto.  Under the Protective Order, Exhibit 2 has been designated by the Trustee as "Confidential Material." Accordingly, it was filed under seal and will be served on parties in interest under the protections afforded by the Protective Order.

The Board of Trustees of Reorganized Southern shall continue to have the power and authority to set the rates of Reorganized Southern to its members so long as they are sufficient to satisfy Reorganized Southern's obligations under the Plan.  Fergus contends that this takes away the Board's authority to set rates and "appears to be unlawful."  The Trustee disagrees with Fergus.  Even before the Debtor filed this Case, under the All Requirements Contracts, the Board was required to set rates that were sufficient, but only sufficient, to cover all of the Debtor's costs and expenses, including debt service payments.  The Trustee contends that Plan does not change this.  In fact, before the Petition Date, the Debtor was required to set rates sufficient to pay off $85 million of debt to the Noteholders.  Under the Plan, the Board must set rates that are sufficient to pay off $60 million in debt at interest rates that are 200 basis points below the prepetition rates.

Through letters dates February 29, 2008 to each of the Members, the Rural Utilities Service ("**RUS**) waived its rights under the All Requirements Contracts to approve changes in the Debtor's rates to the Members.  Thus, the rate increases under the Plan do not need to be approved by the RUS or any other governmental regulatory commission with jurisdiction.

## 3.   Implementation

Reorganized Southern and the Trustee shall be authorized and is directed to take all necessary steps, and perform all necessary acts, to consummate the terms and conditions of the Plan.

## 4.   Corporate Governance

Upon the Effective Date, the Debtor's Articles of Incorporation and Bylaws and any related corporate governance agreements ("**Corporate Governance Agreements**") shall be amended and restated in substantially the form included in the Plan Supplement.  Reorganized

-62-

Southern shall continue to exist after the Effective Date, with all the powers available to such legal entity, in accordance with applicable law and pursuant to its Corporate Governance Agreements.  Nonetheless, the Board of Trustees of Reorganized Southern shall have the power and authority to amend the Corporate Governance Agreements in any way it wishes so long as those amendments are consistent with Reorganized Southern's financial and economic obligations under the Plan.  The Trustee contends that the Plan is a contract and Reorganized Southern must perform its obligtions under the contract.

### 5.   Management

Upon the occurrence of the Effective Date, Reorganized Southern will be operated by substantially the same personnel that and operated the Debtor prior to the Confirmation Date, subject to such changes that may be made based upon and in accordance with the Corporate Governance Agreements after the Effective Date, and such individuals shall be identified at or before the Confirmation Hearing.  The Trustee has entered into a letter of intent with Reorganized Southern's proposed new General Manager, Bill Stewart.  The Trustee selected Mr. Stewart with the assistance and guidance from the exective search team at the National Rural Electric Cooperative Association.  The Members did not participate in the selection of Mr. Stewart.  A copy of the letter of intent and Mr. Stewart's resume may be obtained from counsel for the Trustee on request.

Mid-Yellowstone has contended that the Plan and Disclosure Statement "does not set forth what role the Southern board will have in overseeing the general managers (sic) decision." The Plan and Disclosure Statement do not address this subject because the Plan does not in any way change the intended relationship between the Board and Trustees and the Debtor's General Manager.  Moreover, the Trustee contends that Mid-Yellowstone's contention is misplaced because a board of trustees is supposed to make the decisions and a general manager is supposed to implement those decisions.  Thus, a board of trustees does not oversee a general manager's decisions.

### 6.   Board of Trustees

On the Effective Date, the Board of Trustees of Reorganized Southern shall be comprised of the individuals who currently hold such positions on behalf of the Members, specifically, Arleen Boyd, David Dover, DeeDee Isaacs, and Jim DeCock, and such other and additional individuals as may be identified at or before the Confirmation Hearing, or as otherwise may be required by applicable statute or law.  To comply with the requirements of Montana law, at confirmation Reorganized Southern shall have two trustees from each of the Members. Thereafter, Reorganized Southern may reconsitute its Board in any way its choses consistent with Montana law.  By way of example only, if the Members determine that it is appropriate for Fergus to have two trustees on the Board because of the relative size of its load, and the other three members one, nothing in the Plan prohibits this result.

-63-

### 7. Power Supply Agreement

On the Effective Date or as soon thereafter as reasonably possible, the Reorganized Southern shall enter into the MSCGI Agreement, a copy of which is attached to the Plan as Exhibit A.  Under the MSCGI Agreeement, prior to the start date of any transaction thereunder, the Debtor shall provide or cause to be provided a Guarantee Agreement from each of the Members in favor of MSCGI.  MSCGI has not provided the Trustee with the form of Guarantee Agreement it would like the Members to sign.  With respect to Beartooth, it is the Trustee's understanding that a guarantee of this nature must be approved by the Wyoming Public Service Commission.  If the Members refuse to sign such guarantees, then MSCGI and the Trustee will agree upon alternative forms of security, including increasing the rates under the MSCGI Agreement to reflect the additional risk presented to MSCGI by the absence of such guarantees. The Trustee has designated the MSCGI Agreement as "Confidential Material."  Thus, pursuant to the Protective Order, it has been filed under seal with the Bankruptcy Court and will be served on parties in interest under the protections afforded by the Protective Order.  To review the standard WSPP Agreement, parties are referred to the following link: http://www.wspp.org/current_effective_agreement.php.

### 8. Assumption of All Requirements Contracts

The All Requirements Contracts of Beartooth, Fergus, Mid-Yellowtone, and Tongue River shall be assumed under the Plan.

### 9. Assumption of WAPA Contract

Pursuant to the YVEC Settlement, the WAPA contract has been modified and assumed.

### 10. Making of Distributions

Reorganized Southern, through the Trustee, shall make the distributions required to be made in respect of the Allowed Claims under the Plan, or as may otherwise be required by the Plan (including the Plan Supplement).

