**Jeffery A. Hunnes**
**Guthals, Hunnes & Reuss, P.C.**
**P.O. Box 1977**
**Billings, MT  59103-1977**
**Telephone Number 406-245-3071**
**Facsimile Number 406-245-3074**
**E-Mail: jhunnes@ghrlawfirm.com**
**Montana State Bar I.D. No. 2406**
**Attorneys for Tongue River Electric Cooperative, Inc.**

**Gary Ryder**
**P O Box 72**
**Hysham MT  59038**
**Phone: (406) 342-5546**
**Fax: (406) 342-5626**
**Email: garyryder@rangeweb.net**
**Montana State Bar I.D. No. 2548**
**Attorneys for Mid-Yellowstone Electric Cooperative, Inc.**

**John Paul**
**Law Office of John P. Paul, PLLC**
**P O Box 533**
**Great Falls  MT  59403**
**Phone: (406) 761-4422**
**Fax: (406) 761-2009**
**Email: johnpaul@qwestoffice.net**
**Montana State Bar I.D. No. 1789**
**Attorneys for Fergus Electric Cooperative, Inc.**

**Robert K. Baldwin (I.D. # 3248)**
**Trent M. Gardner (I.D. # 7477)**
**GOETZ, BALDWIN & GEDDES, P.C.**
**35 North Grand**
**P.O. Box 6580**
**Bozeman, MT 59771-6580**
**Ph: (406) 587-0618**
**Fax: (406) 587-5144**
**Email: rbaldwin@goetzlawfirm.com**
**tgardner@goetzlawfirm.com**
**Attorneys for Fergus Electric Cooperative, Inc.**

**Laurence R. Martin (Bar No. 948)**
**lmartin@feltmartinlaw.com**
**Martin S. Smith (Bar No.: 8721)**
**msmith@feltmartinlaw.com**
**FELT, MARTIN, FRAZIER & WELDON, P.C.**
**208 North Broadway, Suite 313**
**P.O. Box 2558**
**Billings, Montana 59103**
**Telephone: (406) 248-7646**
**Fax: (406) 248-5485**
**Attorneys for Beartooth Electric Cooperative, Inc.**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF MONTANA

| | | |
|---|---|---|
| **In Re:** | ) | **Case No. 11-62031-RBK** |
| | ) | |
| **SOUTHERN MONTANA ELECTRIC** | ) | |
| **GENERATION and TRANSMISSION** | ) | |
| **COOPERATIVE, INC.** | ) | |
| | ) | |
| **Debtor.** | ) | |
| | ) | |

---

### FIRST AMENDED DISCLOSURE STATEMENT FOR MEMBER COOPERATIVES' PLAN OF LIQUIDATION FOR SOUTHERN MONTANA ELECTRIC GENERATION AND TRANSMISSION COOPERATIVE, INC.

---

Beartooth Electric Cooperative, Inc., Fergus Electric Cooperative, Inc., Mid-Yellowstone Electric Cooperative, Inc. and Tongue River Electric Cooperative, Inc., each a member cooperative in Southern Montana Electric Generation and Transmission Cooperative, Inc. (the **"Debtor"**), hereby submit the following Disclosure Statement in support of the Member Cooperatives' Plan of Liquidation for Southern Montana Electric Generation and Transmission Cooperative, Inc. dated October 18, 2013.

This Disclosure Statement is submitted as a supplement to the Disclosure Statement for the Trustee's Third Amended Plan of Reorganization filed by the Chapter 11 Trustee, Lee A. Freeman **("Trustee")** on September 24, 2013 (Doc. 1049), which was approved by the Bankruptcy Court by Order dated October 1, 2013 (Doc. 1067) **("Trustee's Disclosure Statement")**.

This Disclosure Statement follows the outline of the topics and content of the Trustee's Disclosure Statement.  References to "Reorganized Southern" in provisions of the Trustee's Disclosure Statement that are adopted and incorporated herein refer to the "Debtor".

**THIS DISCLOSURE STATEMENT HAS NOT YET BEEN APPROVED BY THE COURT**

This proposed Disclosure Statement is not a solicitation of acceptance or rejection of the Members' Plan. Acceptances or rejections may not be solicited until the Bankruptcy Court has approved this Disclosure Statement under Bankruptcy Code § 1125. This proposed Disclosure Statement is being submitted for approval only, and has not yet been approved by the Bankruptcy Court.  This Disclosure Statement was drafted by Beartooth Electric Cooperative, Inc., Fergus Electric Cooperative, Inc., Mid-Yellowstone Electric Cooperative, Inc. and Tongue River Electric Cooperative, Inc. (collectively the "Members") as the members of Debtor, and their counsel.

SUMMARY OF THE MEMBERS' PLAN

The *Member Cooperatives' Plan of Reorganization for Southern Montana Electric Generation and Transmission Cooperative, Inc.*, as it may be amended or modified (the "**Members' Plan**"), submitted by the Members, provides for the prompt and complete liquidation and dissolution of the Debtor; sale, distribution or surrender of the Debtor's assets; substantial distributions to secured creditors commensurate with their collateral; a distribution to unsecured creditors that is equal to if not greater than what they would receive if the Debtor were to be liquidated in Chapter 7; and for the Members to transition to new power suppliers during a limited transition period following confirmation.

The other key elements of the Members' Plan are that the Debtor will appoint a Liquidating Agent to manage the Debtor's liquidation; Highwood Generating Station and other collateral is surrendered to the primary secured creditors, Prudential and Modern Woodmen; the Members' All-Requirements Contracts with Debtor are rejected and terminated; and, the Debtor's power contract with Western Area Power Administration is assigned in agreed allocated shares to the participating Members.

**THE MEMBERS BELIEVE THAT THE MEMBERS' PLAN PROVIDES THE MOST FAIR, EQUITABLE AND BALANCED RESOLUTION OF THE CLAIMS AGAINST THE DEBTOR AND THE INTERESTS OF THE MEMBERS AND WILL PROTECT THE INTERESTS OF THE MEMBERS' PATRONS/CUSTOMERS.  THE MEMBERS STRONGLY RECOMMEND THAT YOU VOTE TO ACCEPT THE MEMBERS' PLAN.**

The Members are seeking to obtain Bankruptcy Court approval of the Members' Plan. Section 1125 of the Bankruptcy Code requires that the Members prepare a disclosure statement containing adequate information of a kind, and in sufficient detail, to enable a hypothetical reasonable investor to make an informed judgment regarding acceptance of the Members' Plan. This Disclosure Statement has been submitted in accordance with such requirements.

## I. INTRODUCTION

The Members submit this disclosure statement (the "**Disclosure Statement**") pursuant to section 1125 of title 11 of the United States Code (the "**Bankruptcy Code**") in connection with the solicitation of acceptances and rejections with respect to the Members' Plan, a copy of which is attached as **Exhibit 1** hereto. The Members' Plan incorporates, without limitation, all exhibits,

supplements, appendices, and schedules thereto, either in their present form or as the same may be altered, amended, or modified from time to time, or added. Unless otherwise defined herein, all capitalized terms contained herein have the meanings ascribed to them in the Members' Plan.

The purpose of this Disclosure Statement is to set forth information to supplement the Trustee's Disclosure Statement (i) regarding the history of the Debtor, its business, and the Chapter 11 Case; (ii) concerning the Members' Plan and alternatives to the Members' Plan; (iii) advising holders of Claims and Member Interests of their rights under the Members' Plan; (iv) assisting the holders of Claims in making an informed judgment as to whether they should vote to accept or reject the Members' Plan; and (v) assisting the Bankruptcy Court in determining whether the Members' Plan complies with the provisions of chapter 11 of the Bankruptcy Code and should be confirmed.

**All holders of Claims and Member Interests are advised and encouraged to read this Disclosure Statement, its exhibits, other documents referred to in the Disclosure Statement, and the Members' Plan in their entirety and to consult with counsel and business and tax advisors. This Disclosure Statement is not legal advice to you. This Disclosure Statement may not be relied upon for any purpose other than for you to determine how to vote on the Members' Plan. This Disclosure Statement is not intended to replace careful and detailed review and analysis of the Members' Plan (or any competing Plan before the Bankruptcy Court for confirmation) by each holder of a claim or interest entitled to vote thereon. This Disclosure Statement is intended to aid and supplement your review of the Members' Plan. The description of the Members' Plan herein is only a summary and holders of claims or interests and other parties in interest are cautioned to review the Members' Plan themselves for a more complete understanding of the Members' Plan. If any inconsistency exists between the Members' Plan and this Disclosure Statement, the terms of the Members' Plan are controlling. The Members' Plan summary in this Disclosure Statement is qualified in its entirety by the Members' Plan and the exhibits and schedules attached to the Members' Plan and this Disclosure Statement. The statements and information contained in this Disclosure Statement are made only as of the date hereof. There can be no assurance that the statements and information contained in this Disclosure Statement will be correct or not have changed at a later time or that you will receive any notice of such changes.**

**This Disclosure Statement includes certain statements, estimates, projections, and assertions provided in good faith by the Members, but reflect assumptions and analysis by the Members, which may or may not prove to be correct. The Members do not undertake any obligation to provide additional information or to correct or update any of the statements and information set forth in this Disclosure Statement or the exhibits hereto.**

**[Awaiting approval of Bankruptcy Court: This Disclosure Statement has been prepared, approved, and distributed in accordance with section 1125 of the Bankruptcy Code, and Bankruptcy Rule 3016(b), and not necessarily in accordance with federal or state securities laws or other non-bankruptcy law. Further, any financial information contained in this Disclosure Statement was not prepared with a view toward compliance with the guidelines established by the American Institute of Certified Public Accountants, the practices recognized to be in accordance with generally accepted accounting principles, or the rules and regulations of the Securities and Exchange Commission regarding projections. No financial information in this document has been reviewed or audited by the Debtor's**

4

independent accountants.  This Disclosure Statement has not been approved by any federal or state securities agencies.  Approval by the Bankruptcy Court does not constitute a recommendation by the Court as to the merits of the Members' Plan, but includes a finding that this Disclosure Statement contains adequate information to enable you to decide whether to vote for or against the Members' Plan.]

A Ballot for the acceptance or rejection of the Members' Plan is enclosed with the Disclosure Statement submitted to the holders of Claims and Membership Interests that the Members believe may be entitled to vote to accept or reject the Members' Plan.

This Disclosure Statement is not and may not be construed as an admission of any fact or liability, stipulation, or waiver in contested matters, adversary proceedings, or other actions or threatened actions, including but not limited to the Members' objections to the Trustee's Plan.  This Disclosure Statement shall not be admissible in any non-bankruptcy proceeding nor shall it be construed to be conclusive advice on the tax, securities, or other legal effects of the Plan as to holders of claims against, or equity interests in, the Debtor.

