Joseph V. Womack, Attorney No. 2641
WALLER & WOMACK
303 N. Broadway, Suite 805
Billings, MT  59101
Telephone:  (406) 252-7200
Fax:  (406) 252-4266
E-mail:  jwomack@jvwlaw.com

John Cardinal Parks, Attorney No. 18669 (Colorado)
Bart B. Burnett, Attorney No. 21258 (Colorado)
Robert M. Horowitz, Attorney No. 17848 (Colorado)
Kevin S. Neiman, Attorney No. 36560 (Colorado)
HOROWITZ & BURNETT, P.C.
1660 Lincoln Street, Suite 1900
Denver, CO  80264
Telephone:  (303) 996-8600
Fax:  (303) 996-8636
E-mail:  jparks@hblegal.net
bburnett@hblegal.net
bhorowitz@hblegal.net
kneiman@hblegal.net

*Counsel for the Chapter 11 Trustee*

## UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF MONTANA

| | |
|---|---|
| In re | |
| **SOUTHERN MONTANA ELECTRIC GENERATION AND TRANSMISSION COOPERATIVE, INC.,** | Case No. 11-62031-11 |
| Debtor. | **NOTICE OF HEARING**<br>**Date: November 12, 2013**<br>**Time: 1:30 p.m.**<br>**Location:  Bighorn Courtroom**<br>**5th Floor Room 5503**<br>**James F. Battin United States Courthouse**<br>**2601 2nd Avenue North**<br>**Billings, Montana** |

**OBJECTION BY TRUSTEE TO, AND REQUEST FOR SUMMARY DENIAL OF, MOTION TO REMOVE CHAPTER 11 TRUSTEE**

Lee A. Freeman, the duly appointed Chapter 11 trustee (the "**Trustee**"), objects to the *Motion to Remove Chapter 11 Trustee* (the "**Motion**") (Dkt. No. 1101) filed by Fergus Electric Cooperative, Inc. ("**Fergus**") and requests that the Court summarily deny the Motion without a hearing.  In support thereof, the Trustee states as follows:

## I.     STATEMENT OF FACTS

On October 21, 2011, debtor Southern Montana Electric Generation and Transmission Cooperative, Inc. (the "**Debtor**") filed its voluntary petition for reorganization under Chapter 11 of Title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq*., commencing this case.

On November 14, 2011, the United States Trustee (the "**UST**") filed a motion for approval (the "**Motion for Approval**") (Dkt. No. 55) of a *Stipulation to Appointment of Trustee* (the "**Stipulation**") (Dkt. Nos. 55-1 and 2).  The Motion for Approval does not state the grounds upon which the UST moved for the appointment of a trustee.  The Stipulation merely states that the UST and the Debtor (as a debtor-in-possession) stipulated and agreed that "the appointment of a Chapter 11 trustee is in the best interest of creditors and this bankruptcy estate."  Dkt. No. 55-1.

On November 17, 2011, the Board of Trustees of the Debtor met and unanimously adopted resolutions dated November 16 and 17 which, collectively, (i) confirmed the seating of Arleen Boyd as a trustee for Beartooth; (ii) retroactively revoked a 20% rate increase; (iii) ratified the filing of this bankruptcy case; (iv) ratified the employment of bankruptcy counsel; (v) ratified the filing of the § 366 motion; and (vi) ratified the Stipulation and the Debtor's joinder in

the Motion for Approval.  See *Declaration of Carrie Boysun* and exhibits thereto, a copy of which is **Exhibit A** hereto.

On November 21, 2011, the Court held a hearing on, among other matters, the Motion for Approval.  A copy of relevant portions of the transcript of the hearing is **Exhibit B** hereto. Counsel for the UST did not state any grounds for the Motion for Approval or why the UST believed that it was appropriate to have a Chapter 11 trustee appointed.  No party in interest objected to the Motion for Approval or expressed any opposition to the appointment of a Chapter 11 trustee, either before or during the hearing.  With no objections having been made, the Court granted the Motion for Approval at the hearing and authorized the UST to proceed with the selection of a trustee.  The Court did not state any grounds for the granting of the Motion for Approval.  Finally, the order granting the Motion for Approval (the "**Order**") (Dkt. No. 113) did not recite any grounds for granting the motion.

## II.    ARGUMENT

### A.    *APPLICABLE LAW*

Fergus seeks relief pursuant to 11 U.S.C. § 1105, entitled *Termination of trustee's appointment*, which states:

> At any time before confirmation of a plan, on request of a party in interest or the United States trustee, and after notice and a hearing, the court may terminate the trustee's appointment and restore the debtor to possession and management of the property of the estate and of the operation of the debtor's business.

While § 1105 vests the courts with the power to terminate a Chapter 11 trustee's appointment, that "does not mean that courts freely exercise that power.  This is reflected in the careful and infrequent application of Section 1105."  *In re Taub*, 441 B.R. 211, 215 (Bankr. E.D.N.Y. 2010).  In this regard,

> A court may consider new evidence and determine that the appointment of a trustee was "improvidently" made.  5 COLLIER ON BANKRUPTCY ¶ 1105.02 at 1105-3 (Alan N. Resnick & Henry J. Sommer eds., 16th ed. 2010).  A court may also terminate a trustee's appointment "'where conditions have changed subsequent to the court's order of appointment **and the continued service by a trustee is not in the interests of creditors, equity security holders, and other interests of the estate**.'"  *In re Curlew Valley Assocs.,* 14 B.R. at 514 (quoting 5 Collier on Bankruptcy ¶ 1105.02 at 1105-3 (15th ed. 1980)).  **In either situation, terminating a trustee's appointment pursuant to Section 1105 is a "rare" occurrence** which may be occasioned by the existence of "circumstances . . . that eliminate the reason for the trustee's appointment, in which case the court may acknowledge the change by restoring the status quo that existed before the trustee's appointment."  5 COLLIER ON BANKRUPTCY ¶ 1105.01 at 1105-2 (16th ed. 2010).