### D. PLAN PROVISIONS GOVERNING DISTRIBUTIONS

### 1. Delivery of Distributions

Subject to Bankruptcy Rule 9010, all distributions to any holder of an Allowed Claim shall be made at the address of such holder as set forth on the Schedules filed with the Bankruptcy Court or on the books and records of the Debtor or its agents, as applicable, unless the Debtor or, after the Effective Date Reorganized Southern, have been notified in writing of a change of address, including, without limitation, by the filing of a proof of Claim by such holder that contains an address for such holder different than the address of such holder as set forth on

-64-

the Schedules.  Payment shall be made to the holder of the Allowed Claim and unless the holder of such Allowed Claim has directed Reorganized Southern, in writing, to make payment to a third party (including through the filing of a proof of Claim instructing that payment be made to a third party thereon).  Payments received on account of Plan distributions shall not be subject to disgorgement.

### 2.    Undeliverable Distributions

#### a.    *Holding of Undeliverable Distributions*

If any distribution to any holder is returned to Reorganized Southern as undeliverable, no further distributions shall be made to such holder unless and until Reorganized Southern is notified, in writing, of such holder's then-current address.  Undeliverable distributions shall remain in the possession of Reorganized Southern until such time as a distribution becomes deliverable.  All entities ultimately receiving undeliverable Cash shall not be entitled to any interest or other accruals of any kind.  Nothing contained in the Plan shall require Reorganized Southern to attempt to locate any holder of an Allowed Claim.

#### b.    *Failure to Claim Undeliverable Distributions*

On or about the six month anniversary of the Effective Date, Reorganized Southern, through the Trustee, shall file a list with the Bankruptcy Court setting forth the names of those entities for which distributions have been made hereunder and have been returned as undeliverable or voided in accordance with the Plan.  Any holder of an Allowed Claim that does not assert its rights pursuant to the Plan to receive a distribution within one year from and after the Effective Date shall have its entitlement to such undeliverable or voided distribution discharged and shall be forever barred from asserting any entitlement pursuant to the Plan against Reorganized Southern or the property of Reorganized Southern.  In such case, any consideration held for distribution on account of such Claim shall revert to Reorganized Southern.

#### c.    *Time Bar to Cash Payment Rights*

Checks issued in respect of Allowed Claims shall be null and void if not negotiated within 90 days after the date of issuance thereof.  Requests for reissuance of any check shall be made to Reorganized Southern by the holder of the Allowed Claim to whom such check originally was issued.  Any claim in respect of such a voided check shall be made on or before 90 days after the expiration of the 90 day period following the date of issuance of such check. Thereafter, the amount represented by such voided check shall be treated in accordance with the provisions of section 5.13(b) of the Plan re undeliverable distributions.

#### d.    *Manner of Payment under the Plan*

-65-

Any Plan distribution to be made in Cash under the Plan shall be made, at the election of Reorganized Southern, by check drawn on a domestic bank or by wire transfer from a domestic bank. Cash payments to foreign creditors may be made, at the option of Reorganized Southern, in such funds and by such means as are necessary or customary in a particular foreign jurisdiction.

### e.   *Maximum Distribution*

In no event shall any holder of any Allowed Claim receive distributions under the Plan in excess of the Allowed amount of such Claim.

### E.   PROVISIONS FOR TREATMENT OF DISPUTED CLAIMS

#### 1.   Objections to Claims; Prosecution of Disputed Claims

Unless otherwise ordered by the Bankruptcy Court, objections to Claims must be filed prior to the Effective Date and may be filed and prosecuted by the Trustee and any party in interest. After the Effective Date any pending or otherwise unresolved objections to Claims may be pursued and prosecuted only by the Trustee and Reorganized Southern unless otherwise ordered by the Bankruptcy Court.

#### 2.   Allowance of Disputed Claims

At such time as a Disputed Claim becomes, in whole or in part, an Allowed Claim, Reorganized Southern shall distribute to the holder thereof the distributions, if any, to which such holder is then entitled under the Plan. Such distribution, if any, shall be made as soon as practicable after the date that the order or judgment of the Bankruptcy Court allowing such Disputed Claim becomes a Final Order but in no event more than 60 days thereafter. For the avoidance of doubt, if any portion of a Claim or Administrative Expense Claim is Disputed, no payment or distribution provided hereunder shall be made on account of the undisputed portion of such Claim or Administrative Expense Claim unless and until the Disputed portion becomes Allowed, is disallowed by Final Order, or is otherwise resolved.

#### 3.   Settlement of Objections to Claims After Effective Date

From and after the Effective Date, Reorganized Southern, through the Trustee, may litigate to judgment, propose settlements of, or withdraw objections to, all pending or filed Disputed Claims, and Reorganized Southern, through the Trustee, may settle or compromise any Disputed Claim without notice and a hearing and without approval of the Bankruptcy Court.

### F.   EXECUTORY CONTRACTS AND UNEXPIRED LEASES

-66-

1.      **Assumption and Assignment of Executory Contracts and Unexpired Leases**

On the Effective Date, and except as otherwise provided by the Plan, pursuant to sections 365(a), 365(b), 363(f), and 1123(b)(2) of the Bankruptcy Code, the Trustee shall assume and assign to Reorganized Southern all executory contracts and unexpired leases specifically designated on Exhibit B to the Plan, which schedule may be amended in accordance with the Plan.

2.      **Rejection of Executory Contracts and Unexpired Leases**

Pursuant to sections 365(a) and 1123(b)(2) of the Bankruptcy Code, all executory contracts and unexpired leases that exist between the Debtor or the Estate and any person or entity shall be deemed rejected as of the Effective Date, except for any executory contract or unexpired lease (a) that has been assumed pursuant to an order of the Bankruptcy Court entered prior to the Effective Date and for which the motion was filed prior to the Confirmation Date; (b) as to which a motion for approval of the assumption or rejection of such executory contract or unexpired lease has been filed prior to the Confirmation Date; or (c) that is specifically designated on Exhibit B to this Plan; provided, however, that the Trustee reserves the right, on or prior to the Confirmation Date, to amend the Plan to delete any executory contract or unexpired lease from Exhibit B or add any executory contract or unexpired lease to Exhibit B, in which event such executory contract(s) or unexpired lease(s) shall be deemed to be, respectively, rejected or assumed; provided further, however, that the respective party or parties to such executory contract(s) shall be given notice of such amendment and shall be provided an opportunity to object to such amendment; provided further, however, nothing herein shall prejudice the Trustee's right to argue that any of the unexpired leases should be recharacterized as a secured financing. The Trustee shall provide notice of any amendments to the Plan to the parties to the executory contracts and unexpired leases affected thereby.