No solicitation of votes to accept the Plan may be made except pursuant to section 1125 of the Bankruptcy Code.  No representations concerning the Debtor or the value of the Debtor's property has been authorized by the Members or the Bankruptcy Court other than as set forth in this Disclosure Statement.  Any information, representations, or inducements made to obtain acceptance of the Members' Plan, which are other than or inconsistent with the information contained in this Disclosure Statement and in the Members' Plan, should not be relied upon by any holder of a Claim entitled to vote on the Members' Plan.

For purposes of brevity, this Disclosure Statement follows the format of the Trustee's Disclosure Statement and incorporates certain of the disclosures from the Trustee's Disclosure Statement, which the Members believe are adequate to provide information about the Debtor's business, financial condition, assets, liabilities, revenues, expenses, and about the Trustee's assertions and arguments.  This Disclosure Statement provides information from the Members on the matters discussed in the Trustee's Disclosure Statement pertinent to understanding the Members' Plan and the good faith reasoning of the Members in seeking your vote in favor of the Members' Plan.  Although this Disclosure Statement incorporates certain of the statements and discussion from the Trustee's Disclosure Statement for information purposes, such incorporation shall not be deemed an admission as to any of Trustee's arguments or a waiver of any claims or defenses available to Members.

### A. HOLDERS OF CLAIMS/MEMBER INTERESTS ENTITLED TO VOTE

The Members adopt and incorporate herein the following provisions of the Trustee's Disclosure Statement: Section I A first paragraph, first sentence of second paragraph, and all of third paragraph.  The remainder of Section I A is replaced to state as follows:

Claim and interests in Classes 2 (Prudential and Modern Woodmen), 3 (First Interstate Bank Loans), 4 (CFC), 5 (Construction Lien Claims), 6 (General Unsecured Claims), 7 (Convenience Claims), 8 (Member Patronage Capital and similar Claims), and 9 (Member Interests) are impaired under the Members' Plan and Claims and Interests in such

Classes will receive distributions under the Plan to the extent not otherwise waived. As a result, holders of Allowed Claims and Interests in those Classes are entitled to vote to accept or reject the Plan.

Holders of Claims in Class 1 (Priority Non-Tax Claims) are unimpaired by the Plan. As a result, holders of Claims in Class 1 are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.

The Members have prepared the attached Members' Plan and are commencing this solicitation after extensive negotiations or attempts at negotiations with, the Trustee, Prudential, Modern Woodmen, the Committee of Unsecured Creditors, and the Western Area Power Administration.  The Members have also engaged in extensive negotiation among themselves and with the Debtor's previous members: Yellowstone Valley Electric Cooperative, Inc. ("YVEC") and Great Falls/Electric City Power, Inc. (collectively, the "City").  The Members are commencing this solicitation because they believe that liquidation of the Debtor is in the best interests of the creditors and the Members and their patrons/customers.

THE MEMBERS BELIEVE THAT THE MEMBER'S PLAN IS FAIR AND EQUITABLE AND PROVIDES THE BEST RECOVERY TO CLAIM HOLDERS UNDER THE CIRCUMSTANCES.  THE MEMBERS BELIEVE THAT ACCEPTANCE OF THE PLAN IS IN THE BEST INTERESTS OF EACH AND EVERY CLASS OF CREDITORS AND INTEREST HOLDERS ENTITLED TO VOTE ON THE MEMBERS' PLAN AND STRONGLY RECOMMEND THAT EACH CREDITOR AND INTEREST HOLDER VOTE TO ACCEPT THE MEMBER'S PLAN.

Holders of Claims or Member Interests may obtain a copy of the Disclosure Statement and the Plan by contacting any of the Members' counsel at the email addresses or telephone numbers in the caption of this Disclosure Statement.

Sections I B and C of the Trustee's Disclosure Statement are replaced in its entirety with the following:

### B. VOTING PROCEDURES

If you are entitled to vote to accept or reject the Plan, a Ballot is enclosed for the purposes of voting on the Plan. If you hold Claims in more than one Class and you are entitled to vote Claims in more than one Class, you will receive separate Ballots, which must be used for each separate Class. Ballots should be returned to:

**Office of the Clerk Court**
**U.S. Bankruptcy Court District of Montana**
**Mike Mansfield Federal Building and U.S. Courthouse, Room 303**
**400 North Main Street**
**Butte, MT 59701**

**With copies to:**
**Jeffery A. Hunnes**
**Guthals, Hunnes & Reuss, P.C.**
**P.O. Box 1977**
**Billings, MT  59103-1977**

**Neal Jensen**
**United States Trustee's Office**
**Liberty Center, Suite 204**
**301 Central Avenue**
**Great Falls, MT 59401**

**TO BE COUNTED, YOUR BALLOT INDICATING ACCEPTANCE OR REJECTION OF THE MEMBERS' PLAN MUST BE RECEIVED BY NO LATER THAN [_____ ____ , 2013], THE VOTING DEADLINE. ANY EXECUTED BALLOT RECEIVED THAT DOES NOT INDICATE EITHER AN ACCEPTANCE OR A REJECTION OF THE MEMBERS' PLAN SHALL NOT BE COUNTED.**

**In addition, as contemplated in the Members' Plan, a Claim is a Class 7 Convenience Claim if such Claim is (a) Allowed in an amount equal to or less than $5,000, or (b) Allowed in an amount greater than $5,000 but is reduced to $5,000 by an irrevocable written election by the holder of such Allowed Claim on the timely submitted Ballot. Accordingly, the Ballot provides for such election.**

**Do not return any other documents with your Ballot.**

**If you are a holder of a Claim or Interest entitled to vote on the Members' Plan and you did not receive a Ballot, received a damaged Ballot, or lost your Ballot, or if you have any questions concerning the Disclosure Statement, the Members' Plan, or the procedures for voting on the Members' Plan, please contact one of the Members' counsel at the email addresses or telephone numbers in the caption of this Disclosure Statement.**

### C. CONFIRMATION HEARING AND DEADLINE FOR OBJECTIONS

**Section 1128 of the Bankruptcy Code requires the Bankruptcy Court to hold a hearing on confirmation of the Members' Plan.  The Confirmation Hearing will be held on _____, 2013 at _____ (Mountain Time) before the Honorable Ralph B. Kirscher, United States Bankruptcy Court for the District of Montana, at 2601 Second Avenue North, Billings, Montana 59101.  The Bankruptcy Court has directed that objections, if any, to confirmation of the Members' Plan, must be in writing and must be filed with the Bankruptcy Court and served upon Jeffery A. Hunnes, Guthals, Hunnes & Reuss, P.C., P.O. Box 1977, Billings, MT  59103-1977, so they are received by counsel for the Members no later than [_____ ___, 2013].  The Confirmation Hearing may be adjourned from time to time without further notice except for the announcement of the adjournment date made at the Confirmation Hearing or at any subsequent adjourned Confirmation Hearing.**

Section II A of the Trustee's Disclosure Statement is replaced in its entirety with the following:

## II. OVERVIEW OF THE PLAN

### A.   SUMMARY OF CLASSIFICATION AND TREATMENT OF CLASSIFIED CLAIMS AND MEMBER INTERESTS

**The following table briefly summarizes the classification and treatment of classified claims and interests under the Members' Plan:**

| Class Description | Impairment and Vote | Treatment |
|---|---|---|
| Class 1: Priority Non-Tax Claims | Unimpaired<br>No | Paid in full on the Effective Date or as soon thereafter as Allowed. |
| Class 2: Prudential and Modern Woodmen | Impaired<br>Yes | The Prudential Claim, evidenced by the Series 2010(A) Notes, and the Modern Woodmen Claim, evidenced by the Series 2010(B) Note, shall be Allowed as Secured Claims in an aggregate principal amount equal to the value of the Noteholders' collateral, consisting of HGS (which the Noteholders have valued at $16,500,000), Encumbered Cash, and the assets described on Exhibits A and B to Schedule 1 of the Indenture, but excluding from Noteholders' collateral the All-Requirements Contracts, the WAPA Contracts, Unencumbered Cash, and the property or interests described as Excepted Property or Excludable Property in the Indenture.   Any alleged pledge of the All-Requirements Contracts shall be terminated by rejection and termination of the All-Requirements Contracts as provided under Articles 5.10 and 8.2 of the Members' Plan.   The Prudential Allowed Secured Claim and the Modern Woodmen Allowed Secured Claim shall not bear interest.<br><br>The Prudential Allowed Secured Claim and the Modern Woodmen Secured Claim shall be paid and satisfied in full by the Debtor surrendering HGS and the other described collateral to Prudential and Modern Woodmen on the Effective Date, subject however to: (i) prior settlements entered into in the Bankruptcy Case; (ii) resolution of any disputes as to whether cash is Encumbered or Unencumbered Cash; (iii) any Avoidance Actions; and, (iv) any and all prior Liens or mortgages, including without limitation the Property Tax Claims and the Construction Lien Claims. |

| Class Description | Impairment and Vote | Treatment |
|---|---|---|
| | | The balance of any Claims of Prudential, Modern Woodmen, Noteholders or the Indenture Trustee in excess of the amount of the Prudential Allowed Secured Claim or the Modern Woodmen Allowed Secured Claim shall be a General Unsecured Claims treated in accordance with Class 6 of the Plan. |
| Class 3: First Interstate Loans | Impaired Yes | The First Interstate Bank Secured Loan Claim shall be Allowed in the amount of the First Interstate Bank Secured Loan outstanding as of the Petition Date.<br><br>First Interstate Bank shall be granted relief from stay to exercise all of its state law rights and remedies against the First Interstate Bank Secured Loan Collateral. Debtor shall make no further payment on the First Interstate Bank Secured Loan Claim. The real property owned by Debtor shall be sold and net proceeds of sale applied first to satisfy the First Interstate Bank Secured Loan Claim. In the event there are surplus proceeds after sale, First Interstate shall deliver such excess proceeds to the Debtor, through the Liquidating Agent, to apply as additional payment to Allowed General Unsecured Claims under Class 6 of the Plan. In the event of a deficiency remaining after application of proceeds of sale of Debtor's real property, the real property owned by SME shall be sold and net proceeds of sale applied to satisfy any deficiency owed on the First Interstate Bank Secured Loan Claim. In the event of a deficiency remaining after application of proceeds of sale of SME's real property, the balance of the First Interstate Secured Loan Claim shall be a General Unsecured Claim and treated and paid in accordance with Class 6 of the Plan. In the event there are surplus proceeds after sale of the SME real property, the surplus shall be delivered to SME.<br><br>The First Interstate Bank Unsecured Loan is treated in accordance with Class 6 of the Plan. First Interstate Bank shall be entitled to exercise any applicable non-bankruptcy remedies in collection of the First Interstate Bank Unsecured Loan or any balance owed following the sale procedures for the First Interstate Bank Secured Loan Collateral. |