*Id.* at 215-16 (emphasis added).

Indeed, even Fergus concedes in the Motion that changed circumstances alone do not warrant the termination of a Chapter 11 trustee's appointment.  Other than the improvident appointment of a trustee, termination is only proper when "the continued service by a trustee is not in the interests of creditors, equity security holders, and other interests of the estate."  Motion, ¶ 16 (quoting *In re Curlew Valley Assocs.,* 14 B.R. 506, 514 (Bankr. D. Utah 1981)).

### B.   *No Change in Circumstances Has Occurred That Justifies Termination of the Trustee's Appointment; Doing So Is Not in the Best Interests of Creditors and Other Interests of the Estate*

As noted above, *Collier* and case law delineate two general bases for termination of a Chapter 11 trustee's appointment under § 1105 of the Bankruptcy Code: (i) new evidence that leads the court to conclude that the appointment was improvidently made; and (ii) that circumstances have changed *and* continued service by a trustee is not in the interests of creditors, equity security holders, and other interests of the estate.

Fergus does not argue that the Trustee was improvidently appointed "in light of evidence which was earlier unavailable."  *Curlew Valley*, 14 B.R. at 515.  Indeed, given the Stipulation and the uncontested Motion for Approval, no such argument could be made.  Rather, Fergus

-4-

argues that "a change in circumstances justifies reinstatement of the debtor to possession." Motion, ¶ 18. That is, because an alleged deadlock among the Debtor's members no longer exists, apparently, on at least on one issue – the liquidation of the Debtor – the need for a Chapter 11 Trustee has been obviated. *Id.* at ¶ 5. The purported deadlock has allegedly been broken by the members' unanimous "belief that the Debtor should be wound up and liquidated" as evidenced by the members' new plan of liquidation. *Id.* at ¶ 6.

Fergus's argument, and indeed its entire Motion, is based on the unproven premise that the Motion for Approval was filed and granted only because there was an alleged deadlock among the members of the Debtor's board of trustees in November 2011. Yet, no grounds for the appointment of a Chapter 11 trustee were stated in the Motion for Approval, the Stipulation, or the Order. Further, in presenting the Motion for Approval to the Court at the hearing thereon, counsel for the UST did not state any grounds for the Motion for Approval or explain why the UST believed that it was appropriate for the Court to appoint a Chapter 11 trustee. Moreover, the unanimous resolutions adopted by the Debtor's board of trustees between the filing of the Motion for Approval and the hearing thereon suggests that the board was not, as alleged by Fergus, "hopelessly deadlocked." Motion, ¶ 19. Indeed, it appears that the Debtor's board was in as much agreement then as the members say they are now. Perhaps it may have been that disagreements among the Debtor's board members prompted them to unanimously stipulate to the appointment of a Chapter 11 trustee, but that is not the same as proving that the sole reason for the filing of UST's Motion for Approval and the entry of the Court's Order was that the Debtor's board was deadlocked. Thus, Fergus has not demonstrated any changed circumstances that warrant termination of the Trustee's appointment. Moreover, Fergus cannot show that termination of the Trustee's appointment is in the best interest of creditors and the estate.

-5-

1.     **The presumption in favor of a debtor-in-possession does not apply here.**

The Trustee does not dispute that there is ordinarily a strong presumption that a debtor should be in control of its Chapter 11 case.  Motion, ¶¶ 11-15.  However, this general legal proposition is irrelevant where, as here, a Chapter 11 trustee has already been appointed.

Moreover, even if it were relevant, the basis for presumption does not exist in this case. As explained by the Third Circuit,

> **In the usual chapter 11 proceeding**, the debtor remains in possession throughout reorganization because "current management is generally best suited to orchestrate the process of rehabilitation for the benefit of creditors and other interests of the estate."  **Thus, the basis for the strong presumption against appointing an outside trustee is that there is often no need for one: "The debtor-in-possession is a fiduciary of the creditors and, as a result, has an obligation to refrain from acting in a manner which could damage the estate, or hinder a successful reorganization.**"

*In re Marvel Entm't Grp., Inc.*, 140 F.3d 463, 471 (3d Cir. 1998) (emphasis added, citations omitted).

Here, the members' recently filed plan of liquidation – *a plan that was filed only one business day before Fergus filed the Motion* – and Fergus's reservation of rights to file a motion to convert this case to a Chapter 7 liquidation (see, *e.g.*, Motion, ¶¶ 10 n.3 and 23 n.4) demonstrate that the members have no intent, as a reinstated debtor-in-possession, to fulfill the Debtor's fiduciary duty to its creditors by maximizing their distributions and refraining from acting in a manner that could damage the estate or hinder a successful reorganization.  In addition, the members are alleged creditors of the Debtor, with Fergus asserting six claims (Proof of Claim Nos. 31-34, 37, and 40) and the other members asserting 19 claims (Proof of Claim Nos. 35, 36, 38, 39, 41-43, and 51-62).  This also weighs against any presumption.  *Marvel*, 140 F.3d at 471-73 (inappropriate to suggest that usual presumption applies to a debtor-in-possession that is also a substantial creditor).