Because the Memorandum of Understanding dated August 16, 2010 between the Debtor and certain owners of land adjacent to HGS is not included on Exhibit B it is deemed rejected under the Plan. The same is true for every other executory contract and unexpired lease of the Debtor that is not on Exhibit B.

3.      **Approval of Assumption and Assignment and Rejection of Executory Contracts and Unexpired Leases**

Entry of the Confirmation Order shall, subject to and upon the occurrence of the Effective Date, constitute the approval, pursuant to sections 365(a), 365(f) and 1123(b)(2) of the Bankruptcy Code, (a) of the assumption and assignment of the executory contracts and unexpired leases assumed or assumed and assigned pursuant to this Plan; and (b) of the rejection of the executory contracts and unexpired leases rejected pursuant to this Plan; provided, however, to the extent any provision of an executory contract or unexpired lease to be assumed under this

Plan limits the Trustee's ability to assume or assume and assign such executory contract or unexpired lease, the effectiveness of such provision shall be limited or nullified to the full extent provided in section 365(f) of the Bankruptcy Code.  Unless otherwise indicated, all assumptions or rejections of executory contracts and unexpired leases in the Plan are effective as of the Effective Date.

### 4.　　Objections

Any party wishing to object to the assumption or assumption and assignment of any executory contract or unexpired lease hereunder, including any proposed Cure, if any, set forth in Exhibit B,  must file an objection with the Bankruptcy Court by the deadline to object to the Plan and such dispute shall be resolved by the Bankruptcy Court.  **Any counterparty that does not object to the assumption or assumption and assignment, or the proposed Cure, if any, set forth in Exhibit B, of its executory contract or unexpired lease under the Plan shall be deemed to have consented to such assumption or assumption and assignment, or Cure and any Claim for Cure, for compensation, adequate assurance, adequate assurance of future performance, or other right, issue, or Claim under section 365 of the Bankruptcy Code, shall be deemed fully satisfied, released, and discharged and forever barred from assertion and shall not be enforceable against Reorganized Southern without the need for any objection by Reorganized Southern or further notice to or action, order or approval of the Bankruptcy Court or any other entity, and any Claim for Cure for compensation, adequate assurance, adequate assurance of future performance, or other right, issue, or Claim under section 365 of the Bankruptcy Code, shall be deemed fully satisfied, released and discharged upon payment of the amount, if any, listed on Exhibit B, notwithstanding anything included in the Schedules or in any proof of claim to the contrary, provided that nothing shall prevent Reorganized Southern from paying any cure amount despite the failure of the relevant counterparty to timely file such request or objection for payment of such Cure.  Reorganized Southern, through the Trustee, also may settle any Cure without further notice to or action, order or approval of the Bankruptcy Court or any other entity.**

### G.　CONTINUED EXISTENCE OF THE ESTATE

The Trustee shall continue to serve as the representative of the Estate and the Estate shall continue in existence from and after the Confirmation Date only until all Allowed Administrative Expense Claims have been paid and any Causes of Action, Avoidance Actions, Claim objections, Disputed Claims, executory contract and lease assumptions, rejections or Cure amounts have been finally litigated or otherwise resolved.  From and after the Confirmation Date, the Trustee shall administer the Estate in accordance with the provisions of the Plan, the Bankruptcy Code and the Bankruptcy Rules, but the Trustee shall not operate Reorganized Southern and Reorganized Southern's business shall be operated in accordance with the Corporate Governance Documents and management in accordance with the Plan.  In the event the Trustee resigns or is removed after the Effective Date and prior to completion of the matters retained by the Trustee in accordance with the Plan, a successor Trustee shall be appointed by the Court.

From and after the Confirmation Date and until completion of the matters retained by the Trustee in accordance with the Plan, the Trustee shall receive such compensation as may be approved by the Court as an Administrative Expense Claim.  The Trustee shall be entitled to retain legal counsel and such other professionals as authorized by the Court to finally complete the retained matters, the fees and expenses of which shall be entitled to payment, in the manner authorized herein as Administrative Expense Claims.  Such fees and expenses shall be paid monthly after invoices are submitted to Trustee.  Any objection to the payment of such fees and expenses by the Trustee must be made in writing within ten (10) days after the invoices are submitted to the Trustee.  If the Trustee timely objects to such fees and expenses, a hearing on that portion of the fees and expenses subject to the objection  shall be held before the Bankruptcy Court, and the fees and expenses subject to the objection shall be paid only in the amount allowed by the Court, and that portion which is not subject to the objection shall be paid by the Trustee.

The fee and expense review procedures set forth above are separate and apart from the fee and expense review procedures that may be performed by the United States Trustee.

## H.    EFFECTIVENESS OF THE PLAN

### 1.    Conditions Precedent to the Confirmation of the Plan

The following are conditions precedent to the Confirmation of the Plan:

#### a.    *Disclosure Statement Order*

The Bankruptcy Court shall have entered the Disclosure Statement Order approving the Disclosure Statement as containing adequate information pursuant to section 1125 of the Bankruptcy Code and authorizing the solicitation of votes with respect to the Plan.

#### b.    *Confirmation Order*

The Bankruptcy Court shall have entered a Confirmation Order (i)  confirming and giving effect to the terms and provisions of the Plan; (ii) determining that all applicable tests, standards, and burdens in connection with the Plan have been duly satisfied and met; (iii) authorizing the Trustee and Reorganized Southern to execute, implement, and take all actions otherwise necessary or appropriate to give effect to the transactions contemplated by the Plan; and (iv) determining that the compromises and settlements set forth in any settlement agreement and the Plan are appropriate, reasonable, and approved and satisfy applicable standards under sections 365, 1123(b)(3) and 1129 of the Bankruptcy Code and Bankruptcy Rule 9019.

### 2.    Conditions Precedent to the Effective Date of the Plan

-69-

The following are conditions precedent to the Effective Date of the Plan: (i) no stay of the Confirmation Order shall then be in effect; and (ii) all authorizations, consents, and approvals determined by the Trustee to be necessary to implement to terms of the Plan shall have been obtained.