| Class Description | Impairment and Vote | Treatment |
|---|---|---|
| | | |
| Class 4 - CFC | Impaired Yes | The CFC Claim, evidenced by the CFC Loan, shall be Allowed in the amount of the CFC Loan outstanding as of the Petition Date. CFC shall be Allowed a Secured Claim in the amount of the value of the CFC Loan Collateral. <br><br> CFC shall be granted relief from stay with respect to the CFC Loan Collateral, and the amount of the CFC Loan Collateral shall be applied in full to payment of the Allowed Secured Claim of CFC. Debtor shall make no further payment of the Allowed Secured Claim of CFC. <br><br> The balance of the CFC Allowed Claim shall be an Allowed General Unsecured Claim and treated in accordance with Class 6 of the Plan. CFC shall be entitled to exercise any applicable non-bankruptcy remedies in collection of the balance of the CFC Claim. |
| Class 5 – Construction Lien Claims | Impaired Yes | Construction Lien Claims shall be Allowed as Secured claims in the full amount owed and outstanding as of the Petition Date, unless otherwise determined by the Bankruptcy Court, including statutory interest and attorneys' fees. The Construction Lien Claim holders shall be granted relief from stay with respect to the Allowed Construction Lien Claims to exercise all of their state law rights and remedies against HGS. The Construction Lien Claim Holders shall retain their Liens which secure their Allowed Construction Lien Claims against HGS and any proceeds of sale of HGS following surrender of HGS to Prudential and Modern Woodmen. |
| Class 6 – General Unsecured Claims | Impaired Yes | Except to the extent that the holder of an Allowed General Unsecured Claim agrees to less favorable treatment or has been paid on account of such General Unsecured Claim prior to the Effective Date, each holder of an Allowed General Unsecured Claim shall receive its Pro Rata share of the remaining surplus of the Unencumbered Cash and the Liquidation Operating Fund upon completion of the Liquidation Period. The Unencumbered Cash |

| Class Description | Impairment and Vote | Treatment |
|---|---|---|
| | | available to pay Allowed General Unsecured Claims shall include any Cash proceeds received by the Estate, the Trustee or the Debtor from the Yellowstone Valley Settlement and the Northwestern Energy deposit.<br><br>On the Effective Date, Debtor shall assign to the Committee any and all right, title and interest in and to the Avoidance Actions, including without limitation all proceeds of the Avoidance Actions. The Unencumbered Cash available to pay Allowed General Unsecured Claims in accordance with the Plan shall include shall include any Cash proceeds received by the Committee. On the Effective Date, Debtor will assign the Central Montana patronage allocation to the Unsecured Creditors to the extent assignable; provided that the Members will retain the Central Montana patronage allocation if not assignable.<br><br>Distribution of the Pro Rata payment to the Allowed General Unsecured Claims shall be made as follows: (i) the Unencumbered Cash and the balance of the Liquidation Operating Fund, remaining upon completion of the Liquidation Period; and (ii) or at any time after the Effective Date regarding any Unencumbered Cash proceeds received by the Unsecured Creditors Committee pursuant to any Avoidance Actions. The Unsecured Creditors Committee shall be responsible for distribution of any net proceeds received from any Avoidance Action.<br><br>The Members shall waive and release any General Unsecured Claims against the Debtor and shall receive nothing for their General Unsecured Claims from liquidation of the Debtor. |
| Class 7 – Convenience Claims | Impaired Yes | Except to the extent that the holder of an Allowed Convenience Claim agrees to less favorable treatment or has been paid on account of such Claim prior to the Effective Date, each holder, if any, of an Allowed Convenience Claim shall receive Cash in an amount equal to 50% of such Allowed Convenience Claim on the later of the Effective Date |

| Class Description | Impairment and Vote | Treatment |
|---|---|---|
| | | or the date such Claim becomes an Allowed Convenience Claim, or as soon thereafter as is practicable.<br><br>Each holder of a Claim Allowed in an amount greater than $5,000, which Claim would otherwise be a General Unsecured Claim, may elect to voluntarily reduce such Claim to $5,000 and be treated as the holder of an Allowed Convenience Claim, and by so electing shall be deemed to have waived any right to participate in any distribution to any Class other than Class 7 as to any Claims it may have. Such election must be made on the Ballot and be received by the Debtor, through the Liquidating Agent on or prior to the Voting Deadline. Any election made after the Voting Deadline shall not be binding or effective. |
| Class 8 – Member Claims | Impaired<br>Yes | On the Effective Date, the Members shall waive and release any Member Claims against the Debtor and shall receive nothing for their Member Claims from liquidation of the Debtor. |
| Class 9 – Member Interests | Impaired<br>Yes | Upon liquidation of all of the assets of the Debtor, the Members shall waive, release, surrender and disclaim their Member Interests and Member Certificates in Debtor and shall receive nothing for their Member Interests from liquidation of the Debtor. |

## B. SUMMARY OF TREATMENT OF UNCLASSIFED CLAIMS

The Members adopt and incorporate the following provisions of the Trustee's Disclosure Statement: Section II B (introductory paragraph) and Section II B 1 (Administrative Expense Claims and Bar Date).

The Members adopt and incorporate the following provisions of the Trustee's Disclosure Statement: Section II B 2 a (Professional Fee Claims); II B 2 b (Priority Tax Claims); II B 2 c (Fees Due the United States Trustee); II B 2 d (Real Property Taxes); provided, that references to "Reorganized Southern" or the "Trustee" therein should be substituted with reference to "Debtor" or the "Members" as applicable.

Section II B 2 e of the Trustee's Disclosure Statement is replaced in its entirety with the following:

### e. *Executory Contracts/Unexpired Leases; Claims*

**Allowed Claims arising out of executory contracts or unexpired leases that are being assumed or assumed and assigned under the Members' Plan, as set forth on Exhibit A to the Members' Plan, are not classified. Rather, except as may otherwise be agreed to by the parties, within 60 days after the Effective Date, Debtor or the party to whom the contract is assigned, shall cure any and all undisputed defaults under the executory contracts and unexpired leases by paying the Cure amount as determined by the Bankruptcy Court or as agreed to by the parties. All disputed defaults that are required to be cured shall be cured either within 60 days of the entry of a Final Order determining the amount, if any, of the Estate's, Debtor's or Assignee's liability with respect thereto, or as may otherwise be agreed to by the parties. The Members reserve the right, however, after the date of this Disclosure Statement but on or prior to the Confirmation Date, to amend the Members' Plan to delete any executory contract or unexpired lease from Exhibit A of the Members' Plan, or add any executory contract or unexpired lease to Exhibit A of the Members' Plan, in which event such executory contract or unexpired lease shall be deemed to be, respectively, rejected or assumed. Any Claims that may arise from the rejection of executory contracts or unexpired leases pursuant to the Members' Plan will be treated as General Unsecured Claims or Convenience Claims, as applicable. As such, to preserve its voting rights in the event that an executory contract or unexpired lease is ultimately rejected, any party to an executory contract or unexpired lease that believes it may have a claim relating to such executory contract or unexpired lease if the contact or lease were to be rejected should submit a Ballot in accordance with the voting procedures set forth herein whether or not such contract or lease is currently on Exhibit A to the Members' Plan. For avoidance of doubt, the Members will send a Ballot to all parties to executory contracts or unexpired leases, including those that are currently contemplated to be assumed or assumed and assigned as set forth on Exhibit A to the Members' Plan. The Ballot will only be counted as a vote on the Members' Plan if it is submitted in accordance with the voting procedures and if the executory contract or unexpired lease is not on Exhibit A to the Members' Plan as of the Confirmation Date and is therefore an executory contract or unexpired lease that will be deemed rejected as of the Effective Date.**

**The Members contend that the Trustee cannot assume, assign or modify the All-Requirements Contracts without their consent and that any assumption, assignment or modification without their consent renders the All-Requirements Contracts void and unenforceable. The Members do not consent to the assumption, assignment or modification of the All-Requirements Contracts under the Trustee's Plan.**

**Claims arising out of the rejection of an executory contract or unexpired lease pursuant to the Members' Plan must be filed with the Bankruptcy Court and served upon the Debtor by the later of: (a) 30 days after notice of entry of the Confirmation Order; or (b) 30 days after the entry of a Final Order by the Bankruptcy Court resolving any pending motion for the assumption or rejection of any executory contract or unexpired lease. All such Claims not filed within such time shall be forever barred from assertion against the Debtor or the Estate and their property and shall be deemed disallowed in full, released and discharged.**

## III. GENERAL INFORMATION

The Members adopt and incorporate the following provision of the Trustee's Disclosure Statement:  Section III A (Overview of Chapter 11), Section III B 1 a, b, c, d and e, except the following supplements with references to Sections III B 1 c and d:

**III B 1.c.**

**Because of the special nature of G&T Cooperatives and their relationships with their Members, all requirement contracts are not assignable without the consent of the Member party to such contract.**

**III B 1.d.**

**At the annual members' meeting in March 2012, the Debtor's Board of Trustees did not elect a slate of new officers (or conduct other business) because they were deadlocked. The Members deny the Trustee's contention that the Debtor's Board of Trustees did not elect a slate of new officers "because the Trustee has assumed virtually all of the rights and powers of the Debtor's Board of Trustees".**

**In addition, the Trustee was only appointed in this bankruptcy because the Board of Trustees was deadlocked, not because of any wrongful actions of the Debtor or its Board of Trustees.  Now that the Members and the Debtor's Board of Trustees unanimously agree that the only viable course of action is liquidation, there is no longer a need for the Trustee and the substantial expenses associated with the Trustee.**

The Members adopt and incorporate the following provisions of the Trustee's Disclosure Statement: Sections III B 2 (Highwood Generating Station and SME); III B 3 (Other Assets); III B 4 (Prepetition Indebtedness), except the following supplement with reference to Section II B 4 a:

**The Members did not individually guarantee any of Southern's debt to the Noteholders.**

The Members adopt and incorporate the following provisions of the Trustee's Disclosure Statement: III B 5 (Power Purchase/Electricity Transmission/Gas Transmission Agreements), III B 6 (Regulatory Oversight of the Debtor); and, III B 7 (Prepetition Business Operations), except the following supplement with reference with Section III B 7:

**The Members deny the Trustee's contention that major expenditures are not required to keep HGS operational and capable of generating power.   The Members contend that major expenditures are necessary to keep HGS operational, including purchase of spare parts, acquisition of a service contract with General Electric, and necessary improvements and upgrades.**

The Members adopt and incorporate the following provisions of the Trustee's Disclosure Statement:  Section III B 8 (The Debtor's Prepetition Rates to Its Members), with the following supplement:

The Debtor made significant payments to PPL in 2011, including payments for power that the Debtor could not use and was required to sell back to PPL at a discount. The Debtor borrowed $5,000,000 from CFC to fund these power payments and to place additional deposits required by PPL. The Debtor's $5,000,000 CFC loan was guaranteed by the Members (excluding Beartooth Electric Cooperative, which was prohibited from guaranteeing the CFC loan by the Wyoming Public Service Commission). The Debtor also renewed a $1,250,000 unsecured line of credit with First Interstate Bank to help fund power purchase obligations. The Debtor's a $1,250,000 unsecured line of credit with First Interstate Bank was also guaranteed by the Members.