-6-

Therefore, based on the unique circumstances of this case, the usual presumption that a debtor should remain in possession does not apply.

### 2. No relevant change of circumstances has occurred.

Fergus argues that "the standard for removing a trustee and restoring the Debtor to control is quite low[,]" and that "it is not surprising that there is no similarly ([in relation to appointment of a trustee]) high bar to the removal of a Chapter 11 trustee and the reinstatement to possession of a Chapter 11 debtor." Motion, ¶¶ 16 and 17. Fergus's high bar/low bar argument, however, flies in the face of the reality that "[i]t is rare that after having ordered the appointment of a trustee a court will terminate the appointment and restore the debtor in possession." Alan R. Resnick, Henry J. Sommer, 7 COLLIER ON BANKRUPTCY, ¶ 1105.01 (16th ed. 2013). *Taub*, which Fergus cites as well (Motion, ¶ 18), notes the "careful and infrequent application of Section 1105." *Taub*, 441 B.R. at 215.

At its essence, Fergus argues that the Trustee's appointment should be terminated because he was appointed solely because the Debtor's board of trustees were "hopelessly deadlocked about management of the Debtor[,]" and "there can now be no dispute that the circumstances have changed and the deadlock no longer exists." Motion, ¶ 19. Fergus further contends that the alleged deadlock has been broken because all of the members believe that the Debtor's assets should simply be liquidated and the Debtor dissolved. Motion, ¶ 20. Although, as parties in interest, the members have the right under § 1121 of the Bankruptcy Code to file a plan for the Debtor, the members' joint filing of a liquidating plan is not a change in circumstances that warrants termination the Trustee's appointment. Rather, it proves that a Chapter 11 trustee is needed in this case now more than ever before.

-7-

      **a.**    ***The case law cited by Fergus does not support the Motion.***

It is telling that Fergus cites no case that supports the proposition that when a displaced board of a debtor desires to liquidate the debtor for the board's own self-interest (as further discussed, *infra*) that change constitutes a changed circumstance warranting termination of a Chapter 11 trustee's appointment.  This is not surprising since "[t]he fundamental purpose of reorganization is to prevent a debtor from going into liquidation, with an attendant loss of jobs and possible misuse of economic resources.  *N.L.R.B. v. Bildisco & Bildisco*, 465 U.S. 513, 528 (1984) (also stating at 514 "the policy of Chapter 11 is to permit successful rehabilitation of debtors. . . .").

      **b.**    ***There is no evidence in the record that a deadlock among the Debtor's board of trustees was the sole basis for the appointment of the Trustee.***

Fergus's allegation that the Trustee was appointed solely because the Debtor's board of trustees was hopelessly deadlocked is not supported by the record in this case.  As noted above, neither the Stipulation nor any of the other court filings related to the Trustee's appointment (as well as the hearing transcript) mention any alleged member deadlock.  Therefore, Fergus's contention that circumstances have changed is based on a false premise that a deadlock was the sole basis for Trustee's appointment.  Indeed, the Stipulation merely states "that the appointment of a Chapter 11 trustee is in the best interest of creditors and this bankruptcy estate."  Nothing in Stipulation explains why that was the case.

      **c.**    ***Fergus's disagreement with the Trustee is not grounds for his removal.***

Under their liquidating plan, Fergus and the other members plan to reject their wholesale power contracts (see § 8.2 of the members' plan (Dkt. No. 1107-1) stating in part: "Debtor specifically rejects the All Requirements Contracts with the Members as identified on Exhibit

B."). The Trustee believes that the members' wholesale power contracts are assumable and that the Debtor should be reorganized so that, among other things, the Debtor would continue to operate and sell power to its members and, through reasonable rates charged to the members, pay down debt (not only to the Noteholders, but to the members of Classes 3, 4, and 5 of his plan) so that they may benefit from the Debtor's going-concern value and realize more than the liquidation value of their collateral. His pending plan of reorganization is intended to achieve these goals, among others (Dkt. No. 1048). While the Trustee appreciates that Fergus disagrees with this approach and hopes to avoid its obligations under its 2007 agreement that binds it through 2048, "[d]isagreement with a trustee's business judgment is not sufficient evidence of an improvident appointment or changed circumstances." *Taub*, 441 B.R. at 216.

### d.   *Independent of the alleged conflict among the Debtor's board of trustees, there was cause for the appointment of the Trustee at the inception of the case and that cause remains.*

Aside from the members' alleged prepetition deadlock, independent cause existed on the petition date and continues through today for appointment of the Trustee.

> **Conflict between a debtor and its creditors can constitute cause for appointment of a chapter 11 trustee**. *In re Marvel Entertainment Group, Inc.,* 140 F.3d 463, 472-73 (3rd Cir.1998); *Cajun Electric Power Cooperative, Inc. v. Central Louisiana Elec. Co., Inc.* (*In re Cajun Power Cooperative, Inc.*), 74 F.3d 599, 600 (5th Cir.1996) (adopting on reh'g the opinion of dissent in 69 F.3d 746 (5th Cir.1995)). There is no *per se* rule under which debtor-creditor conflict requires the appointment of a trustee. *Marvel,* 140 F.3d at 473; *Cajun Electric,* 74 F.3d at 600. Rather, the courts must be given discretion to appoint a trustee on a case-by-case basis, when the conflict extends beyond that which always exists between debtor and creditors and threatens the breakdown of reorganization efforts. *Marvel,* 140 F.3d at 472-73.