### 3.    Effect of Non-Occurrence of the Effective Date

If the Effective Date does not occur, the Plan shall be null and void and nothing contained in the Plan shall: (i) constitute a waiver or release of any Claims against or Member Interests in the Debtor; (ii) prejudice in any manner the rights of the Trustee; or (iii) constitute an admission, acknowledgement, offer, or undertaking of any manner by the Trustee.

## I.    OTHER PLAN PROVISIONS

### 1.    Binding Effect

Except as otherwise provided in section 1141(d)(3) of the Bankruptcy Code, and to the fullest extent permitted by section 1141 of the Bankruptcy Code, on and after the Effective Date, the provisions of the Plan shall bind any holder of a Claim against, or Member Interest in, the Debtor or the Estate and their respective successors and assigns, whether or not the Claim or Member Interest of such holder is impaired under the Plan and whether or not such holder has accepted the Plan.

### 2.    Discharge of Claims

Upon the Effective Date, except as otherwise expressly provided herein, each holder (as well as any trustees and agents on behalf of each holder) of a Claim or Member Interest and any Affiliate of such holder shall be deemed to have forever waived, released, and discharged Reorganized Southern, to the fullest extent permitted by section 1141 of the Bankruptcy Code, of and from any and all Claims, Causes of Action, interests, rights, and liabilities that arose prior to the Confirmation Date and, upon the Effective Date, all such persons shall be forever precluded and enjoined, pursuant to section 524 of the Bankruptcy Code, from prosecuting any Causes of Action or asserting any such discharged Claim against or Member Interest in the Debtor or Reorganized Southern.

### 3.    Exculpation and Release of the Trustee, the Indenture Trustee, Prudential, and Modern Woodmen

Subject to the occurrence of the Effective Date, the Confirmation Order shall constitute a release, discharge, and forgiveness of all claims, demands, or Causes of Action which the Debtor, the Estate, the Committee or Reorganized Southern holds or is entitled to prosecute on behalf of any other party against (i) the Trustee, his agents, attorneys, or other professionals and

-70-

all of their respective shareholders, managers, members, officers, employees, agents, advisors, consultants, successors, and assigns; and (ii) the Indenture Trustee, Prudential, and Modern Woodmen and their respective shareholders managers, members, officers, directors, employees, advisors, consultants, successors, and assigns.  This release shall cover all claims and Causes of Action, derivative or otherwise, which may be brought in the name of, on behalf of, or in the right of the Debtor, the Estate, the Committee, Reorganized Southern, or the Trustee.  The Trustee and any professionals, including, without limitation, attorneys retained by the Trustee, and all of their respective shareholders, managers, members, officers, employees, agents, advisors, consultants, successors, and assigns shall not have or incur any liability to any person for any Cause of Action or any act taken or omission, after the Petition Date, in connection with or related to the Chapter 11 Case or the operations of the Debtor's business during the Chapter 11 Case, including but not limited to (a) formulating, preparing, disseminating, implementing, confirming, consummating, or administrating the Plan (including soliciting acceptances or rejections thereof); (b) the Disclosure Statement or any contract, instrument, release, or other agreement or document entered into or any action taken or omitted to be taken in connection with the Plan; or (c) any distributions made pursuant to the Plan, except for acts constituting willful misconduct or gross negligence, and in all respects such parties shall be entitled to rely upon the advice of counsel with respect to their duties and responsibilities under the Plan.

## 4.      Retention of Causes of Action/Reservation of Rights

Except as expressly provided in the Plan, Reorganized Southern shall retain, and nothing contained in the Plan or the Confirmation Order shall be deemed to be a waiver or the relinquishment of, any rights and Causes of Action that the Debtor, the Trustee, the Committee, or the Estate may have under any provision of the Bankruptcy Code or any applicable nonbankruptcy law, including, without limitation, (i) all Causes of Action and Avoidance Actions; (ii) the Beartooth Litigation; (iii) any and all Claims against any person or entity to the extent such person or entity asserts a crossclaim, counterclaim, and/or Claim for setoff, recoupment, or which seeks any affirmative relief, in any form or manner whatsoever, against the Debtor or the Estate, and their respective officers, directors, or representatives; and (iv) the turnover of any property of the Debtor's Estate.  **No person or entity may rely on the absence of a specific reference in the Plan or the Disclosure Statement to any Cause of Action against them as any indication that the Trustee or Reorganized Southern will not pursue any and all available Causes of Action against them.  The Trustee, the Estate, and Reorganized Southern, as applicable, expressly reserve all rights to prosecute any and all Causes of Action against any person or entity.**

## 5.      Injunction

All persons or entities who have held, hold, or may hold Claims against or Member Interests in the Debtor or the Estate and other parties in interest, along with their respective present or former employees, agents, officers, directors, or principals, are permanently enjoined,

on and after the Effective Date, with respect to Claims released under the Plan and all Claims and Member Interests against the Debtor or the Estate, from (i) commencing, conducting, or continuing in any manner, directly or indirectly, any suit, action, or other proceeding of any kind (including, without limitation, any proceeding in a judicial, arbitral, administrative, or other forum) against or affecting the Debtor, the Estate, Reorganized Southern, or their property; (ii) enforcing, levying, attaching (including, without limitation, any prejudgment attachment), collecting, or otherwise recovering by any manner or means, whether directly or indirectly, any judgment, award, decree, or order against the Debtor, the Estate, Reorganized Southern, or their property; (iii) creating, perfecting, or otherwise enforcing in any manner, directly or indirectly, any encumbrance of any kind against the Debtor, the Estate, Reorganized Southern, or their property; (iv) asserting any right of setoff or recoupment, directly or indirectly, against any obligation due the Debtor, the Estate, Reorganized Southern, or any of their property, except as contemplated or allowed by the Plan; (v) acting or proceeding in any manner, in any place whatsoever, that does not conform to or comply with the provisions of the Plan; (vi) commencing, continuing, or asserting in any manner any action or other proceeding of any kind with respect to any Claims and Causes of Action which are extinguished or released pursuant to the Plan; and (vii) taking any actions to interfere with the implementation or consummation of the Plan.

## 6.     Jurisdiction of Bankruptcy Court

The Bankruptcy Court shall retain exclusive jurisdiction of all matters arising under, arising out of, or related to, the Chapter 11 Case and the Plan pursuant to, and for the purposes of, sections 105(a) and 1142 of the Bankruptcy Code.