The 53.1% increase in rates from Debtor to the Members between February 18, 2009 and June 17, 2011 was crippling to the Members and their patrons and customers. The increased rates to the Members patrons/customers were contributed to by the Members' payment of costs and expenses for the permitting, design and initial construction work on HGS before the Noteholders' financing was completed and by costs of litigation related to HGS. The resulting rate increases to rural Montana and Wyoming customers caused a revolt at Beartooth, including the replacement of Beartooth's trustee on the Debtor's Board of Trustees and a removal of several of Beartooth's trustees. The increased rates which the Members were required to pass on to their customer/patrons have caused patrons/customers to look to other electric power sources and to openly and publicly criticize the Debtor and its management.

Section III B 9 of the Trustee's Disclosure Statement is replaced in its entirety with the following:

### 9. The Debtor's Projected Rates under the Trustee's Plan

The Members believe that their current rates from the Debtor are excessive and well above the "market" rate for wholesale power and that the projected rates under the Trustee's Plan as described in the Trustee's Disclosure Statement will result in financial failure for the Debtor and cascading financial failures for the Members and/or their rural Montana patrons/customers.

The Trustee's projected wholesale power rates to the Members are understated in the Trustee's Plan. The Trustee acknowledges in the Trustee's Disclosure Statement that the MSCGI Agreement requires the Members to execute a Guarantee Agreement. The Trustee's Disclosure Statement states "[I]f the Members refuse to sign such guarantees, then MSCGI and the Trustee will agree upon alternative forms of security including increasing the rates under the MSCGI Agreement to reflect the additional risk presented to MSCGI by the absence of such guarantees." (Doc. 1049 at 64) The Members did not guarantee Southern's power purchase agreement with PPL and have advised the Trustee that they will not guarantee the MSCGI Agreement. Therefore the Trustee's projected rates are not accurate and the Trustee has failed to disclose the actual rates.

The Trustee's projected wholesale power rates reflected in the Trustee's Disclosure Statement, which by the Trustee's own admission are understated, show the following projected increases to the Members:

15

| | |
|---|---|
| **2014** | **$70.43** |
| **2015** | **$75.42** |
| **2016** | **$79.60** |
| **2017** | **$80.94** |
| **2018** | **$82.12** |
| **2019** | **$86.90** |
| **2020** | **$87.10** |
| **2021** | **$87.28** |
| **2022** | **$88.47** |
| **2023** | **$89.66** |
| **2024** | **$91.78** |
| **2025** | **$93.65** |

**Even these understated rates reflect more than a 10% wholesale rate increase between December 2014 and December 2016; and a nearly 25% wholesale rate increase between December 2014 and December 2019.**

**The Trustee's Disclosure Statement argues that a realistic comparison of acceptable rates for the Members should be derived from 2009 financial projections prepared by Southern's management, in a summary report of Southern's accountants, Douglas Wilson & Co. P.C. The Members believe that the projections are taken out of context and the Trustee has not fully disclosed the circumstances surrounding the projections. Regardless, the projections are from 2009, and the Debtor has since filed bankruptcy. Thus the 2009 projections are irrelevant to the issues in this bankruptcy and the Debtor's prospects for moving forward. The Members believe that the 2009 financial forecast was just that – financial projections made in a different economic environment and before the Debtor's bankruptcy.**

**The Members agree with the Trustee's Disclosure Statement that the rates charged by other wholesale power marketers in the area are lower than the wholesale rates charged by the Debtor to the Members. The Trustee's Disclosure Statement references the Basin wholesale rate and Basin's response to the Trustee's RFP. It states that Basin advised the Trustee that it was willing to sell power to the Debtor's Members through one of its Montana Class A members at a premium of $6.00/MWh above its Class A rate. (Doc. 1049 at 33) The Trustee's Disclosure Statement fails to disclose that Basin's response to the RFP included a packaged proposal to purchase HGS; and, some of the Members believed the premium to finance the purchase of HGS.**

**The Members believe that the projected wholesale rates under the Trustee's Plan are unreasonable and will result in financial failure of the Debtor through or as a result of the failure of some of the Members and their patrons/customers. The Members believe that the Members' Plan is the best viable alternative to the Trustee's Plan which will impose unacceptable power rates on the Members' rural Montana customers and perpetuate the crushing debt that presently cripples the Debtor.**

The Members adopt and incorporate the following provisions of the Trustee's Disclosure Statement: Sections III B 10 (Prepetition Employee Matters).

### C. SIGNIFICANT ADDITIONAL EVENTS LEADING TO THE CHAPTER 11 CASE

The Members adopt and incorporate the following provisions of the Trustee's Disclosure Statement: Sections III C introductory section (Significant Additional Events Leading to the Chapter 11 Case), with the following supplement:

**The Members believe that the permitting, financing and construction of HGS was a contributing factor to the Debtor filing bankruptcy. The Debtor and the Members expended significant amounts of capital in designing and seeking financing for HGS as it was initially intended as a coal-fired generation plant. The Debtor and the Members also expended significant amounts of capital in the permitting, financing and construction of HGS and for attorney's fees and costs incurred for legal actions that accompanied its siting, permitting and construction.**

**The Temple Report, which has now been finalized and is available to creditors, provides insights into the history of the Debtor and events leading to its Chapter 11 filing.**

**The Members believe that the Debtor cannot reorganize as an ongoing operational entity because of the differences among them, particularly the differences between the Members and Southern, the differences between the other Members and Beartooth, and fundamental differences regarding operational issues among all Members. The Members desire stability and certainty for their own rural Montana customers and firmly believe it is impossible to provide such stability through Debtor.**

The Members adopt and incorporate the following provisions of the Trustee's Disclosure Statement: Sections III C 1 (The YVEC Litigation); III C 2 (The Great Falls/ECP Litigation) and II C 3 (The Billings Gazette Litigation), with the following supplement:

**The Members believe that the YVEC State Court Litigation, the Great Falls Litigation and the Billings Gazette Litigation were all contributing factors in the Debtor's bankruptcy filing. In addition, there were legal actions filed to challenge the construction of HGS. The Debtor incurred significant legal fees and costs in defending each of these legal actions.**

### IV. THE CHAPTER 11 CASE

The Members adopt and incorporate the following provisions of the Trustee's Disclosure Statement: Section IV A through O. The Members adopt and incorporate the following provisions of the Trustee's Disclosure Statement: Sections IV P (Adversary Proceedings), with the following supplement to Section IV P 1 (The Beartooth Adversary Proceeding):

**The Members believe the Beartooth Adversary Proceeding has merit. The Members do not believe that the Trustee's Plan is confirmable regardless of the outcome of the Beartooth Adversary Proceeding or the Noteholders' appeal of an adverse decision.**

Section IV P 3 (The Construction Lien Adversary Proceeding) of the Trustee's Disclosure Statement is replaced in its entirety with the following:

**3. The Construction Lien Adversary Proceeding**

**On May 10, 2013, EPC Services Company ("EPC") commenced an adversary proceeding against the Noteholders, the Trustee, and certain parties purporting to have perfected construction liens against HGS, bearing Adv. No. 13-00016 (Doc. 844). In this adversary proceeding, EPC seeks a judicial determination of the nature, extent, and priority of the liens asserted against HGS. The Trustee and the other parties have filed answers to the adversary complaint and, in some cases, cross-claims against other parties. Discovery is ongoing in this proceeding, and a pretrial conference is scheduled for September 4, 2013. The Member's Plan provides for appropriate treatment of any Allowed Claims of the construction lien holders by providing for payment of reasonable interest and attorney's fees and recognizing their first priority lien in HGS.**

The Members supplement the Trustee's Disclosure Statement with the following Section IV P 4:

**4.     Members Adversary Proceeding**

**On September 23, 2013, the Members commenced an adversary proceeding against the Trustee, bearing Adv. No. 13-00036 (Doc. 1053). In this adversary proceeding, the Members seek a judicial determination that the All-Requirements Contracts cannot be assumed or assigned by the Trustee without the consent of the Members and that the assumption and assignment proposed in the Trustee's Plan impermissibly modifies the All-Requirements Contracts and renders them void and unenforceable. The Trustee has not yet filed an answer in the adversary proceeding.**

The Members adopt and incorporate the following provisions of the Trustee's Disclosure Statement: Section IV Q (Claims Process and Bar Date).

The Members adopt and incorporate the following provisions of the Trustee's Disclosure Statement: Section IV R (The Plan Process), except with reference to Section IV R 1 the Members make the following addition:

**The Members believe that the Trustee's Plan as proposed is not confirmable because: (i) the Plan includes and relies on the MSCGI Agreement as a cornerstone for reorganization and the MSCGI Agreement requires the Members to execute a Guarantee Agreement which they not willing to provide; and (ii) the Trustee's Plan imposes the MSCGI Agreement on the Members in violation of their rights under the Debtor's Articles, Bylaws, Montana law and the All-Requirements Contracts that form the basis of their interrelationship with the Debtor. The Members did not guarantee the PPL power purchase agreement and have advised the Trustee that they will not guarantee the MSCGI Agreement.**

The Members adopt and incorporate the following provisions of the Trustee's Disclosure Statement: Section IV S (The PPL Administrative Expense Claim). The Members adopt and

incorporate the following provisions of the Trustee's Disclosure Statement: Section IV T (The YVEC Settlement), with the following supplement:

**The Members believe that the YVEC settlement and the City settlement adversely affected the viability of a reorganization of the Debtor and the Debtor's ability to continue to operate because YVEC and the City constituted approximately 50% of the Debtor's electric power load as of mid-2011.  YVEC and the City contributed to payment of the general and administrative expenses and the overhead of Debtor and purchased power from the Debtor. The future financial benefit of their contribution to overhead is paid over to the Noteholders or the General Unsecured Creditors, rather than to helping defray the Debtor's expenses.  If YVEC and the City had remained as positive contributing members of the Debtor, the viability of a future reorganization and the Debtor's ability to operate as a G&T with electric generation would have been vastly enhanced.**