*In re Nat'l Farm Fin. Corp.*, 07-31580 TEC, 2008 WL 410236, *2 (Bankr. N.D. Cal. Feb. 12, 2008) (emphasis added). Given the members' desire to liquidate the Debtor, turn over physical collateral to secured creditors, and avoid their obligations under their wholesale power contracts

(see also the members' complaint against the Trustee (Adv. No. 13-00036) that seeks a declaration judgment that, among other things, their wholesale power contract are not assumable or assignable without their consent), "[t]he conflicts present in this case go beyond the 'inherent' conflicts under which all healthy cooperatives operate." *In re Cajun Elec. Power Coop., Inc.*, 69 F.3d 746, 751 (5th Cir. 1995) *opinion withdrawn in part on reh'g,* 74 F.3d 599 (5th Cir. 1996), *cert. denied*, 117 S. Ct. 51 (1996). Indeed, "members in healthy cooperatives [do not] consider strategies which seem designed to break-up and scavenge the assets of the debtor." *Id.* *Cajun Electric* further instructs that:

> Once cooperative members begin working at cross-purposes, to the extent Cajun's members have, the appointment of a trustee may be the only effective way to pursue reorganization. *See In re Colorado-Ute Electric Ass'n, Inc.,* 120 B.R. 164, 176 (D.Colo.1990) (holding the appointment of a trustee proper where court could not envision a way for current management to resolve conflicts) [(also stating: "**The Court cannot envision a way for the current management and board to resolve the inherent conflict between what is best for Colorado-Ute, its creditors and the co-op members.**")]. As the district court recognized, this is a large and messy bankruptcy that promises to get worse without a disinterested administrator at the helm.

*Id.* (emphasis added). The Third Circuit in *Marvel* was "impressed by the persuasive reasoning" in *Cajun Electric* and summarized why a Chapter 11 trustee was appropriate in *Cajun Electric* in a manner that is similar here as a result of the members' intent to avoid their obligations under their wholesale power contracts and effectively jettison the Debtor's best chance to meet its obligations to its creditors through either a liquidating plan or conversion to Chapter 7:

> In [*Cajun Electric*], the debtor-in-possession's interests conflicted with those of its creditors to such an extent that "the appointment of a trustee may be the only effective way to pursue reorganization." The debtor-in-possession was a utility cooperative whose board members were faced with a federal agency order lowering its utility rates. The debtor-in-possession's board members, themselves managers or members of the debtor-in-possession's individual member utility companies, were required to decide whether to appeal the agency order, seeking to maintain the high rates charged to the individual member companies and thus

-10-

> to better enable the debtor-in-possession to meet its debt obligations to its creditors in bankruptcy, or to take no action and charge less to their individual companies. *Cajun Elec.,* 69 F.3d at 747. The court recognized that the debtor-creditor conflict went "beyond the 'inherent' conflicts under which all healthy cooperatives operate." *Cajun Elec.,* 74 F.3d at 600 (adopting dissent at 69 F.3d at 751). The extent of this conflict alone provided sufficient cause for the appointment of a trustee under § 1104(a)(1).

*Marvel*, 140 F.3d at 472. See also *In re Cajun Elec. Power Coop., Inc.*, 191 B.R. 659, 662-63 (M.D. La. 1995) *vacated sub nom. In re Cajun Elec. Power Coop., Inc.*, 69 F.3d 746 (5th Cir. 1995) *opinion withdrawn in part on reh'g,* 74 F.3d 599 (5th Cir. 1996), *cert. denied*, 117 S. Ct. 51 (1996) ("There is little doubt that the lower the rates charged, the less revenue there will be to pay the outstanding debt in this case. Furthermore, any rate increase which Cajun might seek is adverse to its members."; "Under the facts of this case, it is impossible for the debtor-in-possession to act as a fiduciary for the estate at the same time as it acts as a fiduciary for its members and customers."; "There are other examples of conflicts: [] the apparent primary interest of the Cajun board in protecting the rates and the actual existence of its members rather than trying to maximize the value of the debtor's estate."); and *Wabash Valley Power Ass'n, Inc. v. Rural Electrification Admin.*, 903 F.2d 445, 451 (7th Cir. 1990) ("A debtor in bankruptcy is supposed to maximize the value of the estate, which opposition to a rate increase does not. This suit serves the interests of Wabash's members at the expense of the interests of Wabash's creditors. We are surprised that the bankruptcy judge has allowed Wabash to operate as debtor in possession, when the clash of interests between creditors and its current management is so obvious.").

Moreover, acrimony between a debtor and a creditor is a sufficient ground for the appointment of a Chapter 11 trustee. *Marvel*, 140 F. 3d at 472. The filing of the members' liquidating plan and their refusal even to attempt, through rates that they would pay to the

Debtor, to pay down any of the Debtor's obligations to the Noteholders other than tossing them the keys to Highwood Generating Station are as acrimonious as any actions one can image.

Furthering the *actual* conflict here is that the members are also alleged creditors of the Debtor.

Also, as noted above, if the Court were to terminate the Trustee's appointment, the Debtor would again be a debtor-in-possession and would have a fiduciary duty to maximize value for the benefit of creditors and to refrain from taking action that would hinder a successful reorganization. *Marvel*, 140 F.3d at 471. Thus, in their capacity as the members of the board of trustees of the Debtor, the members would have a legal obligation to oppose their own liquidating plan. This hopeless conflict of interest warrants the continued appointment of the Trustee, not his termination.