## 7.     Modification of Plan

The Trustee reserves the right, in accordance with the Bankruptcy Code and the Bankruptcy Rules to amend or modify the Plan at any time prior to the entry of the Confirmation Order.  After the entry of the Confirmation Order, the Trustee may, upon order of the Bankruptcy Court, amend or modify the Plan, in accordance with section 1127(b) of the Bankruptcy Code or remedy any defect or omission or reconcile any inconsistency in the Plan in such manner as may be necessary to carry out the purpose and intent of the Plan.  A holder of an Allowed Claim or Member Interest that is deemed to have accepted the Plan shall be deemed to have accepted the Plan as modified if the proposed modification does not materially and adversely change the treatment of the Claim or Member Interest of such holder.

## 8.     Withdrawal or Revocation

The Trustee may withdraw or revoke the Plan at any time prior to the Confirmation Date. If the Trustee revokes or withdraws the Plan prior to the Confirmation Date, or if the Confirmation Date does not occur, then the Plan shall be deemed null and void.  In such event,

nothing contained herein or in the Plan shall be deemed to constitute a waiver or release of any Causes of Action, or Claim by or against the Debtor or the Estate or any other person or to prejudice in any manner the rights of the Trustee or any other person in any further proceedings involving the Debtor.

## VI.     CERTAIN FACTORS AFFECTING THE DEBTOR

### A.     RISK OF NON-CONFIRMATION OF THE PLAN

Although the Trustee believes that the Plan will satisfy all requirements necessary for confirmation by the Bankruptcy Court, there can be no assurance that the Bankruptcy Court will reach the same conclusion or that modifications of the Plan will not be required for confirmation or that such modifications would not necessitate resolicitation of votes.

### B.     FAILURE OF CONDITIONS PRECEDENT TO CONFIRMATION OF THE PLAN

The Plan provides for certain conditions that must be satisfied (or waived) prior to Confirmation of the Plan and for certain other conditions that must be satisfied (or waived) prior to the Effective Date.  As of the date of this Disclosure Statement, there can be no assurance that any or all of the conditions in the Plan will be satisfied (or waived).  Accordingly, there can be no assurance that the Plan will be confirmed by the Bankruptcy Court, and if the Plan is confirmed, there can be no assurance that the Plan will be consummated.

## VII.     CONFIRMATION OF THE PLAN

### A.     REQUIREMENTS FOR CONFIRMATION OF THE PLAN

#### 1.     General Requirements of Section 1129

At the Confirmation Hearing, the Bankruptcy Court will determine whether the following confirmation requirements specified in section 1129 of the Bankruptcy Code have been satisfied:

- The Plan complies with the applicable provisions of the Bankruptcy Code.

- The Trustee has complied with the applicable provisions of the Bankruptcy Code.

- The Plan has been proposed in good faith and not by any means proscribed by law.

- Any payment made or promised by the Trustee or by a person acquiring property under the Plan for services or for costs and expenses in, or in connection with, the Chapter 11 Case, or in connection with the Plan and incident to the Chapter 11

-73-

Case, has been disclosed to the Bankruptcy Court, and any such payment made before confirmation of the Plan is reasonable, or if such payment is to be fixed after confirmation of the Plan, such payment is subject to the approval of the Bankruptcy Court as reasonable.

- The Trustee has disclosed the identity and affiliations of any individual proposed to serve, after confirmation of the Plan, as a director, officer, or voting trustee of the Debtor, or a successor to the Debtor under the Plan (and such is consistent with the interests of creditors and equity security holders and with public policy), and the identity of any insider that will be employed or retained by Reorganized Southern and the nature of any compensation for such insider has been disclosed.

- Any governmental regulatory commission with jurisdiction, after confirmation of the applicable Plan, over the rates of the Debtor, as applicable, has approved any rate change provided for in the applicable Plan, or such rate change is expressly conditioned on such approval.

- With respect to each Class of Claims or Member Interests, each holder of an impaired Claim or impaired Member Interest either has accepted the Plan or will receive or retain under the Plan on account of such holder's Claim or Member Interest, property of a value, as of the Effective Date, that is not less than the amount such holder would receive or retain if the Debtor was liquidated on the Effective Date under chapter 7 of the Bankruptcy Code.  In addition, should any Class make a valid section 1111(b) election under the Bankruptcy Code, the Plan provides that any Claims in such Class will receive under the Plan on account of such Claims, property of a value, as of the Effective date of the Plan, that is not less than the value of such holder's interest in the estate's interest in the property that secures such Claims, in accordance with section 1129(a)(7)(B).  See discussion of "Best Interests Test" below.

- Except to the extent the Plan meets the requirements of section 1129(b) of the Bankruptcy Code (discussed below), each Class of Claims or Member Interests has either accepted the Plan or is not impaired under the Plan.

- Except to the extent that the holder of a particular Claim has agreed to a different treatment of such Claim, the Plan provides that Claims, if any, of the kind specified in sections 507(a)(1), (2), (3), (4), (5), (6), (7), or (8), are treated in accordance with section 1129(a)(9) of the Bankruptcy Code.

- Confirmation of the Plan is not likely to be followed by the liquidation or the need for further financial reorganization of the Debtor or any successor to the Debtor

under the Plan, unless such liquidation or reorganization is proposed in the Plan. See discussion of "Feasibility Analysis" below.

- All fees payable under section 1930 of title 28, as determined by the Bankruptcy Court at the Confirmation Hearing, have been paid or the Plan provides for the payment of all such fees on the Effective Date of the Plan.

- The Debtor has not obligated itself to provide such benefits, if any for the continuation, after the Effective Date, of payment of all "retiree benefits" (as defined in section 1114 of the Bankruptcy Code).

## 2.    Best Interests Tests

The "best interests of creditors" requires that, in order to be confirmed, a plan must be in the best interests of each holder of a claim or interest in an impaired class that has not voted to accept the plan. Accordingly, if an impaired class does not unanimously accept a plan, the best interests test requires that the bankruptcy court find that the plan provides to each non-consenting holder in such impaired class a recovery on account of such holder's claim or interest that has a value at least equal to the value of the distribution that each such holder would receive in a liquidation under chapter 7 of the Bankruptcy Code.