**The Members acknowledge that the Trustee deemed resolution of the YVEC District Court Action, the City District Court Action and the City Adversary Proceeding as necessary and prudent from the standpoint of eliminating litigation expense and uncertainty, and the deadlock created by the presence of YVEC and the City as members of the Debtor. However, the Trustee's settlements with YVEC and the City have left the Debtor with only four members and a greatly reduced load and ability to pay operating expenses and debt, leaving liquidation as the only realistic option.**

**Like YVEC and the City of Great Falls/ECP, the Members did not guarantee the Debtor's obligations to the Noteholders.  The Debtor granted the Noteholders a security interest in the Debtor's right to payments under the All-Requirements Contracts between the Debtor and the Members.  The Members contend that the All-Requirements Contracts cannot be assumed or assigned under the Bankruptcy Code without their consent and that the Trustee's Plan, by its modification of the All-Requirements Contracts and by its involuntarily imposed assumption and assignment, renders the All-Requirements Contracts void and unenforceable.  The Members' Plan provides that the All-Requirements Contracts will be rejected and terminated on the Effective Date of the Members' Plan.**

The Members adopt and incorporate the following provisions of the Trustee's Disclosure Statement: Section IV U (The Trustee's Report), with the following supplement:

**The Temple Report has been finalized and is available to parties in interest on request from the Trustee or any of the Members' counsel.  The Eide Bailly Forensic Accounting Report dated October 8, 2013 has also been finalized and is available to parties in interest from the Trustee of any of the Members' counsel.  The Eide Bailly Report concludes, from examination of the Debtor's financial activity from January 2008 through October 2011, that no irregularities or patterns indicia of fraud were detected.  The Trustee's Report has not been filed or provided to the Members.**

The Members adopt and incorporate the following provisions of the Trustee's Disclosure Statement: Section IV V (The Valuation Motion and the Limited Objection), with the following supplement:

**The Members and the United States of America Western Area Power Administration, dispute that the WAPA contracts are part of the Noteholders' collateral.**

**The Members contend that the Report of Alverez and Marsal which places the intrinsic value of the All-Requirements Contracts at $125,700.00 is biased and flawed.  The proposed settlement reached by the Trustee has the effect of treating the Noteholders as oversecured creditors by paying them interest over 12 years, while the Trustee acknowledges that the valuation of the Noteholders' collateral by the Trustee's own experts actually renders them undersecured.**

**The Members' Plan provides for the liquidation of the Debtor and the surrender of HGS and the Encumbered Cash to the Noteholders, providing the Noteholders with the actual value of their security and properly treating them as undersecured creditors.**

The Members adopt and incorporate the following provisions of the Trustee's Disclosure Statement: Section IV W (The Settlement Between the Trustee and the Noteholders), with the following supplement:

**The Members believe that the proposed settlement between the Trustee and the Noteholders, which was reached without participation of the Members, is unacceptable and cannot form the basis for a confirmable plan of reorganization.**

**The Members emphasize the Trustee's statements that the Noteholders refused to respond to the Members' settlement proposals.  The Members made serious efforts to come together with acceptable proposals to the Noteholders over a several month period.  All proposals made by the Members included provision that Beartooth could leave Southern.  The Members also acknowledge that the Trustee chose to adopt the positions of the Noteholders (despite their refusals to negotiate) and determined to impose the Trustee's and the Noteholders' skewed Plan on the Members.  The Members believe that the Noteholders have made no serious concessions in negotiations or in the proposed settlement that they have co-written into the Trustee's Plan.**

**The Members' Plan provides for the liquidation of the Debtor and the surrender of HGS and the Encumbered Cash to the Noteholders.**

The Members adopt and incorporate the following provisions of the Trustee's Disclosure Statement: Section IV X, Y and Z.

## V. THE MEMBERS' CHAPTER 11 PLAN

Section V introductory paragraph, A, B, and C of the Trustee's Disclosure Statement are replaced in their entirety with the following:

**The Members' Plan is attached as Exhibit 1 hereto and forms a part of this Disclosure Statement.  Statements as to the rationale underlying the treatment of Claims and Member Interests under the Members' Plan and the description of the Debtor's business and financial affairs are not intended to, and shall not, waive, compromise or limit any**

rights, claims or causes of action or bind any persons in the event the Members' Plan is not confirmed.

### A. CONSIDERATIONS REGARDING THE MEMBERS' PLAN

The Members' Plan provides for the liquidation and dissolution of the Debtor; and distribution or surrender of all of the assets of the Debtor. The Trustee has stabilized the Debtor's business operations and improved its cash position by rejecting the PPL contract and buying short term power at prevailing market prices while charging the Members, and until recently YVEC and the City, the above-market wholesale power rates that the Debtor had been charging the Members prior to the bankruptcy filing. The Trustee's rejection of the PPL contract, which was permitted under section 365 of the Bankruptcy Code, resulted in a claim against the Estate by PPL of $374,863,708.19.

The rejection of the PPL contract and the resulting ability to buy cheaper short term power on the open market has indeed worked to the advantage of the Noteholders – paying them approximately $1,041,000 per month since April 2012 (and over $2.5 million to their attorneys) and resulting in Debtor holding a large amount of cash encumbered by the Noteholders. The benefit to the Noteholders in the bankruptcy has been at the expense of PPL.

The benefit to the Noteholders in the bankruptcy has also been at the expense of the patrons and customers of the Members through payment of unreasonably high power rates. The Trustee's Plan calls for payment of even further increased rates to further benefit the Noteholders and MSCGI at the detriment of the Montana rural electricity customers who must either bear these costs for electrical power or find another source of electricity. The Members believe there is a public interest in providing rural Montana power consumers with electricity at fair and reasonable rates, rather than forcing them to bear the burden of the Noteholders' quest for profits from a bad loan.

The Members have deep divisions between themselves and between themselves and the Debtor. At this time the Members are aligned solely by their shared judgment that they should not remain members of the Debtor under the forced financial regime of Trustee's and Noteholders' Plan. Beartooth has openly stated that it could face bankruptcy if forced to reorganize and remain as a member of the Debtor. The other Members have each investigated bankruptcy alternatives for their cooperatives if they are forced into a plan of reorganization that is untenable. The Members' relationships with each other and with the Debtor are furthered strained by widely differing opinions on management and future operations.

The Members believe that the financial failure or a bankruptcy of any of the Members will have a domino effect and result in the financial failure or bankruptcy filings of the other Members and the Debtor. This belief is supported by the provisions of the MSCGI Agreement which requires a Guarantee Agreement from each of the Members and rates dependent upon specified load requirements for the Debtor.

The Members are all searching for stability. None of the Members believe that stability can be found in any reorganization of Debtor, as none of the Members believe that a

reorganized Debtor could stay together long term.  Thus, the Members believe that the best alternative for all parties at this time is to liquidate the Debtor and distribute its remaining assets to the secured creditors as to their legitimate remaining collateral and the balance to the unsecured creditors.  Under the Members' Plan, the Members waive any claims against the Debtor and any rights to distributions from the liquidation of the Debtor.  Immediate liquidation will also stop the $1.5 to $2 million that is being paid each month as adequate protection to the Noteholders, for the Noteholders' professionals, and for the Trustee's expenses and the expenses of the Trustee's professionals.

### B. CLASSIFICATION AND TREATMENT OF CLAIMS AND MEMBER INTERESTS

See the detailed summary of the classification and treatment of classified and unclassified Claims at section II (A) of this Disclosure Statement.

### C. IMPLEMENTATION OF THE PLAN

#### 1.    Liquidation and Cessation of Operations

Under the Members' Plan, on the Effective Date the appointment of the Chapter 11 Trustee will terminate and the Debtor will be restored to possession for the sole purpose of winding up the affairs of the Debtor; execution of agreements and documents provided for in the Members' Plan; surrender, distribution, assignment and liquidation of the Debtor's assets; and dissolving the Debtor pursuant to this Plan.  Debtor shall only continue its business and operations to the extent necessary to complete the liquidation and to implement this Plan.  The Members shall continue to be the members of Debtor subject to and in accordance with the terms and conditions of this Plan for the purpose of completing the liquidation of the Debtor.  The only Members of Debtor as of the Effective Date shall be the Members.

#### 2.    Management and Liquidating Agent.

The Members' Plan provides for their appointment of a Liquidating Agent.  The Members have identified James Winchell, a certified public accountant in Billings, Montana as an appropriate professional to act as Liquidating Agent.  The Members believe that appointment of the Liquidating Agent will be necessary to manage the liquidation of the Debtor and make distributions under the Member's Plan.   They also believe that appointment of the Liquidating Agent will limit the possibility of disagreement between the Members as to management of post-confirmation liquidation matters.  Due to differences with the Trustee and his professionals, the Members do not believe wish to incur the expense of retaining the Trustee to liquidate the Debtor.

Under the Members' Plan, a Liquidating Agent will manage the liquidation of the Debtor and the Estate, operations during the Transition Period, and shall make the distributions under the Plan on behalf of the Debtor.  Debtor, through the Liquidating Agent, will litigate to judgment, settle or withdraw objections to Claims.  The Liquidating Agent may employ such agents and/or professionals as the Liquidating Agent deems necessary to administer the Plan and make the distributions under the Plan.  The

Liquidating Agent shall serve without bond.  The Liquidating Agent shall have authority to manage liquidation and carry out the terms of this Plan, provided, however, that the Liquidating Agent shall  report on the status of the administration of the Plan and the liquidation of the Debtor to the Debtor's Board of Trustees and, in the event of a disagreement regarding the course of action to be taken by the Liquidating Agent in managing the liquidation or making distributions, the Board of Trustees by affirmative supermajority vote of 75% of the Trustees may direct the course of action of the Liquidating Agent as to such matter.  The Liquidating Agent shall have the status of a party-in-interest and may participate in any proceedings before the Bankruptcy Court relating to the liquidation or administration of the Debtor. The Liquidating Agent may pay the Liquidating Agent Expenses, and the salaries, fees and expenses of professionals employed by the Liquidating Agent, as set aside in the Liquidation Operating Fund.

Any tangible personal property assets of the Debtor that are not subject to Liens shall either be distributed or liquidated by the Debtor, through the Liquidating Agent and the net proceeds shall be paid and distributed to Allowed General Unsecured Claims under Class 6 of the Plan.

3.      Transition Period for Power Purchases.

Under the Members' Plan, on the Effective Date, Debtor will determine a period of time, not to exceed 90 days, to contract for purchase of electrical power ("Transition Period").  During the Transition Period the Debtor will supply all of the Members' electric power supply requirements based on the current rate formula and the Members will purchase all of their electric power requirements from Debtor.  During the Transition Period, the Members will make and finalize arrangements to purchase their electric power needs from a source or sources other than Debtor as determined by each Member in its sole discretion.  Debtor will cease purchasing electric power and selling wholesale power to the Members at the end of the Transition Period.