In sum, because Fergus and the other members want to avoid their obligations under their wholesale power contracts and liquidate the Debtor in furtherance of their fiduciary duties to their respective members and customers, the members are incapable of subordinating their own interests for the benefit of the Debtor's creditors and its estate. *Commodity Futures Trading Comm'n v. Weintraub*, 471 U.S. 343, 355 (1985) ("One of the painful facts of bankruptcy is that the interests of shareholders become subordinated to the interests of creditors."). This was so when the Trustee was appointed and it continues through today.

### 3.    Termination of the Trustee's appointment is not in the best interest of the creditors or the estate.

As for the other conjunctive element, termination of the Trustee's appointment is not in the best interest of the Debtor's creditors or its estate. Since the Trustee's appointment nearly two years ago, he initially and successfully stabilized the Debtor's operations and finances, and

then proceeded to attempt to maximize distributions to the Debtor's creditors through proposing a plan that reorganizes the Debtor.   Regarding this latter undertaking, the Trustee "has a fiduciary obligation to conserve the assets of the estate and to maximize distribution to creditors." *U.S. v. Aldrich (In re Rigden)*, 795 F.2d 727, 730 (9th Cir. 1986); *Walsh v. Nw. Nat'l Ins. Co. of Milwaukee, Wisconsin (In re Ferrante)*, 51 F.3d 1473, 1477 (9th Cir. 1995) ("As trustee, he can, indeed must, seek to 'maximize the value of the estate.'   Were he to do less he might well be liable for breaching that duty.") (citations omitted).   Debtors-in-possession have the same fiduciary obligations.   See, *e.g.*, *In re An-Tze Cheng*, 308 B.R. 448, 455 (B.A.P. 9th Cir. 2004) *aff'd and remanded sub nom. In re Cheng*, 160 F. App'x 644 (9th Cir. 2005) ("The debtor in possession performing the duties of the trustee is the representative of the estate and is saddled with the same fiduciary duty as a trustee to maximize the value of the estate available to pay creditors.").

Glossing over the conflicts of interest, Fergus argues that termination of the Trustee's appointment is in the best interest of the estate because the Trustee is pursuing an allegedly unconfirmable plan that is opposed by the members and is thus "forcing the **Debtor** to incur millions of dollars in unnecessary expenses" including "**paying over $1 million a month in adequate protection to Prudential**."   Motion, ¶ 26 (emphasis added).   Ironically, much of the recent administrative expenses have been incurred because of the members' increasing aggressiveness – a "deluge of litigation" commenced by the members that imposes a heavy

burden "on the estate's limited resources." *Taub*, 441 B.R. at 215.[1]  In any event, this argument

is baseless for at least five reasons.

First, by its own admission, Fergus is concerned, not about creditors, but about the

Debtor and Fergus's own perceived self-interests.

Second, Fergus's increased administrative expense argument was rejected as having "no

basis in fact or law" in *Cajun Electric* when the district court appointed a trustee.  *Cajun Elec.*,

191 B.R. at 663.

Third, in allowing the Trustee to continue to use the Noteholders' cash collateral and thus

operate the Debtor, the Court entered a final cash collateral order to which the Trustee has been

bound to comply, including making adequate protection payments.  Fergus did not object to the

final cash collateral motion or order and should not now be heard to complain since the Trustee

is simply doing what the Court has ordered that he do – for the benefit of the Debtor's creditors.

Indeed, under the Trustee's plan, the adequate protection payments and payments of

professional's fees to the Noteholders to which Fergus complains in the Motion will pay down

---

[1]     The Trustee has not yet raised the Debtor's rates to the members because revenues from
the YVEC Contract had been sufficient to pay costs of estate and build up unencumbered cash.
With no more unencumbered cash being generated from the YVEC contract, the longer the
members insist on litigating, the more expensive this case will become and the less
unencumbered cash will be available for unsecured creditors as admitted by Fergus (Motion, ¶
27).  To lessen the risk that the continued pendency of this case does not result in a decrement in
the amount of unencumbered cash available for distribution to unsecured creditors, the Trustee is
considering raising the Debtor's rates to cover the increased administrative cost caused by the
members' insistence in litigating.  The members were given fair warning of this possibility on
November 21, 2011, when the Debtor's counsel advised during the hearing on the motion to
appoint a Chapter 11 trustee that a trustee might raise rates.  Transcript, 20:13-23.  If the Trustee
does decide to raise the Debtor's rates, the Trustee will seek to carve out this additional revenue
from the Noteholders' collateral pursuant to § 552(b)(1) of the Bankruptcy Code so that the
additional cash is unencumbered and available for distribution to unsecured creditors.

approximately $25 million in debt.  But Fergus does not want creditors to be paid and neither would the Debtor if it were to be reinstalled as a debtor-in-possession.

Fourth, Fergus is again simply disagreeing with the Trustee's exercise of his business judgment made on a reasonable basis and within the scope of his authority under the Bankruptcy Code – a disagreement that is irrelevant, especially in the context of a motion to terminate a trustee's appointment.  *Taub*, 441 B.R. at 216.

And fifth, in the Motion, as Fergus and the other members have done in opposing approval of the Trustee's disclosure statement, Fergus attacks the confirmability of the Trustee's plan, as though that were a valid reason for terminating the Trustee's appointment, which, of course, it is not.  For example, in Fergus's objection to the Disclosure Statement, it argued:

> Further, the proposed plan is wholly premised on assigning the wholesale power contracts between Southern and its Members (the "WPCs").  However, given the plan treatment of the WPCs each of the Members objects to such assignment and believes the plan improperly changes the fundamental nature of the WPCs and the Members' participation in Southern.  The Disclosure Statement ignores this issue, which is fatal to the plan.  *See In re Cajun Electric Power Cooperative, Inc.*, 230 B.R. 693 (M.D.La. 1999).