After consideration of the effects that a chapter 7 liquidation would have on the ultimate proceeds available for distribution to creditors in this Chapter 11 Case, the Trustee has determined that confirmation of the Plan will provide each creditor and member interest holder with a recovery that is not less than it would receive pursuant to a liquidation of the Debtor under chapter 7 of the Bankruptcy Code. In addition, should any Class make a valid section 1111(b) election under the Bankruptcy Code, the Plan provides that any Claims in such Class will receive under the Plan on account of such Claims, property of a value, as of the Effective date of the Plan, that is not less than the value of such holder's interest in the Estate's interest in the property that secures such Claims, in accordance with section 1129(a)(7)(B).

## 3.    Liquidation Analysis

A liquidation analysis is to enable each creditor to determine the recovery it would receive in the event the Debtor's bankruptcy case was liquidated pursuant to the provisions of chapter 7 of the Bankruptcy Code. Each creditor may compare the results of a chapter 7 liquidation with the treatment provided under the proposed chapter 11 Plan and use that information to determine whether to accept or reject the Plan. To conduct such analysis, the first step is to determine the estimated amount that would be generated from the liquidation of the Debtor's assets in the context of a chapter 7 liquidation case. The gross amount of cash available to holders of Claims would be the sum of the proceeds from the disposition of the Debtor's assets through the liquidation proceedings and the cash held by the Debtor at the time of the

-75-

commencement of the chapter 7 case.  This gross amount of cash is then reduced by the amount of any Claims secured by the Estate's assets, the costs and expenses of the liquidation, and additional administrative expenses that may result from the termination of the Debtor's businesses and the use of chapter 7 for the purposes of liquidation.   Any remaining net cash would be allocated to creditors in strict priority in accordance with section 726 of the Bankruptcy Code.  Underlying the liquidation analysis are a number of estimates and assumptions regarding liquidation proceeds that, although considered reasonable by the Trustee, are inherently subject to significant business, economic, and competitive uncertainties beyond the control of the Trustee.  As explained below in the liquidation analysis, unsecured creditors are likely to receive no recovery in a chapter 7 liquidation.  As such, unsecured creditors are receiving a greater recovery under the proposed Plan than they would receive in a chapter 7 liquidation.

The Trustee's liquidation analysis is attached as **Exhibit** 3 hereto.

### 4.    Feasibility

The Bankruptcy Code requires that a debtor demonstrate that confirmation of a plan is not likely to be followed by liquidation or the need for further financial reorganization.  This standard requires the Court to find that Reorganized Southern has a reasonable probability of performing its obligations under the Plan, including its obligations under any debt instruments issued under, and contracts entered into in connection with, the Plan.

The Trustee believes that the Plan is feasible.  The Debtor will be able to perform its obligations under the MSCGI Agreement, pay off the debt to the Prepetition Secured Parties as restructured, and charge reasonable rates to its remaining members such that they would not attempt to extricate themselves from their wholesale power contracts with the Debtor in favor of what might appear to be more attractive power supply alternatives.

In December 2009, the Debtor's Board of Trustees received from its outside accountants, Douglas Wilson & Company, P.C., a detailed Financial Forecast for the period from December 31, 2009 through December 31, 2021 (the "2009 Forecast").  The Debtor included the 2009 Forecast in an Offering Memorandum Supplement dated December 4, 2009 that was provided to Prudential and intended to induce Prudential to loan the Debtor the funds necessary to build a 40 MW gas-fired generating facility as the first phase of HGS.   The 2009 Forecast assumed, among other things, that the Debtor would borrow $85 million for the purpose of paying off existing debt and constructing Phase I of HGS and would repay the debt over 30 years.  The 2009 Forecast included projected rates for the four members participating in HGS, that is, Beartooth, Fergus, Mid-Yellowstone, and Tongue River, through the end of 2021.  As noted above, for the years 2014 through 2021,  the rates (including transmission) projected by the 2009 Forecast started at $79.97/MWh and ended at $94.56/MWh with an average rate of $89.98/MWh.  In comparison, the rates (including transmission) under the Plan start at $70.43/MWh in 2014 and are projected to be at $87.28/MWh in 2021 with an average rate of $81.22/MWh, resulting in an

average reduction of approximately 10% when compared to the projections in the 2009 Forecast. Thus, the Debtor's rates to its members under the Plan will be far lower than what they were projected to be when the Debtor borrowed $85 million to pay off existing debt and construct Phase I of HGS.  Further, under the Plan, the compounded annual growth in the Debtor's  rates to its members between 2014 (when they will be the same as they have been since June 2011) and 2025 is 2.6%, which is about the rate of inflation.  For Members whose cost of wholesale power represents 50% of their rate to their customers, such as Beartooth, the 2.6% increase in the Debtor's wholesale rate will translate into only a 1.3% increase in the customer's retail rate, all other things being equal.  The Trustee believes that the Members' customers will not be harmed or unduly burdened if their monthly electric bills go up from, for example, $100 per month in 2014 to $101.30 per month in 2015.  Finally, the Trustee believes that the Debtor's rates to its Members under the Plan will be as low or lower than the rates that they would pay if they were to join another G & T cooperative.

In The Trustee also believes that the Estate will have enough cash to pay all Administrative Expense Claims, Professional Fee Claims, Priority Tax Claims, fees due the United States Trustee, any DIP Financing Claim, Real Property Taxes and Priority Non-Tax Claims in full in cash on the Effective Date or as otherwise provided by the Plan and satisfy all other payment obligations under the Plan in accordance with and as required by the Plan.

The Trustee does not believe the loss of YVEC and the City as members will affect the feasibility of the Plan.  Granted, revenues from their All Requirements Contracts have been lost, but the costs of servicing those contracts have also been eliminated.  Further, although YVEC and the City will no longer pay for their load ratio share of the Debtor's general and administrative expenses or "G & A," the remaining four Members rates are not greatly affected by that since only 2 to 3% of the Debtor's rates to its Members has consisted of G & A expenses. Finally, the MSCGI is an all requirements contract, not a contract for the sale of blocks of power as was the PPL contract.  Thus, there is little if any risk that Reorganized Southern will have too much or too little power.