4.      Assignment of WAPA Contracts.

Pursuant to the YVEC Settlement, the Debtor's WAPA contract was modified, assumed and partially assigned in accordance with the Bankruptcy Court's Findings of Fact and Conclusions of Law dated April 5, 2013 (Doc. 783) and the Bankruptcy Court's Order dated April 5, 2013 (Doc. 784).  Subject to approval of the Western Area Power Administration, under the Members' Plan the WAPA Contract power will be assigned and allocated among the participating Members, Fergus, Mid-Yellowstone and Tongue River, according to agreement between the participating Members.

The WAPA Contracts shall be assigned to the Members, free and clear of any liens and encumbrances, effective on the last day of the Transition Period.

5.      Liquidation Operating Fund.

If not previously terminated, the DIP Order shall terminate on the Effective Date. Debtor, through the Liquidating Agent, shall establish a Liquidation Operating Fund for payment of the Debtor's and the Liquidating Agent's operational expenses and professional

fees and expenses incurred during the Liquidation Period.  The Liquidation Operating Fund shall be funded with one-half of the Unencumbered Cash and with Debtor's net income generated from sale of electric power to the Members during the Transition Period.  The balance of Liquidation Operating Fund remaining after Liquidation of Debtor shall be paid and distributed to Allowed General Unsecured Claims under Class 6 of the Plan.

6.      Corporate Governance and Board of Trustees.

Upon the Effective Date, the Debtor's Articles of Incorporation and Bylaws and any related corporate governance agreements ("Corporate Governance Agreements") shall remain unchanged except as may be required to accomplish the provisions of the Members' is Plan.  Debtor shall continue to exist after the Effective Date, with all the powers available to such legal entity, in accordance with applicable law, the Members' Plan and pursuant to its Corporate Governance Agreements, only for such time as necessary to liquidate the Debtor in accordance with this Plan and to dissolve the Debtor under Montana law as deemed advisable by its advisors.  On the Effective Date, the Debtor's Board of Trustees shall be comprised of the individuals who currently hold such positions on behalf of the Members, specifically, Arleen Boyd, David Dover, DeeDee Isaacs, and Jim DeCock.  In addition, each Member shall elect or appoint one additional individual to serve on the Board of Trustees of Debtor on behalf of that Member.  Debtor's Corporate Governance Agreements will be amended to provide for the additional four trustees.

7.      Operational Personnel during Transition Period.

Under the Members' Plan, upon the Effective Date and during the Transition Period, Debtor's office administration and power scheduling will be conducted by substantially the same operational personnel that conducted such operations prior to the Confirmation Date. Debtor will surrender HGS, subject to all valid liens, to Prudential and Modern Woodmen on the Effective Date and the operational personnel for HGS will no longer be employed or contracted with Debtor.   Debtor, through the Liquidating Agent, shall have authority to employ any persons deemed necessary to manage liquidation of Debtor.

8.      Rejection and Termination of All Requirements Contracts.

The Members' All Requirements Contracts are rejected on the Effective Date. Debtor and the Members shall execute any and all necessary documents and agreements deemed necessary to terminate the All-Requirements Contracts as of the Effective Date with provision that neither the Debtor nor the Members shall have any obligations to the other arising from the rejection and termination of the All-Requirements Contracts.   The Members have agreed to waive any rejection damage claims against Debtor resulting from such rejection.

D. PLAN PROVISIONS GOVERNING DISTRIBUTIONS

The Members adopt and incorporate the following provisions of the Trustee's Disclosure Statement: Section V D (Plan Provisions Governing Distributions), provided that references to "Reorganized Southern" shall be to "Debtor" and references to "Reorganized Southern, through the Trustee" shall be to "Debtor, through the Liquidating Agent" with the following supplements:

1.      **Delivery of Distributions**

**Under the Members' Plan, the Debtor through the Liquidating Agent, will make the distributions required to be made in respect of the Allowed Claims under the Members' Plan, or as may otherwise be required by the Members' Plan.**

2.      **Undeliverable Distributions**

b.      ***Failure to Claim Undeliverable Distributions***

**In the case of undeliverable or voided distributions after one year, any consideration held for distribution on account of such Claim shall revert to Debtor and shall be paid over to the General Unsecured Creditors.**

The Members adopt and incorporate the following provisions of the Trustee's Disclosure Statement: Section V E (Provisions for Disputed Claims), provided that references to "Reorganized Southern" shall be to "Debtor" and references to "Reorganized Southern, through the Trustee" shall be to "Debtor, through the Liquidating Agent" with the following supplements:

## E. PROVISIONS FOR TREATMENT OF DISPUTED CLAIMS

1.      **Objections to Claims; Prosecution of Disputed Claims**

**Unless otherwise ordered by the Bankruptcy Court, objections to Claims against the Debtor must be made by the Debtor, through the Liquidating Agent, or by any other party in interest, and served upon each holder of a Claim to which an objection is made and filed with the Bankruptcy Court within ninety (90) days of the Effective Date.  Objections to Claims may be prosecuted by the Debtor, through the Liquidating Agent and by any party in interest.**

Section V F and G of the Trustee's Disclosure Statement are replaced in their entirety with the following:

## F.     EXECUTORY CONTRACTS AND UNEXPIRED LEASES

1.      **Assumption and Assignment of Executory Contracts and Unexpired Leases**

**On the Effective Date, and except as otherwise provided by the Members' Plan, pursuant to sections 365(a), 365(b), 363(f), and 1123(b)(2) of the Bankruptcy Code, the Debtor shall assume or assume and assign to the stated parties all executory contracts and unexpired leases specifically designated on Exhibit A to the Members' Plan, which schedule may be amended in accordance with the Members' Plan.**

2.      **Rejection of Executory Contracts and Unexpired Leases**

Pursuant to sections 365(a) and 1123(b)(2) of the Bankruptcy Code, all executory contracts and unexpired leases that exist between the Debtor or the Estate and any person or entity shall be deemed rejected as of the Effective Date, except for any executory contract or unexpired lease (a) that has been assumed pursuant to an order of the Bankruptcy Court entered prior to the Effective Date and for which the motion was filed prior to the Confirmation Date; (b) as to which a motion for approval of the assumption or rejection of such executory contract or unexpired lease has been filed prior to the Confirmation Date; or (c) that is specifically designated on Exhibit A to the Members' Plan; provided, however, that the Members reserve the right, on or prior to the Confirmation Date, to amend the Members' Plan to delete any executory contract or unexpired lease from Exhibit A or add any executory contract or unexpired lease to Exhibit A, in which event such executory contract(s) or unexpired lease(s) shall be deemed to be, respectively, rejected or assumed; provided further, however, that the respective party or parties to such executory contract(s) shall be given notice of such amendment and shall be provided an opportunity to object to such amendment; provided further, however, nothing herein shall prejudice the Members' right to argue that any of the unexpired leases should be recharacterized as a secured financing. The Members shall provide notice of any amendments to the Members' Plan to the parties to the executory contracts and unexpired leases affected thereby.

Under the Members' Plan, the All-Requirements Contracts identified on Exhibit B and any executory contracts or leases not identified on Exhibit A to the Members' Plan are rejected.  The Members' Plan provides for the Debtor and the Members to execute agreements terminating the All-Requirements Contracts on the Effective Date.

### 3. Approval of Assumption and Assignment and Rejection of Executory Contracts and Unexpired Leases

Entry of the Confirmation Order shall, subject to and upon the occurrence of the Effective Date, constitute the approval, pursuant to sections 365(a), 365(f) and 1123(b)(2) of the Bankruptcy Code, (a) of the assumption and assignment of the executory contracts and unexpired leases assumed or assumed and assigned pursuant to the Members' Plan; and (b) of the rejection of the executory contracts and unexpired leases rejected pursuant to the Members' Plan; provided, however, to the extent any provision of an executory contract or unexpired lease to be assumed under the Members' Plan limits the Members' ability to assume or assume and assign such executory contract or unexpired lease, the effectiveness of such provision shall be limited or nullified to the full extent provided in section 365(f) of the Bankruptcy Code. Unless otherwise indicated, all assumptions or rejections of executory contracts and unexpired leases in the Members' Plan are effective as of the Effective Date.

### 4. Objections

Any party wishing to object to the assumption or assumption and assignment of any executory contract or unexpired lease hereunder, including any proposed Cure, if any, set forth in Exhibit A, must file an objection with the Bankruptcy Court by the deadline to object to the Plan and such dispute shall be resolved by the Bankruptcy Court. Any counterparty that does not object to the assumption or assumption and assignment, or the proposed Cure, if any, set forth in Exhibit A, of its executory contract or unexpired lease

26

under the Members' Plan shall be deemed to have consented to such assumption or assumption and assignment, or Cure and any Claim for Cure, for compensation, adequate assurance, adequate assurance of future performance, or other right, issue, or Claim under section 365 of the Bankruptcy Code, shall be deemed fully satisfied, released, and discharged and forever barred from assertion and shall not be enforceable against Debtor without the need for any objection by Debtor or further notice to or action, order or approval of the Bankruptcy Court or any other entity, and any Claim for Cure for compensation, adequate assurance, adequate assurance of future performance, or other right, issue, or Claim under section 365 of the Bankruptcy Code, shall be deemed fully satisfied, released and discharged upon payment of the amount, if any, listed on Exhibit A, notwithstanding anything included in the Schedules or in any proof of claim to the contrary, provided that nothing shall prevent Debtor from paying any cure amount despite the failure of the relevant counterparty to timely file such request or objection for payment of such Cure. Debtor also may settle any Cure without further notice to or action, order or approval of the Bankruptcy Court or any other entity.

### G. CONTINUED EXISTENCE OF THE ESTATE AND DISSOLUTION

Under the Members' Plan, the Board of Trustees of Debtor shall serve as the representative of the Estate and the Estate shall continue in existence from and after the Confirmation Date and until all payments and distributions to the holders of Allowed Claims shall have been made under the Plan and a final decree pursuant to Rule 3022 of the Bankruptcy Rules is entered. From and after the Confirmation Date, the Estate shall remain in existence and the Board of Trustees shall administer the Estate in accordance with the provisions of the Members' Plan, the Bankruptcy Code and the Bankruptcy Rules.

Following surrender of HGS, subject to all valid liens, and the collateral and completion of payments and distributions as provided for in this Plan, and the completion of winding up of its affairs, and all other matters deemed necessary by its consulting professionals, Debtor shall file Articles of Dissolution with the Montana Secretary of State for the purpose of dissolving the Debtor.

The Members adopt and incorporate the following provisions of the Trustee's Disclosure Statement: Section V H (Effectiveness of the Plan), provided that references to the "Plan" shall be to the "Members' Plan", references "Reorganized Southern" shall be to "Debtor" and references to "Trustee" shall be to "Debtor" or the "Liquidating Agent" as applicable.