*Fergus Electric's Objection to Trustee Disclosure Statement* (Dkt. No. 1031) at pp. 3 and 4. After the Court has reset the deadline to object to the Trustee's plan, Fergus can make these arguments in *that* context.  However, Fergus's plan-related arguments in no way support the Motion or its sought relief.   In fully defending against the Motion and in support of the confirmability of this plan, the Trustee is compelled to briefly explain why *Cajun Electric*, so heavily relied upon by Fergus and the other members to argue that the Trustee's plan is not confirmable, actually supports the Trustee's appointment and the confirmation of his plan.

In *Cajun Electric*, all but one of the members executed all requirements contracts (the "**Supply Contracts**") with their G & T cooperative, Cajun Electric, in 1967 that were to expire

in 2010.  *In re Cajun Elect. Power Coop., Inc.*, 230 B.R. 715, 724 (M.D. La. 1999).  When the

1967 Supply Contracts were executed, Cajun Electric did not own any generation or transmission

facilities.  *Id.*  Rather, Cajun Electric purchased its power from third parties, including investor-

owned utilities, for resale to its members to fulfill its power supply obligations to the members

under the Supply Contracts.  *Id.* at 725.  In 1976, all of Cajun Electric's members executed

superseding Supply Contracts that extended the previous term to 2021.  *Id.* at 724.  One reason

why the members did this was for Cajun Electric to obtain financing from the Rural Utilities

Service to construct generation and transmission facilities to serve its members.  *Id.*  Those

generation and transmission facilities were built and were fully operational when Cajun Electric

filed its Chapter 11 petition on December 21, 1994.  *Id.*  In 1990, all but three of Cajun Electric's

members agreed to extend the term of their respective Supply Contracts to 2026.  *Id.* at 725.

Thus, when the *Cajun Electric* court issued its decision regarding the Supply Contracts and the

trustee's plan, three of the 12 Supply Contracts expired in 22 years and the other nine expired in

27 years.

Unlike the Trustee's plan in this case, the trustee's plan of reorganization in *Cajun*

*Electric* proposed to sell virtually all of Cajun's assets to Louisiana Generating ("**Generating**").

Cajun Electric, however, would continue as a cooperative and would supply its members with

power through the Supply Contracts that were to be assumed under the trustee's plan.  Without

any generating assets, Cajun Electric would thereafter obtain from Generating all of its power for

resale to its members under a 25-year Power Supply and Service Agreement ("**PSSA**").  *In re*

*Cajun Elec. Power Coop., Inc.*, 230 B.R. 693, 700 (Bankr. M.D. La. 1999).

Like the Debtor's members, Cajun Electric's members challenged the confirmability of

the trustee's plan through a declaratory judgment adversary proceeding.  *Id.* at 698.  Both sides

filed motions for summary judgment on the eight counts in the members' adversary proceeding complaint. The trustee prevailed on his motion for summary judgment as to most of the counts in the complaint. *Id.* at 715. In granting summary judgment in favor of the trustee on Count IV, the court:

- ruled that the Supply Contracts could be assumed *and* assigned under the trustee's plan without the consent of the members. *Id.* at 704-09. The court specifically held that the Supply Contracts were not personal service contracts. *Id.* at 708-09;

- granted judgment in favor of the trustee on the issue of whether the members had a contractual right to elect Cajun Electric's board of directors. *Id.* at 710-11 and 715; and

- granted summary judgment in favor of the trustee on the issue of whether Cajun Electric's bylaws was an executory contract that must be included in any assumption or assignment of the Supply Contracts. *Id.* at 711.

The members, however, prevailed on their primary claim for declaratory relief – that the trustee's plan somehow modified the Supply Contracts – but the court's ruling was based on facts that were radically different than those before this Court and premised on a unique doctrine of Louisiana civil law for which there is no Montana law equivalent. Specifically, the *Cajun Electric* court found that under the trustee's plan the members would have no control over Cajun Electric's activities for the next 25 years (that is, through the duration of the Supply Contracts of three of the members and all but the last two years of the Supply Contracts executed by the other nine members). *Id.* at 712. Further, the court found as follows:

Under the Trustee's Plan, the cost of electricity will be controlled not by the board of directors, but by Generating, the party supplying electricity to Reorganized Cajun. The role of the board will be to accept the bill and assess it to the Members. The Members will have no ability to control their own costs, exercise economic options, or otherwise direct their destiny. This result eliminates the reason to enter the contracts in the first place.

*Id.* at 713 (footnote omitted).

-17-

The court therefore concluded that "[a] direct result of the modification of the Supply Contracts resulting from confirmation of the Trustee's Plan would be the invalidation of the Supply Contracts based upon a failure of *cause* under Louisiana law." *Id.* at 714.  The court explained the doctrine of "failure of cause" under Louisiana civil law as follows:

> Louisiana has long recognized the civil law principle know [sic] as "failure of cause".  According to the law of civil obligations, there are four elements to a binding agreement: (1) capacity, (2) consent, (3) object, and (4) cause.

> "Cause" is the reason why a party obligates himself.  Cause is the motive upon which a party based its decision to enter into a binding agreement.  A contract may be invalidated for unilateral error of fact as to the motive or principal cause for entry into that contract.  In the event that the cause for which a party agreed to bind himself ceases to exist, the party's consent is vitiated, resulting in a failure of the obligation as a whole.  Louisiana has a substantial body of longstanding jurisprudence recognizing failure of cause as a basis for the invalidation of contracts.