The feasibility of the Plan is further demonstrated by the Pro Forma Financial Projections for Reorganized Southern that are attached as Exhibit 2 hereto.  The Trustee has not attached historical financial information regarding the Debtor because he believes it could be confusing or even misleading.  Before September 30, 2011, the Debtor purchase a signficant amount of power from the Bonneville Power Adminstration (BPA).  The Debtor's contract with BPA terminated on September 30, 2011.  The Debtor signed confirmations with PPL in June 2009 in anticipation of that.  Prepetition, the Debtor also purchased power from PPL, but the Trustee rejected the PPL contract and proposes to replace it with the MSCGI Agreement.  The former was a contract for blocks of power, whereas the latter is a load following all requirements contract.  Before June 2011, the City's load was approximately 20 MW.  After the City started letting go of its load, it dwindled to around 6 MW.  Although the City continues to purchase power from the Debtor after the effective date of its settlement with the Trustee, it is not expected to purchase any power

from Reorganized Southern after the Plan is confirmed.  Similarly, YVEC stopped purchasing power from the Debtor on May 31, 2013.  Lastly, since February 2013 the Trustee has been prepaying for power under one-month to three-month contracts with prices that fluxuate depending on the season and the market whereas Reorganized Southern will purchase power under a 10 year fixed-price contract.  Thus the differences between the economics of the Debtor and Reorganized Southern are vast that the Trustee believes that they would only confuse if not mislead parties in interest.  If parties in interest would like to obtain audited or unaudited financial statements for the Debtor, they may be obtained, on request, from counsel for the Trustee.

Fergus claims that because of the financial condition of the Members, that none of the Members "approved" or want to be part of Reorganized Southern, and that the Plan calls for rates to be charged to the Members that are allegedly in excess of "market rates," the Plan is not feasible.  The Trustee disputes these claims.  Fergus also contends that the loss of the YVEC and the City's loads may somehow affect the feasibility of the Plan.  The Trustee disputes this as well.

There is the risk that the Members might file another Chapter 11 petition after the Plan in this Case is confirmed.  It is generally recognized that there is a good faith filing requirment and if a bankruptcy court determined that the filing was not in good faith and merely to frustrate a confirmed plan that was determined to be fair and equitable to the Members, the case would likely be dismissed.  As happened in this Case, a Chapter 11 trustee would probably be appointed who would most likey move the Bankruptcy Court to dismiss the case.  Even if there was a Chapter 11 trustee in a second Chapter 11 case (a so-called "Chapter 22"), he or she would have the same duty under Ninth Circuit law as the Trustee: to attempt to reorganize the Debtor and maximize value for the benefit of creditors.  There is also a risk that Reorganized Southern could file a Chapter 7 case, but that would be, in the Trustee's view, extremely dangerous to the Members and their customers.  It is not clear whether the Bankruptcy Court would permit the Chapter 7 trustee to operate the Debtor and provide power to the Members.  Morever, even if the Bankruptcy Court did, all the Debtor's cash would be the cash collateral of the Noteholders and the Trustee believes that the Noteholders would never agree to let the Chapter 7 trustee use their cash collateral.  It may be that the Members have determined a way to obtain a source of power and tranmission on extremely short notice in a Chapter 7 scenario, but the Trustee is unaware of how this could be accomplished without the Members risking having their systems "go dark."

There is also the risk that one or more of the Members might file their own Chapter 11 petition in response to confirmation of the Plan.  Again, such a filing may not pass muster under the good faith filing standard and the case could be dismissed.  Further, a Chapter 11 trustee would likely be appointed, and the Trustee believes that the Member's trustee would assume the All Requirements Contract with the Debtor because another G & T cooperative would not want the bankrupt member as a member without the contract, and it would be difficult if not impossible for the member to pursuade a potential supplier to sell power to it.

-78-

### B.    REQUIREMENTS OF SECTION 1129(b) OF THE BANKRUPTCY CODE

The Bankruptcy Code permits the Bankruptcy Court to confirm a chapter 11 plan of reorganization over the dissent of any Class of Claims or Member Interests as long as the standards in section 1129(b) are met.  This power to confirm a plan over dissenting classes – often referred to as "cram down" – is an important part of the reorganization process.  It ensures that no single group (or multiple groups) of claims or interests can block a restructuring that otherwise meets the requirements of the Bankruptcy Code and is in the interests of the other constituents in the case.

The Bankruptcy Court may confirm the Plan over the rejection or deemed rejection of the Plan by a Class of Claims or Member Interests if the Plan "does not discriminate unfairly" and is "fair and equitable" with respect to such class.  The Trustee believes that the Plan will satisfy both the "no unfair discrimination" requirement and the "fair and equitable" requirement should any impaired Class of Claims reject the Plan (these requirements only apply in the event an impaired Class of Claims votes to reject the Plan).

A plan is fair and equitable with respect to a class of secured claims that rejects the plan if the plan provides (1)(a) that the holders of claims included in the rejecting class retain the liens securing those claims whether the property subject to those liens is retained by the debtor or transferred to another entity, to the extent of the allowed amount of such claims, and (b) that each holder of a claim of such class received on account of that claim deferred cash payments totaling at least the allowed amount of that claim, or a value, as of the effective date of the plan, of at least the value of the holder's interest in the estate's interest in such property; (2) for the sale, subject to section 363(k) of the Bankruptcy Code, of any property that is subject to the liens securing the claims included in the rejecting class, free and clear of the liens, with the liens to attach to the proceeds of the sale, and the treatment of the liens on proceeds under clause (1) or (2) of this paragraph; or (3) for the realization by such holders of the indubitable equivalent of such claims.  Although holders of Claims in Classes 2(A), 2(B), 3, and 5 are impaired, the holders of Claims in such Classes are receiving treatment under the Plan that meets the requirements of section 1129(b)(1) and (2)(A) of the Bankruptcy Code.  Therefore, the Trustee believes that the Plan is fair and equitable with respect to holders of such secured claims.