Section V I (Other Plan Provisions) of the Trustee's Disclosure Statement is replaced in its entirety with the following:

### I. OTHER PLAN PROVISIONS

#### 1.    Binding Effect

Except as otherwise provided in section 1141(d)(3) of the Bankruptcy Code, and to the fullest extent permitted by section 1141 of the Bankruptcy Code, on and after the Effective Date, the provisions of the Members' Plan shall bind any holder of a Claim against, or Member Interest in, the Debtor or the Estate and their respective successors and assigns,

whether or not the Claim or Member Interest of such holder is impaired under the Members' Plan and whether or not such holder has accepted the Members' Plan.

### 2.   Discharge of Claims

Upon the Effective Date, except as otherwise expressly provided herein, each holder (as well as any trustees and agents on behalf of each holder) of a Claim or Member Interest and any Affiliate of such holder shall be deemed to have forever waived, released, and discharged Debtor, to the fullest extent permitted by section 1141 of the Bankruptcy Code, of and from any and all Claims, Causes of Action, interests, rights, and liabilities that arose prior to the Confirmation Date and, upon the Effective Date, all such persons shall be forever precluded and enjoined, pursuant to section 524 of the Bankruptcy Code, from prosecuting any Causes of Action or asserting any such discharged Claim against or Member Interest in the Debtor.

### 3.   Exculpation and Release of the Debtor and Its Members

Subject to the occurrence of the Effective Date, the Confirmation Order shall constitute a release, discharge, and forgiveness of all claims, demands, or Causes of Action which any party in interest, creditor, the Committee or the Trustee holds or is entitled to prosecute on behalf of any other party against (a) the Debtor, its agents, attorneys, or other professionals and all of their respective shareholders, managers, members, officers, employees, agents, advisors, consultants, successors, and assigns; and (b) the Members and their respective shareholders, managers, members, officers, directors, employees, advisors, consultants, successors, and assigns. This release shall cover all claims and Causes of Action, derivative or otherwise, which may be brought in the name of, on behalf of, or in the right of the Debtor, the Estate, the Committee, Debtor, or the Trustee. The (a) Debtor and its Members, (b) the Committee, and (c) Trustee (collectively the "Exculpated Parties") and any professionals, including without limitation, attorneys retained by the Exculpated Parties, and all of their respective shareholders, managers, members, officers, employees, agents, advisors, consultants, successors, and assigns shall not have or incur any liability to any person for any Cause of Action or any act taken or omission, after the Petition Date, in connection with or related to the Chapter 11 Case or the operations of the Debtor's business during the Chapter 11 Case, including but not limited to (i) formulating, preparing, disseminating, implementing, confirming, consummating, or administrating this Plan (including soliciting acceptances or rejections thereof); (ii) the Disclosure Statement or any contract, instrument, release, or other agreement or document entered into or any action taken or omitted to be taken in connection with this Plan; or (iii) any distributions made pursuant to this Plan, except for acts constituting willful misconduct or gross negligence, and in all respects such parties shall be entitled to rely upon the advice of counsel with respect to their duties and responsibilities under this Plan.

### 4.   Retention of Causes of Action/Reservation of Rights

Except as expressly provided in the Members' Plan, Debtor shall retain, and nothing contained in the Members' Plan or the Confirmation Order shall be deemed to be a waiver or the relinquishment of, any rights and Causes of Action that the Debtor, the Committee, or the Estate may have under any provision of the Bankruptcy Code or any applicable non-

bankruptcy law, including, without limitation, (a) all Causes of Action and Avoidance Actions; (b) the Beartooth Litigation; (c) any and all Claims against any person or entity to the extent such person or entity asserts a crossclaim, counterclaim, and/or Claim for setoff, recoupment, or which seeks any affirmative relief, in any form or manner whatsoever, against the Debtor or the Estate, and their respective officers, directors, or representatives; and (d) the turnover of any property of the Debtor's Estate. Unless previously resolved, the Beartooth Litigation will be dismissed with prejudice on the Effective Date.  No person or entity may rely on the absence of a specific reference in the Plan or the Disclosure Statement to any Cause of Action against them as any indication that the Debtor will not pursue any and all available Causes of Action against them. The Estate, and Debtor, as applicable, expressly reserve all rights to prosecute any and all Causes of Action and Claim objections against any person or entity.

### 5.      Injunction

All persons or entities who have held, hold, or may hold Claims against or Member Interests in the Debtor or the Estate and other parties in interest, along with their respective present or former employees, agents, officers, directors, or principals, are permanently enjoined, on and after the Effective Date, with respect to Claims released under the Plan and all Claims and Member Interests against the Debtor or the Estate, from (i) commencing, conducting, or continuing in any manner, directly or indirectly, any suit, action, or other proceeding of any kind (including, without limitation, any proceeding in a judicial, arbitral, administrative, or other forum) against or affecting the Debtor, the Estate, or their property; (ii) enforcing, levying, attaching (including, without limitation, any prejudgment attachment), collecting, or otherwise recovering by any manner or means, whether directly or indirectly, any judgment, award, decree, or order against the Debtor, the Estate, or their property; (iii) creating, perfecting, or otherwise enforcing in any manner, directly or indirectly, any encumbrance of any kind against the Debtor, the Estate, or their property; (iv) asserting any right of setoff or recoupment, directly or indirectly, against any obligation due the Debtor, the Estate, or any of their property, except as contemplated or allowed by the Members' Plan; (v) acting or proceeding in any manner, in any place whatsoever, that does not conform to or comply with the provisions of the Members' Plan; (vi) commencing, continuing, or asserting in any manner any action or other proceeding of any kind with respect to any Claims and Causes of Action which are extinguished or released pursuant to the Members' Plan; and (vii) taking any actions to interfere with the implementation or consummation of the Members' Plan.

### 6.      Jurisdiction of Bankruptcy Court

The Bankruptcy Court shall retain exclusive jurisdiction of all matters arising under, arising out of, or related to, the Chapter 11 Case and the Members' Plan pursuant to, and for the purposes of, sections 105(a) and 1142 of the Bankruptcy Code.

### 7.      Modification of Plan

The Members reserve the right, in accordance with the Bankruptcy Code and the Bankruptcy Rules to amend or modify the Members' Plan at any time prior to the entry of the Confirmation Order. After the entry of the Confirmation Order, the Debtor or the

Members may, upon order of the Bankruptcy Court, amend or modify the Members' Plan, in accordance with section 1127(b) of the Bankruptcy Code or remedy any defect or omission or reconcile any inconsistency in the Members' Plan in such manner as may be necessary to carry out the purpose and intent of the Members' Plan. A holder of an Allowed Claim or Member Interest that is deemed to have accepted the Members' Plan shall be deemed to have accepted the Members' Plan as modified if the proposed modification does not materially and adversely change the treatment of the Claim or Member Interest of such holder.

<strong>8.        Withdrawal or Revocation</strong>

**The Members may withdraw or revoke the Members' Plan at any time prior to the Confirmation Date. If the Members revoke or withdraw the Members' Plan prior to the Confirmation Date, or if the Confirmation Date does not occur, then the Members' Plan shall be deemed null and void.  In such event, nothing contained herein or in the Disclosure Statement shall be deemed to constitute a waiver or release of any Causes of Action, or Claim by or against the Debtor, the Trustee or the Estate or any other person or to prejudice in any manner the rights of the Members or any other person in any further proceedings involving the Debtor.**

## VI.    CERTAIN FACTORS AFFECTING THE DEBTOR

The Members adopt and incorporate the following provisions of the Trustee's Disclosure Statement: Section VI (Certain Factors Affecting the Debtor), provided that references to "Trustee" are substituted with "Members", and references to "Plan" are substituted with "Members' Plan".

## VII.    CONFIRMATION OF THE PLAN

The Members adopt and incorporate the following provisions of the Trustee's Disclosure Statement: Section VII A 1 (General Requirement of Section 1129) and Section VII A 2 (Best Interests Test), provided that references to "Trustee" are substituted with "Members", references to "Plan" are substituted with "Members' Plan", and references to "Reorganized Southern" are substituted with "Debtor".

The Members adopt and incorporate the following provisions of the Trustee's Disclosure Statement: Section VII A 3 (Liquidation Analysis), except the last 3 sentences of the first paragraph and the last paragraph, are supplemented as follows:

**Members disagree with the Trustee's conclusions under Section VII A 3 that "unsecured creditors are likely to receive no recovery in a chapter 7 liquidation" or that "unsecured creditors are receiving a greater recovery under the proposed Plan than they would receive in a chapter 7 liquidation."  The Members believe that the Trustee's Plan is not feasible and will result in the financial failure of the Debtor and of some or all of the Members.  The Members believe that by assigning all Unencumbered Cash and Avoidance Actions (including claims for disgorgement from the Noteholders and the Trustee) to the unsecured creditors and by providing for payment of the balance of Liquidation Operating Funds to the unsecured creditors, that the unsecured creditors will receive a greater**

**recovery under the proposed Members' Plan than they would receive in a chapter 7 liquidation or under the Trustee's proposed Plan.**

**The Members' liquidation analysis is attached as Exhibit 2 hereto.**

Section VII A 4 (Feasibility) of the Trustee's Disclosure Statement is replaced in its entirety with the following:

**4.      Feasibility**

**The Members do not believe that the Trustee's Plan is feasible.  The Members believe that the Members' Plan is feasible and the best alternative available to the creditors, the Members and other parties in interest for resolution of the Bankruptcy Case.**

**The Bankruptcy Code requires that a debtor demonstrate that confirmation of a plan is not likely to be followed by liquidation or the need for further financial reorganization. This standard requires the Court to find that the reorganized debtor described in the Trustee's Plan has a reasonable probability of performing its obligations under the Trustee's Plan, including any debt instruments and contracts entered into in connection with the Trustee's Plan.**

**The Members believe that the Trustee's Plan cannot be performed and will result in liquidation or further financial reorganization or bankruptcy by the Debtor and some or all of the Members.  The Members believe that the Trustee's Plan is not feasible for many reasons, including the following:**

- **The MSCGI Agreement requires the Debtor to deliver undefined Guarantee Agreements executed by the Members and the Members will not guarantee the power purchase obligations of the Debtor to Morgan Stanley.**

- **If the MSCGI Agreement is not guaranteed by the Members, the Trustee has advised that MSCGI will increase its power purchase rates to Southern which will result in further increased rates to the Members.**

- **The current wholesale rates charged by Southern to the Members are already above market and crippling the Members and their own patron/customers. The increased rates presently forecast in the Trustee's Plan (before increased rates under any revised MSCGI Agreement) will result in unsustainable electric rates to the Members and their own patron/customers.**

- **The Members' relationship with Southern is unworkable because Members are intent on terminating their membership in Southern and their All-Requirements Contracts with Southern. The Members are the only customers and source of revenue for Debtor. The Members' All-Requirements Contracts are the sole source and basis to fund the Trustee's Plan.**