*Id.* at 714 (footnotes omitted).

The *Cajun Electric* court found that the trustee's plan resulted in a failure of cause under Louisiana law reasoning as follows:

> Under the Trustee's Plan, there is a failure of cause as it pertains to the Members' reason for entering into the Supply Contracts.  **The Members' primary motivation for entry into the Supply Contracts was to insure that the G & T, of which they were co-owners, obtained sufficient capacity to meet their power requirement needs and to enjoy those benefits reasonably expected to stem from one owning its own generating capacity.**

> **Under the Trustee's Plan, the Members will not enjoy the benefits they expected to receive when the Supply Contracts were executed.  First, Cajun will have no generating capacity under the Trustee's Plan, and is precluded from obtaining such capacity for 25 years.**  Second, the Members will have no meaningful control or input into the provider of its wholesale power.  In the past, the Members were afforded directorship and meaningful input into the operation of their wholesale provider, whereas they will now be given seats on the board of a shell corporation that does not even have final authority over its own annual budget.

-18-

Third, the Members will not have any significant authority over the wholesale rate to be charged or the rate design that is employed. Additionally, the members are robbed of the benefits of diversity and economies of scale that they previously enjoyed as pre-bankruptcy members of Cajun. Finally, the rate now includes profit for Generating, **whereas no profit was paid for the electricity generated by the Cajun assets prior to bankruptcy**.

**The Members were willing to be bound to the terms of the Supply Contracts based upon their principal cause or motive of obtaining generating capacity and the benefits associated therewith.** If the modification of the Supply Contracts created by the Trustee's Plan, in its current form, were to be allowed, the Supply Contracts which require the Members to purchase power from Cajun will become invalid based upon a failure of cause.

*Id.* at 715 (emphasis added).

None of the foregoing reasoning applies to this case or the Trustee's plan proposed for the Debtor. Even if the Debtor's members were motivated to sign their Wholesale Power Contracts with the Debtor based on the prospect of building their own generating assets, unlike in *Cajun Electric*, the Debtor keeps HGS under the Trustee's plan. After confirmation of the Trustee's plan, the Debtor and its members are free to do with HGS what they wish, including selling it. Further, unlike *Cajun Electric* in which the reorganized debtor would have been precluded from building new generating capacity, the reorganized Debtor may build additional generating capacity, including completing Phase II of HGS should it chose to do so.

Also, unlike the 25-year PSSA with Generating, the 10-year contract with Morgan Stanley Capital Group merely replaces a 10-year power supply contract that the Debtor had entered into pre-petition with PPL with a far superior contract. Firstly, the prices under the Morgan Stanley contract are lower than the prices under the PPL contract. Even more importantly, unlike the PPL contract that was a contract for fixed quantities or blocks of power that far exceeded the Debtor's actual needs, the Morgan Stanley contract is an all-requirements contract that provides no more power than the reorganized Debtor will need and is shaped to its

load requirements.  Moreover, when the Morgan Stanley contract expires, the Wholesale Power Contracts executed by the members in 2007 and that remain at the end of 2048 will be in effect for another 25 years.  In contrast, the PSSA with Generating had a term longer than three of the Supply Contracts and only two years less than the other nine Supply Contracts.  Also, although Morgan Stanley presumably hopes to make a profit from its power supply contract, that is no different than the for-profit power supply contract between the Debtor and PPL.

Further, unlike the board in *Cajun Electric*, the reorganized Debtor's board will have full control and authority over its budget.  Before the Debtor filed its petition, that budget included repaying $75 million at 8% interest and $10 at 7.25% interest.  Under the Trustee's plan, the budget will only need to include repaying $60 million at interest rates that are 200 basis points lower than the Debtor had agreed to pay prepetition.  Granted, the reorganized Debtor's rates must include debt service payments to the Noteholders and the other payments provided for under the Trustee's plan, but under the Wholesale Power Contracts, the Debtor's rates had to include all of its costs of operation and debt service obligations.

Further, under the Trustee's plan, the members will remain in control of the Debtor.  The only change to corporate governance under the plan will be to increase the number of board members to eight (the same increase proposed in the members' liquidating plan) to comply with the Montana law requirement that the board have at least five trustees and the Debtor's bylaws, which require that there be no less than five and no more than 12 trustees.  But the members can change that number to five or nine, or even 12 if they want to.

Finally, although the reorganized Debtor may not have the same kind of diversity and economies of scale that the Debtor had pre-petition, it will likewise not have the expensive and disruptive litigation it had prepetition with YVEC and the City of Great Falls, litigation that the

-20-

Debtor could very well have lost.  The settlement of that litigation, with the approval of this Court, resulted in the termination of YVEC's and Great Falls' membership in the Debtor.  The members did not object to either of the settlements on the grounds that their approval would change the Debtor's load diversity or economies of scale.