If the Class 6 rejects the Plan, the Trustee submits that the Bankruptcy Court may still confirm the Plan because the Plan "does not discriminate unfairly."  With respect to an objecting impaired class of unsecured creditors, the Bankruptcy Code's "unfair discrimination" requirement prohibits disparate treatment of similarly situated creditors absent a legitimate business or economic justification.  In this case, the Plan does not violate the "unfair discrimination" prohibition as the only other classes of arguable equal priority to the Class 6 under the Plan are the Convenience Claims Class, CFC, First Interstate Bank Unsecured Loan, and Member Patronage Capital and similar Claims.  Section 1122(b) of the Bankruptcy Code

-79-

explicitly permits the creation of a convenience class, and convenience classes are common in bankruptcy plans. In addition, any holder of an Allowed General Unsecured Claim can elect to voluntarily reduce such Claim to $5,000 and be treated as the holder of an Allowed Convenience Claim. The Trustee believes that the CFC, First Interstate Bank Unsecured Loan, and Member Patronage Capital and similar Claims are appropriately separately classified and provided different treatment under the Plan from the General Unsecured Claims under existing case law, given the legal character of the claims are not substantially similar to the General Unsecured Claims.

With respect to CFC and First Interstate Bank Unsecured Loan in particular, Fergus, Mid-Yellowstone, and Tongue River, on a load ratio share basis, have guaranteed payment of CFC's Claim and all of the foregoing members as well as Beartooth have guaranteed payment of First Interstate Bank's Unsecured Loan Claim jointly and severally. Under these circumstances, separate classification and treatment of CFC and First Interstate Bank Unsecured Loan is authorized by existing case law. Moreover, the separate classification and treatment of CFC and First Interstate Bank Unsecured Loan is fair and equitable since the foregoing members of the Reorganized Southern would either pay these claims through rates charged to them by the Reorganized Southern or through payments made directly to CFC or First Interstate Bank Unsecured Loan. Thus, the guarantors of these debts would pay CFC and First Interstate Bank Unsecured Loan one way or another. The Trustee believes that the classification treatment of these claims is consistent with the law. See, *e.g.*, *In re Loop 76, LLC*, 465 B.R. 525 (B.A.P. 9th Cir. 2012).

Also, if the Class of General Unsecured Claims against the Debtor rejects the Plan, the Trustee submits that the Bankruptcy Court may still confirm the Plan because it satisfies the "fair and equitable" requirement. With respect to an objecting impaired class of unsecured creditors, the "fair and equitable" requirement generally in a for-profit entity case requires that either (i) the allowed value of the claim be paid in full; or (ii) no holder of any claim or interest that is junior to the rejecting unsecured class receive or retain under the plan any property on account of such junior claim or interest. This is commonly referred to as the "absolute priority rule." However, in this case, given the Debtor is a not-for-profit entity, there can be no violation of the absolute priority rule even though the Plan provides that the Member Interests and Member Patronage Capital and similar Claims are unimpaired, while the General Unsecured Claims are not receiving full payment under the Plan. See, *e.g.*, *In re Indian Nat'l Finals Rodeo, Inc.*, 453 B.R. 387 (Bankr. D. Mont. 2011).

For the reasons described above, the Trustee believes that the proposed Plan is "fair and equitable," does not unfairly discriminate, and complies with section 1129(b) of the Bankruptcy Code.

## VIII.   ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN

A.    LIQUIDATION UNDER CHAPTER 7

If no plan is confirmed, the Chapter 11 Case may be converted to a case under chapter 7 of the Bankruptcy Code, pursuant to which a trustee would be elected or appointed to liquidate the Debtor's assets for distribution to creditors in accordance with the priorities set forth in the Bankruptcy Code.  It is impossible to predict precisely how the proceeds of the liquidation would be distributed to the respective holders of Claims against or Member Interests in the Debtor.  A discussion of the effects that a chapter 7 liquidation would have on the recovery of holders of Claims and Member Interests and the Debtor's liquidation analysis are set forth above.

B.    ALTERNATIVE PLAN OF REORGANIZATION

The Trustee believes that the Plan affords holders of Claims the potential for the greatest realization on the Debtor's assets under the circumstances, as described herein.  If, however, the Plan is not confirmed and/or consummated, the theoretical alternatives include:

- formulation of an alternative plan or plans of reorganization by the Trustee or any other party in interest; or

- liquidation of the Debtor under chapter 7 or chapter 11 of the Bankruptcy Code.

## IX.    TAX CONSIDERATIONS

The treatment of Claims and Member Interests under the Plan may have important tax implications for creditors and Member Interest holders.  The Trustee has not performed and will not perform any analysis of such tax implications.  The tax effects must be determined separately by each creditor and Member Interest holder for themselves.  Holders of Claims and Member Interests are urged to obtain advice from their own tax advisors regarding the application of federal and state tax laws.  The Trustee makes no representations with respect to the tax implications of the Plan.

### IRS Circular 230 Disclosure

To ensure compliance with IRS Circular 230, each holder of a Claim is hereby notified that: (i) any discussion of U.S. federal tax issues in this Disclosure Statement is not intended or written to be used, and cannot be used, by such holder for the purpose of avoiding penalties that may be imposed on such holder under the Internal Revenue Code; (ii) any such discussion has been included by the Trustee as proponent of the transactions proposed in the Plan; and (iii) each such holder should seek advice based on their particular circumstances from an independent tax advisor.

## X.      CONCLUSION

For all the reasons set forth in this Disclosure Statement, the Trustee believes that confirmation and consummation of the Plan is in the best interests of all creditors, and urges all holders of a Claim or Member Interests entitled to vote to accept the Plan and to evidence such acceptance by returning their Ballots so that they will be received no later than [_____, 2013].

Dated: September 23, 2013.

| | |
|---|---|
| Joseph V. Womack | */s/ John Cardinal Parks* |
| WALLER & WOMACK | John Cardinal Parks |
| 303 N. Broadway, Suite 805 | Bart B. Burnett |
| Billings, MT  59101 | Robert M. Horowitz |
| Telephone:    (406) 252-7200 | Kevin S. Neiman |
| Fax:            (406) 252-4266 | HOROWITZ & BURNETT, P.C. |
| E-mail:        jwomack@jvwlaw.com | 1660 Lincoln Street, Suite 1900 |
| | Denver, CO  80264 |
| | Telephone:    (303) 996-8600 |
| | Fax:            (303) 996-8636 |
| | E-mail:        jparks@hblegal.net |
| | bburnett@hblegal.net |
| | bhorowitz@hblegal.net |
| | kneiman@hblegal.net |

*Counsel for the Chapter 11 Trustee*

-82-