- **The relationship between Southern and its members has deteriorated since 2008 to the point that two members, YVEC and the City of Great Falls/ECP, have departed from Southern and terminated their all-requirements contracts with Debtor.  This litigation lasted over four years.**

- **The deteriorated relationship between Debtor and the Members extends beyond legal disagreements to extensive public dissension in the press and political pressures with State and Federal elected officials, including efforts to change the Montana Rural Electric and Telephone Cooperative Act.  The Members' relationships with Southern range from tenuous to openly antagonistic.**

- **The Members' relationships between themselves have broken down to the point that there is disagreement concerning retention or disposal of HGS and appropriate protocols for operations.  Some Members believe that Beartooth wishes to impose additional regulation on Montana electric cooperatives and to join an investor owned utility company and no longer exist as a Montana electric cooperative.  Further, there are fundamental disagreements about many, if not all, aspects of future management among the Members.**

- **The Members' relationships with their own members, who are the Montana rural electric consumers ultimately effected by the rates imposed by the Trustee's Plan, have suffered because of the increased rates charged by Southern and the Members and the dissension and negative impressions created about Southern in the press and by Members and former members, criticisms of Southern.**

- **Some of the Members have threatened to file their own bankruptcies and all of the Members have been forced to evaluate their own bankruptcies because of the domino effect of bankruptcies by the Debtor, by one or more Members, or by the Members' customers due to crippling power charges.**

- **The Members believe that their All-Requirements Agreements are not assumable, assignable or modifiable, without their consent, under the Bankruptcy Code; and that the Trustee's Plan is not feasible because it renders the All-Requirements Contracts void and unenforceable.**

- **The Trustee's Plan calls for retention of HGS by the reorganized debtor and consent from the Noteholders and MSCGI before HGS could be sold.  Many of the Members believe that HGS has little value or constitutes a liability to the Debtor and cannot be retained.  The Trustee's valuation of HGS discussed at Section IV V of the Trustee's Disclosure Statement supports this conclusion.**

- **The settlement reached between the Trustee and the Noteholders provides for treatment of the Noteholders' claims as though they were oversecured by paying them interest over up to 12 years at the expense of the Members and their patron/customers.**

- **The Debtor has lost over 50% of its load as of mid-2011 due to the releases of YVEC and the City of Great Falls as members of the Debtor.  This leaves the size of the Debtor much more vulnerable to financial failure due to unforeseen developments and the factors discussed above.**

**The Members' Plan is feasible as it calls for the orderly liquidation of the Debtor through surrender of collateral assets to secured creditors, distributions and assignments to unsecured creditors and sale or distribution of remaining assets of the Debtor.**

Section VII B (Requirements of Section 1129(b) of the Bankruptcy Code), of the Trustee's Disclosure Statement is replaced in its entirety with the following:

## B. REQUIREMENTS OF SECTION 1129(b) OF THE BANKRUPTCY CODE

**The Bankruptcy Code permits the Bankruptcy Court to confirm a chapter 11 plan of reorganization or liquidation over the dissent of any Class of Claims or Member Interests as long as the standards in section 1129(b) are met. This power to confirm a plan over dissenting classes – often referred to as "cram down" – is an important part of the reorganization process. It ensures that no single group (or multiple groups) of claims or interests can block a restructuring that otherwise meets the requirements of the Bankruptcy Code and is in the interests of the other constituents in the case.**

**The Bankruptcy Court may confirm the Members' Plan over the rejection or deemed rejection of the Members' Plan by a Class of Claims or Member Interests if the Members' Plan "does not discriminate unfairly" and is "fair and equitable" with respect to such class. The Members believe that the Members' Plan will satisfy both the "no unfair discrimination" requirement and the "fair and equitable" requirement should any impaired Class of Claims reject the Members' Plan (these requirements only apply in the event an impaired Class of Claims votes to reject the Members' Plan).**

**A plan is fair and equitable with respect to a class of secured claims that rejects the plan if the plan provides (1)(a) that the holders of claims included in the rejecting class retain the liens securing those claims whether the property subject to those liens is retained by the debtor or transferred to another entity, to the extent of the allowed amount of such claims, and (b) that each holder of a claim of such class received on account of that claim deferred cash payments totaling at least the allowed amount of that claim, or a value, as of the effective date of the plan, of at least the value of the holder's interest in the estate's interest in such property; (2) for the sale, subject to section 363(k) of the Bankruptcy Code, of any property that is subject to the liens securing the claims included in the rejecting class, free and clear of the liens, with the liens to attach to the proceeds of the sale, and the treatment of the liens on proceeds under clause (1) or (2) of this paragraph; or (3) for the realization by such holders of the indubitable equivalent of such claims.  Although holders of Claims in Classes 2, 3, 4 and 5 are impaired, the holders of Claims in such Classes are receiving treatment under the Plan that meets the requirements of section 1129(b)(1) and (2)(A) of the Bankruptcy Code.  Therefore, the Members believe that the Members' Plan is fair and equitable with respect to holders of such secured claims.**

If Class 6 rejects the Members' Plan, the Members submit that the Bankruptcy Court may still confirm the Members' Plan because the Members' Plan "does not discriminate unfairly." With respect to an objecting impaired class of unsecured creditors, the Bankruptcy Code's "unfair discrimination" requirement prohibits disparate treatment of similarly situated creditors absent a legitimate business or economic justification. In this case, the Members' Plan does not violate the "unfair discrimination" prohibition as the only other classes of arguable equal priority to Class 6 under the Members' Plan is the Convenience Claims Class. Section 1122(b) of the Bankruptcy Code explicitly permits the creation of a convenience class, and convenience classes are common in bankruptcy plans. In addition, any holder of an Allowed General Unsecured Claim can elect to voluntarily reduce such Claim to $5,000 and be treated as the holder of an Allowed Convenience Claim.

Also, if the Class of General Unsecured Claims against the Debtor rejects the Members' Plan, the Trustee submits that the Bankruptcy Court may still confirm the Members' Plan because it satisfies the "fair and equitable" requirement. With respect to an objecting impaired class of unsecured creditors, the "fair and equitable" requirement generally in a for-profit entity case requires that either (i) the allowed value of the claim be paid in full; or (ii) no holder of any claim or interest that is junior to the rejecting unsecured class receive or retain under the plan any property on account of such junior claim or interest. This is commonly referred to as the "absolute priority rule." However, in this case, the Members' Plan provides for liquidation of the Debtor and distributes to the unsecured creditors more than they would receive in a chapter 7 liquidation.

For the reasons described above, the Members believe that the proposed Members' Plan is "fair and equitable," does not unfairly discriminate, and complies with section 1129(b) of the Bankruptcy Code.

Sections VIII, IX and X of the Trustee's Disclosure Statement are replaced in their entirety with the following:

## VIII. ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN

### A.   LIQUIDATION UNDER CHAPTER 7

If no plan is confirmed, the Chapter 11 Case may be converted to a case under chapter 7 of the Bankruptcy Code, pursuant to which a trustee would be elected or appointed to liquidate the Debtor's assets for distribution to creditors in accordance with the priorities set forth in the Bankruptcy Code. It is impossible to predict precisely how the proceeds of the liquidation would be distributed to the respective holders of Claims against or Member Interests in the Debtor. A discussion of the effects that a chapter 7 liquidation would have on the recovery of holders of Claims and Member Interests and the Debtor's liquidation analysis are set forth above.

### B.   ALTERNATIVE PLAN OF REORGANIZATION

The Members believe that the Members' Plan affords holders of Claims the potential for the greatest realization on the Debtor's assets under the circumstances, as described

herein.  If, however, the Members' Plan is not confirmed and/or consummated, the theoretical alternatives include:

- **confirmation of the Trustee's proposed Plan**

- **formulation of an alternative plan or plans of reorganization by the Trustee or any other party in interest; or**

- **liquidation of the Debtor under chapter 7 or chapter 11 of the Bankruptcy Code.**

## IX. TAX CONSIDERATIONS

**The treatment of Claims and Member Interests under the Members' Plan may have important tax implications for creditors and Member Interest holders. The Members have not performed and will not perform any analysis of such tax implications. The tax effects must be determined separately by each creditor and Member Interest holder for themselves. Holders of Claims and Member Interests are urged to obtain advice from their own tax advisors regarding the application of federal and state tax laws. The Trustee makes no representations with respect to the tax implications of the Plan.**

### IRS Circular 230 Disclosure

To ensure compliance with IRS Circular 230, each holder of a Claim is hereby notified that: (i) any discussion of U.S. federal tax issues in this Disclosure Statement is not intended or written to be used, and cannot be used, by such holder for the purpose of avoiding penalties that may be imposed on such holder under the Internal Revenue Code; (ii) any such discussion has been included by the Members as proponents of the transactions proposed in the Members' Plan; and (iii) each such holder should seek advice based on their particular circumstances from an independent tax advisor.

## X. CONCLUSION

For all the reasons set forth in this Disclosure Statement, the Members believe that confirmation and consummation of the Members' Plan is in the best interests of all creditors, and urges all holders of a Claim or Member Interests entitled to vote to accept the Plan and to evidence such acceptance by returning their Ballots so that they will be received no later than [_____, 2013].

DATED this 18th day of October, 2013.

**Guthals, Hunnes & Reuss, P.C.**

By:  ____/s/ Jeffery A. Hunnes_____
            Attorneys for Tongue River Electric
            Cooperative, Inc.

**Law Office of John P. Paul, PLLC**

By:    /s/ John P. Paul _____
        Attorneys for Fergus Electric
        Cooperative, Inc.

**Goetz, Baldwin & Geddes, P.C.**

By:    /s/ Trent M. Gardner _____
        Attorneys for Fergus Electric
        Cooperative, Inc.

**Gary Ryder**

By:    /s/ Gary Ryder_____
        Attorneys for Mid-Yellowstone Valley
        Electric Cooperative, Inc.

**Felt, Martin, Frazier & Weldon, P.C.**

By:    /s/ Martin S. Smith_____
        Attorneys for Beartooth Electric
        Cooperative, Inc.

## <u>CERTIFICATE OF SERVICE</u>

I, the undersigned, certify under penalty of perjury that on October 18, 2013, or as soon as possible thereafter, a copy of the foregoing Disclosure Statement for Members Cooperatives' Plan of Liquidation for Southern Montana Electric Generation and Transmission Cooperative, Inc. was served electronically by the Court's ECF notice to all persons/entities requesting special notice or otherwise entitled to the same and that in addition service by mailing a true and correct copy, first class mail, postage prepaid, was made to the following persons/entities:  None

Guthals Hunnes & Reuss, P.C.

By:   /s/ Jeffery A. Hunnes_____
      Jeffery A. Hunnes