Not only is *Cajun Electric* factually distinguishable from this case, but also the failure of cause doctrine that the court applied to the Supply Contracts in *Cajun Electric* has no equivalent in Montana law – the law that applies to the Debtor's Wholesale Power Contract with its members.[2]

Even if the doctrine of "frustration of purpose" as recognized in Restatement (Second) of Contracts, § 265 (1981) were held to be analogous to the Louisiana civil law doctrine of "failure of cause," it would not affect the confirmability of the Trustee's plan.  In the only published Montana case that even mentions the doctrine, *Bain v. Williams*, 800 P.2d 693 (Mont. 1990), the Montana Supreme Court overturned a trial court's decision holding that "frustration of purpose" justified rescission of contract because the trial court had looked beyond the four corners of contract when determining the parties' intent and, effectively, wrote a contingency into the contract that it did not contain.[3]  Thus, *Bain* can be reasonably interpreted as an implicit rejection

---

[2]    What is more, although perhaps not as important, the parties in *Cajun Electric* never briefed or argued the doctrine of failure of cause; it was something the court raised *sua sponte* in its ruling on the cross motions for summary judgment.  Although an appeal was filed, the case was settled and the trustee's amended, consensual plan affirmed, before the appeal could be heard.

[3]    Ironically, the court in *Cajun Electric* refused to look beyond the four corners of the Supply Contracts when it denied the members' request for a declaration that they had a contractual right to elect Cajun's board of directors and that a violation of the bylaws by either Cajun or the members would constitute a material breach of the Supply Contracts, ruling that it could not consider anything extrinsic to the Supply Contracts.  230 B.R. at 710-11.  And yet, in applying the doctrine of failure of cause, contrary to its previous ruling regarding extrinsic

of the doctrine of frustration of purpose.  Further, even if the doctrine of frustration of purpose were recognized in Montana, it is subject to well-established restrictions that make it inapplicable here.  For example, the change in circumstance must render performance "virtually worthless to the other, frustrating his purpose in making the contract" and the object interfered with "must be so completely the basis of the contract that, as both parties understand, without it the transaction would make little sense."  Restatement (Second) of Contracts, § 265 cmt. a (1981).  Accord *La Motte v. Hilgedick*, 956 F.2d 274, *5 (9th Cir. 1992).  Nothing in the Trustee's plan of reorganization comes close to satisfying this extremely rigorous standard.

For the foregoing reasons, the members' reliance on *Cajun Electric* is misplaced; nothing in that case or in Montana law threatens confirmation of the Trustee's plan here.  What does threaten confirmation of the Trustee's plan is Fergus's groundless Motion as if the Trustee's appointment were terminated, he would no longer be a party in interest, losing his standing to propose a plan of reorganization under § 1121 of the Bankruptcy Code.  And that is exactly what Fergus wants because the only plan of reorganization that would then be on file would be the liquidating plan of which Fergus is a co-proponent.  Moreover, Fergus may even argue that the appointment of the Trustee merely tolled exclusivity under § 1121(b) and that the Debtor, through its members, now has the exclusive right to file a plan.  Such potential mischief is yet another reason why the Court should deny the Motion.

## III.   CONCLUSION

Throughout his tenure, the Trustee has endeavored to balance the competing interests of the various constituents, including those of the Debtor, the Debtor's unsecured and secured

---

evidence and the holding in *Bain*, the *Cajun Electric* court felt free to consider matters outside the four corners of the Supply Contracts.

creditors, and the Debtor's members.  If the Trustee's appointment is terminated, no one will be left to perform that function.  Thus, termination of the Trustee's appointment is decidedly against the interest of creditors and the estate.  Because the Motion is without any basis in law or fact, it should be summarily denied.

       Dated: November 4, 2013.

/s/ Joseph V. Womack
Joseph V. Womack
WALLER & WOMACK
303 N. Broadway, Suite 805
Billings, MT 59101
Telephone:     (406) 252-7200
Fax:             (406) 252-4266
E-mail:        jwomack@jvwlaw.com

John Cardinal Parks
Bart B. Burnett
Robert M. Horowitz
Kevin S. Neiman
HOROWITZ & BURNETT, P.C.
1660 Lincoln Street, Suite 1900
Denver, CO 80264
Telephone:     (303) 996-8600
Fax:             (303) 996-8636
E-mail:        jparks@hblegal.net
               bburnett@hblegal.net
               bhorowitz@hblegal.net
               kneiman@hblegal.net

*Counsel for the Chapter 11 Trustee*

-23-

## CERTIFICATE OF SERVICE

       I, the undersigned, certify under penalty of perjury that, in accordance with the Trustee's Limited Notice List, on November 4, 2013, or as soon as possible thereafter, copies of the foregoing were served electronically by the Court's ECF notice to all persons/entities requesting special notice or otherwise entitled to the same and that in addition service by mailing a true and correct copy, first class mail, postage prepaid, was made to the following persons/entities:

PPL EnergyPlus, LLC
2 North Ninth Street
Allentown, PA 18101

NorthWestern Energy
40 East Broadway St.
Butte, MT 59701-9394

LS Jensen Construction
4685 Mullan Road
Missoula, MT 59808

Stanley Consultants
8000 S. Chester St.
Centennial, CO 80112

Electrical Consultants, Inc.
3521 Gabel Road, Ste. 2
Billings, MT 59102

Corval Group
1633 Eustis Street
Saint Paul, MN 55108

Falls Construction Company
1001 River Drive North
Great Falls, MT 59401

First Interstate Bank
PO Box 5010
Great Falls, MT 59403-5010

Grassman Tractor Service
512 51st Street South
Great Falls, MT 59405

Modern Woodman of America
Attn: Investment Department
1701 First Avenue
Rock Island, IL 61201

National Rural Utilities Co-op Fin.
20701 Cooperative Way
Dulles, MT 20166

Prudential Capital Group
2200 Ross Avenue, Suite 4200E
Dallas, TX 75201

Yellowstone Electric Company
1919 4th Avenue North
Billings, MT 59101

By: /s/ Connie Reynolds
    Connie Reynolds
    Legal Assistant

-24-