Steven M. Johnson
CHURCH, HARRIS, JOHNSON & WILLIAMS, P.C.
114 Third Street South
P.O. Box 1645
Great Falls, MT 59403
Telephone: 406.761.3000
Fax: 406.453.2313
E-mail: sjohnson@chjw.com

Jonathan B. Alter
BINGHAM McCUTCHEN LLP
One State Street
Hartford, CT 06103-3178
Telephone: 860.240.2700
Fax: 860.240.2800
E-mail: jonathan.alter@bingham.com

Steven Wilamowsky
BINGHAM McCUTCHEN LLP
399 Park Avenue
New York, NY 10022
Telephone: 212.705.7000
Fax: 212.702.3607
E-mail: steven.wilamowsky@bingham.com

*Counsel to the Noteholders*

UNITED STATES BANKRUPTCY COURT
DISTRICT OF MONTANA

| | |
|---|---|
| In re: | Case No. 11-62031-11 |
| SOUTHERN MONTANA ELECTRIC GENERATION AND TRANSMISSION COOPERATIVE, INC., | Hearing Date: December 10, 2013<br>Hearing Time: 1:30 p.m.<br>Hearing Location:<br>**Fifth Floor Courtroom**<br>**Federal Courthouse**<br>**2601 2nd Avenue North**<br>**Billings, Montana** |
| Debtor. | |

**NOTEHOLDERS' OBJECTION TO THE FIRST AMENDED
DISCLOSURE STATEMENT FOR MEMBER COOPERATIVES'
PLAN OF LIQUIDATION FOR SOUTHERN MONTANA ELECTRIC
<u>GENERATION AND TRANSMISSION COOPERATIVE, INC.</u>**

The Prudential Insurance Company of America, Universal Prudential Arizona Reinsurance Company, Prudential Investment Management, Inc. as successor-in-interest to Forethought Life Insurance Company, and Modern Woodmen of America (collectively, the "Noteholders"), through their undersigned attorneys, as and for their objection (this "Objection") to the *First Amended Disclosure Statement for Member Cooperatives' Plan of Liquidation for Southern Montana Electric Generation and Transmission Cooperative, Inc.* [Doc. No. 1107] (the "Members' Disclosure Statement"), respectfully state as follows:

## Summary of Objection[1]

Recent developments in this case have placed the Members (who are insiders of the Debtor) in control of the Debtor, with the stated design to liquidate the Debtor and absolve themselves of liability under their contracts with the estate. Every bankruptcy proceeding is primarily for the benefit of creditors first, then equity constituents second. Bankruptcy also favors reorganization over liquidation. The Member's Plan, however, turns those goals on their heads. Given their conflict of interest, the Members' Disclosure Statement warrants careful scrutiny of the adequacy of the Members' disclosures, including the rationale and motives underpinning the Members' Plan.

The Members' Disclosure Statement is rife with statements that the Noteholders submit are inaccurate, inflammatory, misleading, or some combination of all three. Still, the Noteholders are mindful of the fact that many issues presented by flaws in the Members' Disclosure Statement are a direct product of the deficiencies in the underlying Members' Plan, and can be dealt with at the confirmation hearing.

For this reason, the Noteholders have addressed their objections only to discrete portions of the Members' Disclosure Statement that contain statements or omissions that, in the

---
[1] Capitalized terms not defined in this Summary have the meanings ascribed to them later in the Objection.

A/75843429.5

Noteholders' view, are particularly problematic or that discuss aspects of the Members' Plan that are patently unconfirmable, as a matter of law. These portions should not be permitted to remain. Over seventy proofs of claim were filed in the Debtor's case, many by parties not represented by counsel and with no past involvement in this chapter 11 case. The integrity of the bankruptcy process demands that those parties not make their voting decisions based upon what they read in a disclosure statement that is not only insufficient, but that is affirmatively misleading as well.

In addition, to the extent that certain provisions would render the Members' Plan patently unconfirmable, the Noteholders (and the estate) should not have to bear the cost of going forward and opposing confirmation of a chapter 11 plan that, on its face, could never be confirmed. Finally, the Members' Disclosure Statement must be amended in order to reflect the Members' newly-minted status as the managers of the Debtor as debtor-in-possession. This new status affects various important aspects of the Members' Plan, including the management and operation of the Debtor through and beyond its effective date, and the Debtor's position regarding the numerous pending adversary proceedings and contested matters to which it is a party.[2]

### Relevant Background

1. On October 21, 2011 (the "Petition Date"), Southern Montana Electric Generation and Transmission Cooperative, Inc. (the "Debtor") filed a voluntary petition for reorganization under chapter 11 of title 11 of the United States Code, 11 U.S.C. § 101 *et seq.* (the "Bankruptcy Code").

2. As of the Petition Date, the Debtor was comprised of six members:

---

[2] In light of the Trustee's removal, the Noteholders have separately moved, on an emergency basis, for a status conference at which issues of procedure and timing may be addressed, including the timing of the Court's consideration of the competing plans for resolution of the Debtor's chapter 11 case.

A/75843429.5

Yellowstone Valley Electric Cooperative, Inc., City of Great Falls/Electric City Power, Inc., Tongue River Electric Cooperative, Inc., Fergus Electric Cooperative, Inc., Mid-Yellowstone Electric Cooperative, Inc., and Beartooth Electric Cooperative, Inc. (collectively, the "Members").

3. On November 29, 2011, the Court appointed Lee Allen Freeman as chapter 11 trustee (the "Trustee").

4. The Noteholders hold certain notes (the "Notes") pursuant to the terms of the Indenture of Mortgage, Security Agreement and Financing Statement dated as of February 26, 2010, among the Debtor as grantor, U.S. Bank National Association as indenture trustee, Bank of New York Mellon Trust Company, N.A. as collateral agent, and certain guarantors. The Notes are secured by valid, priority liens upon and in substantially all of the Debtor's assets and all proceeds and products of such assets, pursuant to the terms of the Indenture.

5. On September 23, 2013, the Trustee filed the *Disclosure Statement for Trustee's Third Amended Plan of Reorganization for Southern Montana Electric Generation and Transmission Cooperative, Inc.* [Doc. No. 1049] (the "Trustee's Disclosure Statement") and the *Trustee's Third Amended Plan of Reorganization for Southern Montana Electric Generation and Transmission Cooperative, Inc.* [Doc. No. 1048] (the "Trustee's Plan").

6. On October 1, 2013, the Court entered an Order [Doc. No. 1067] approving, among other things, the Trustee's Disclosure Statement over numerous objections and setting the date and time for the confirmation hearing on the Trustee's Plan (the "Confirmation Hearing"), and various related deadlines. The Court subsequently vacated the Confirmation Hearing and deadlines [Doc. No. 1089] and has yet to reset them.

7. On October 25, 2013, the Members filed the *Member Cooperatives' Plan*

*of Liquidation of Southern Montana Electric Generation and Transmission Cooperative, Inc.* [Doc. No. 1107-1] (the "Members' Plan") and the Members' Disclosure Statement.

8. By Order dated November 26, 2013 [Doc. No. 1160] (upon motion of the Members), the Court removed the Trustee and restored the Debtor to management and control of its estate, as debtor-in-possession. Upon information and belief, the Debtor has not yet disclosed its intentions with respect to the continued prosecution of the Trustee's Plan (to which the Debtor has now succeeded), or the conflicts presented given the Members' prosecution of their own plan. Assuming the Debtor does not adopt the Trustee's Plan, the Noteholders are preparing to file their own, modified version of the Trustee's Plan to provide for the reorganization of the Debtor on terms that will realize going-concern value for the benefit of all creditors of the estate.

## OBJECTIONS

9. A disclosure statement must provide enough information to enable the Debtor's creditors and this Court to make an informed judgment about the proposed plans. "At a minimum, § 1125(b) seeks to guarantee that a creditor receives adequate information about the plan before the creditor is asked for a vote." *Duff v. U.S. Trustee (In re California Fid., Inc.)*, 198 B.R. 567, 571 (9th Cir. B.A.P. 1996) (citation omitted). Further, "mere allegations or opinions, unsupported by factual information, do not meet the required [adequate information] standard." *In re Civitella*, 15 B.R. 206, 208 (Bankr. E.D. Pa. 1981). A disclosure statement should not be approved if it "does not contain the kind of clarity nor realism required by the adequate information standard of Code § 1125 . . . ." *In re Copy Crafters Quickprint, Inc.*, 92 B.R. 973, 981 (Bankr. N.D.N.Y. 1988). Set forth below are statements made by the Members that require additional information or qualification, absent which the Members' Disclosure Statement cannot meet even the minimum standards necessary for Court approval:

A/75843429.5

- "The Members believe that the Member's [sic] Plan is fair and equitable and provides the best recovery to claim holders under the circumstances. The Members believe that acceptance of the plan is in the best interests of *each and every class of creditors* and interest holders entitled to vote on the Members' Plan and strongly recommend that each creditor and interest holder vote to accept the Member's [sic] Plan." Members' Disclosure Statement, p. 6. (emphasis supplied)

10. The suggestion that the Members' Plan is in the best interests of "each and every class of creditors" is not supported by underlying assertions of fact in the Members' Disclosure Statement, and improperly assumes that providing each class with treatment that is, at best, equal to those classes' worst-case chapter 7 liquidation recovery is sufficient to make confirmation of the Members' Plan consistent with their best interests.

11. An appropriate analysis of the creditors' best interests would compare the liquidation proposed by the Members with a going-concern reorganization that would employ the Debtor's incremental reorganization value to service a portion of the Debtor's secured and unsecured debt at a level consistent with feasibility under section 1129(a)(11) of the Bankruptcy Code. Instead, the Members' Disclosure Statement relies on the bald assertion that the Members' Plan is in the best interests of "each and every class of creditors," without a hint of support for that statement. Indeed, the Members' Plan, by its express terms, reveals the contrary to be true.

12. "Each and every class of creditors" includes, principally, the Noteholders, Construction Lienholders, and holders of General Unsecured Claims (all as defined in the Trustee's Plan). Taken in that order, it is beyond question that the Members' Plan is not in the best interests of the Noteholders. That is because the cornerstone of the Members' Plan is the rejection of the All-Requirements Contracts (as defined in the Trustee's Plan), which are the Noteholders' collateral. Upon rejection, the value of the All-Requirements Contracts under the Members' Plan effectively will be transferred to the Members and, for the estate's purposes, be

-6-

reduced to zero.[3] The Trustee's Plan, on the other hand, realizes the value of the All-Requirements Contracts for the Debtor's estate by having the Debtor assume the All-Requirements Contracts. By fixing rates for the Members that are lower than those contracts would otherwise allow, the Trustee's Plan effectively divides that value among the Noteholders, the Members, and other estate constituents. Even in a pure liquidation, it is inconceivable that a chapter 7 trustee would simply let go of valuable contracts rather than exercise his or her fiduciary duty and attempt to realize value from them for the benefit of stakeholders. Thus, there is no scenario under which the Members' Plan can reasonably be said to be in the best interests of the Noteholders.

13. Construction Lienholders, too, fare poorly under the Members' Plan, which asks them to fight out their asserted lien priorities with the Noteholders and then, only if successful, earn the right to try to foreclose on their collateral. On the other hand, under the settlement that was achieved in connection with the Trustee's Plan, Construction Lienholders are to receive a negotiated cash settlement of $3,325,000, payable in front-loaded installments over four years, with no need for litigation or state court foreclosure processes.

14. Holders of General Unsecured Claims are not spared either: they fare as badly or worse under the Members' Plan than under any other conceivable scenario. As under the Trustee's Plan, the Members' Plan provides holders of General Unsecured Claims with a *pro rata* portion of Unencumbered Cash, except that under the Members' Plan, that *pro rata* portion will inevitably be much smaller than otherwise, due to the large deficiency claim of the Noteholders (and, to a lesser extent, the Construction Lienors) that would dilute unsecured creditor recoveries under the Members' Plan but that would be waived under the terms of the

---

[3] For the avoidance of doubt, the Noteholders do not waive any right to pursue the Members or any other party for any claims that may be associated with the rejection of the All-Requirements Contracts.

A/75843429.5

Trustee' Plan. Moreover, based on the "Liquidation Analysis" annexed to the Members' Plan, it appears that the recoveries to General Unsecured Claim holders under the Members' Plan will, in any event, be nothing. The Liquidation Analysis, which presumes a liquidation under chapter 7 of the Bankruptcy Code, predicts a zero dollar recovery for holders of General Unsecured Claims in chapter 7. Given that there is no cost identified in the Liquidation Analysis that would not be borne in a chapter 11 liquidation as well, the projected recovery for general unsecured creditors under the Members' Plan necessarily must also be zero dollars. It is therefore impossible for the Members' Plan to be in the "best interests" of general unsecured creditors.

- **"Because of the special nature of G&T Cooperatives and their relationships with their Members, all requirements contracts are not assignable without the consent of the Member party to such contract." Members' Disclosure Statement, p. 14.**

15. The accuracy of this assertion is currently the subject of pending litigation, including an adversary proceeding that was filed by the Members themselves (Adv. Proc. 13-00036) (the "Members' Adversary Proceeding"). Nothing in the All-Requirements Contracts suggest they are not assignable, and if the Members disagree, at least some explanation for their disagreement that goes beyond their conclusory assertions are called for in order to satisfy section 1125(b). This is particularly so given the existence of decisional precedent that has found wholesale electric power contracts without express prohibitions on assignment to be subject to assumption and assignment under section 365 of the Bankruptcy Code. *See, e.g., Cajun Elec. Members Committee v. Mabey (In re Cajun Elec. Power Cooperative, Inc.)*, 230 B.R. 693, 709 (Bankr. M.D. La. 1999) ("[T]here is nothing regarding the 'nature' of the Supply Contracts which prohibits their assignment.").

16. More importantly, the Members' contention is misleading because it fails to disclose the conflict of interest that motivates them to make it, a conflict that has become more pronounced now that the Members control the Debtor. The Members are both the equity interest

A/75843429.5

holders of the Debtor and the Debtor's sole customers and source of revenue. The Members' Plan allows the Members, as customers, to shed contracts that they consider to be above-market despite the fact that the Debtor will be diminished as a result. *See, e.g., United Air Lines, Inc. v. U.S. Bank Trust Nat'l Ass'n (In re UAL Corp.),* 346 B.R. 456, 467 (Bankr. N.D. Ill. 2006) (citations omitted) ("Assumption is the choice for above-market leases and contracts. It commits the estate to full performance under the contract (including cure of any defaults by the debtor) in exchange for a continuation of the counterparty's duties."). The Members' Plan would reject the All-Requirements Contracts without any corresponding benefit to the estate. The Members' Disclosure Statement should explain why this is an acceptable result for creditors, or at least highlight the inherent conflict of interest that would alert the Debtor's creditors to the imprudence of uncritically accepting the Members' legal assessment of the Debtor's rights under the All-Requirements Contracts.

- **"The increased rates which the Members were required to pass on to their customer/patrons have caused patrons/customers to look to other electric power sources and to openly and publicly criticize the Debtor and its management." Members' Disclosure Statement, p. 15.**

17. The Noteholders are aware of no evidence of "patrons/customers" seeking alternative sources of power. Nor are they aware of widespread criticism of the Debtor, rather than its prepetition operations while controlled by the Members. In fact, virtually all of the public criticism of the Debtor since the Petition Date has emanated from the Members themselves, who have frequently taken to the press to voice their desired liquidation outcome, on no uncertain terms.

18. The Members also do not explain why rates currently charged for power should be cause for complaint at all, given that those rates are substantially lower than the 2009 projections the Members originally signed up for when they induced the Noteholders to buy the

Notes. To the extent that even these relatively low rates have threatened the viability of the individual Members by causing a loss of customers (or reduced power usage from existing customers), the Members' Disclosure Statement should provide the underlying data to back this up, including a chart comparing historical usage with recent trends, so as to permit creditors to confirm what are presently just bare, conclusory allegations. In the absence of some substantiation, the Members' statement is both self-serving and conclusory, and serves no valid disclosure purpose.

- **"The Members' Plan provides for the liquidation of the Debtor and the surrender of HGS and the Encumbered Cash to the Noteholders, providing the Noteholders with the actual value of their security and properly treating them as undersecured creditors." Members' Disclosure Statement, p. 20.**

19. The notion that the Noteholders are receiving "the actual value of their security" under the Members' Plan is entirely dependent upon the incorrect assumption that the All-Requirements Contracts have no value. The Members' Disclosure Statement should, at a minimum, disclose the fact that the Members' position regarding the "actual value" of the Noteholders' collateral only holds true if the Members prevail in the Members' Adversary Proceeding, but not otherwise.

20. It is the Noteholders' contention that the All-Requirements Contracts have *substantial* value. Indeed, any extended, contractually committed, flow of net revenue almost always has value, which can be readily calculated to its present value using a reasonable discount rate for the future stream of those payments due. A non-conflicted Debtor would assume the All-Requirements Contracts so as to preserve their value for the benefit of its estate and its creditors.

A/75843429.5

- "**The Members believe there is a public interest in providing rural Montana power consumers with electricity at fair and reasonable rates, rather than forcing them to bear the burden of the Noteholders' quest for profits from a bad loan.**" Members' Disclosure Statement, p. 21.

        21.    This statement is inflammatory and adds nothing informative to the Members' Disclosure Statement. The characterization of the Noteholders' goals in the Debtor's case as a "quest for profits" from a "bad loan" is not only unfair and irrelevant, but patently false too. It should either be deleted, or the Members should acknowledge that the Debtor solicited and induced the Noteholders to purchase the Notes pursuant to a formal request and that the Members themselves approved the loan on behalf of the Debtor less than two years before the Petition Date. The Members should also note that the Debtor's projected rates in 2009 were much higher than the projected rates under the Trustee's Plan, and that the Members' rates have not increased since the Petition Date.

- "**The other Members have each investigated bankruptcy alternatives for their cooperatives if they are forced into a plan of reorganization that is untenable.**" Members' Disclosure Statement, p. 21. "**The current wholesale rates charged by Southern to the Members are already above market and crippling the Members and their own patron/customers. The increased rates presently forecast in the Trustee's Plan (before increased rates under any revised MSCGI Agreement) will result in unsustainable electric rates to the Members and their own patron/customers.**" Members' Disclosure Statement p. 31.

        22.    This statement of the Members amounts to nothing more than argument-by-innuendo. If the Members have truly "investigated bankruptcy alternatives for their cooperatives" they should disclose what the outcome of that investigation has been. For creditors to properly assess these assertions, the Members must provide information regarding each Member's current financial situation, the costs and regulatory processes associated with a Member's bankruptcy filing and plausible alternative power contracts for the Members' continued operations. It is undisputed that absent the Debtor's chapter 11 filing, the Members (and, by extension, their ratepayers) would be paying higher rates today under their All-

A/75843429.5

Requirements Contracts. The Members' assertion that they have investigated bankruptcy alternatives if "forced" into a plan of reorganization is fundamentally inconsistent with that fact. Moreover, the very fact that prepetition, the Members had contemplated paying higher than currently prevailing rates is itself undisclosed in the Members' Disclosure Statement. Adequate information under section 1125(b) of the Bankruptcy Code demands, at a minimum, the disclosure that the Members actually contracted with knowledge of the likelihood of substantially higher rates than the ones that they now claim are so ruinous to their customers.

- **"Immediate liquidation will also stop the $1.5 to $2 million that is being paid each month as adequate protection to the Noteholders, for the Noteholders' professionals, and for the Trustee's expenses and the expenses of the Trustee's professionals." Members' Disclosure Statement, p. 22.**

23. In light of the removal of the Trustee, there will no longer be an accrual of fees for the Trustee and the Trustee's professionals, with or without the Members' Plan. Additionally, the Members' Plan contemplates the appointment of a liquidating trustee, who will need his own legal and financial professionals. The Debtor, too, presumably will begin accruing fees of its own counsel, effective immediately, given that it has just been restored to debtor-in-possession status.

24. In a related vein, the Members' Disclosure Statement should contain a discussion of how the Members' Plan and the plan process is affected by the removal of the Trustee. The Debtor has just inherited the responsibility of managing an operating electric power cooperative, with assets that including contracts, a physical plant, and numerous adversary proceedings and contested matters (many of which are identified in the Members' Disclosure Statement), including several of which that the Members now find themselves on both sides of. The Members' Disclosure Statement should explain how the Members intend to ensure that the Debtor is adequately managed through the contemplated effective date of the Members' Plan,

-12-

both respect to its business as well as its litigation assets, in a way that will avoid asset degradation or spoliation, otherwise maximize value to its estate, and eliminate the influence of any actual or apparent conflicts of interest.

- **"Under the Members' Plan, on the Effective Date, Debtor will determine a period of time, not to exceed 90 days, to contract for purchase of electrical power ('Transition Period')." Members' Disclosure Statement, p. 23.**

25. The Members provide no information regarding the Debtor's source of power purchases during the Transition Period. Further information is necessary in order to allow creditors to determine the viability of this option and the cost and availability of power to the Debtor during this Transition Period. Additionally, as the Noteholders have not consented to the use of their cash collateral under the Members' Plan, there is no apparent source of funding for the Debtor's power purchases during the Transition Period, a problem that is left unexplained by the Members.

- **"If not previously terminated, the DIP Order shall terminate on the Effective Date." Members' Disclosure Statement, p. 23.**

26. The incorrectness of this statement is one of which the Court may take judicial notice. While consensual cash collateral *usage* may be terminated, the essential protections of the Cash Collateral Order remain in full force. Pursuant to the Cash Collateral Order [Dkt. No. 413], "(a) the protections afforded to the Prepetition Secured Parties under this Final Order, and any actions taken pursuant thereto, shall survive the entry of an order (i) dismissing the Chapter 11 Case or (ii) converting the Chapter 11 Case into a case under Chapter 7 of the Bankruptcy Code, and (b) the Adequate Protection Liens and the Superpriority Claims shall continue in the Chapter 11 Case, in any such successor case or after any such dismissal." This error should be corrected.

A/75843429.5

- "The Members have agreed to waive any rejection damage claims against Debtor resulting from such rejection [of the All-Requirements Contracts]." Members' Disclosure Statement, p. 24.

27. While the Members purport to be waiving possible rejection claims due to the rejection of the All-Requirements Contracts, the Noteholders are at a loss to understand what those could possibly be, given that the Members' overarching and all-consuming goal in this case has been to rid themselves of the All-Requirements Contracts. The suggestion that the Members could have rejection damage claims appears designed to mislead creditors into thinking that the Members are giving up value in exchange for the substantial benefits that the Members (and only the Members) are primed to achieve under their plan.

- "Upon the Effective Date . . . each holder . . . of a Claim or Member Interest . . . shall be deemed to have forever waived, released, and discharged Debtor, to the fullest extent permitted by section 1141 of the Bankruptcy Code . . . ." Members' Disclosure Statement, p. 28.

28. The provision for the discharge of the Debtor under the Members' Plan renders it patently unconfirmable as a matter of law. Section 1141(d)(3) of the Bankruptcy Code provides that a discharge is not available to a chapter 11 debtor if: "(A) the plan provides for the liquidation of all or substantially all of the property of the estate; (B) the debtor does not engage in business after consummation of the plan; and (C) the debtor would be denied a discharge under section 727(a) of this title if the case were a case under chapter 7 of this title." Unlike the Trustee's Plan, the Members' Plan provides for the liquidation of all or substantially all of the Debtor's estate, and does not contemplate a going-forward business. Because the Debtor is not an individual, it also would be ineligible for a discharge under section 727(a) of the Bankruptcy Code. The Members' Plan is, accordingly, not confirmable on its face. Because the underlying plan is patently unconfirmable, the disclosure statement may not be approved. *See In re Phoenix Petroleum Co.*, 278 B.R. 385, 394 (Bankr. E.D. Pa. 2001); *In re United States Brass Corp.*, 194

A/75843429.5

B.R. 420, 422 (Bankr. E.D. Tex. 1996); *In re Eastern Maine Electric Cooperative, Inc.,* 125 B.R. 329, 333 (Bankr. D. Me. 1991); *In re Filex, Inc.,* 116 B.R. 37, 41 (Bankr. S.D.N.Y. 1990).

- **"Subject to the occurrence of the Effective Date, the Confirmation Order shall constitute a release, discharge, and forgiveness of all claims, demands, or Causes of Action which any party in interest, creditor, the Committee or the Trustee holds or is entitled to prosecute on behalf of any other party against . . . (b) the Members . . . ." Members' Disclosure Statement, p. 28.**

29.  The Members' Plan purports to release a wide array of third-party non-debtors, including parties to pending litigation. The Members' Plan provides for an absolute release by all parties of claims or demands against the Members for no apparent consideration, and without any temporal limitation or connection to a successful reorganization that could possibly validate it under the precedent of this Court. *See In re Yellowstone Mountain Club, LLC,* 460 B.R. 254, 277 (Bankr. D. Mont. 2011) ("The exculpation clause in the case *sub judice* is not barred by Ninth Circuit Law. The exculpation clause is temporal in nature and covers those parties who were closely involved with drafting the Settlement Term Sheet.... As the testimony clearly shows, without the Settlement Term Sheet, it is doubtful the Debtors could have achieved confirmation of a Chapter 11 plan, and indeed it is very likely the Debtors' bankruptcies would have been converted to Chapter 7 and the assets liquidated."). Indeed, unlike in *Yellowstone*, the Members here seek to liquidate the Debtor here *notwithstanding* the desire of the Trustee, the Noteholders, and the Construction Lienholders to reorganize. The Members should not be rewarded with releases and, if they should, they certainly should be required to explain why that is the case.

30.  For these reasons, too, the Members' Plan is patently unconfirmable, with fatal consequences for the Members' Disclosure Statement as a result. *In re Phoenix Petroleum Co.,* 278 B.R. at 394.

A/75843429.5

## Conclusion

WHEREFORE, the Noteholders respectfully request that the Court deny approval of the Members' Disclosure Statement.

Respectfully submitted this 2nd day of December, 2013.

/s/ Jonathan B. Alter
Jonathan B. Alter, Esq.
BINGHAM McCUTCHEN LLP
One State Street
Hartford, CT 06103
Telephone: 860.240.2700
E-mail: jonathan.alter@bingham.com

Steven Wilamowsky
BINGHAM McCUTCHEN LLP
399 Park Avenue
New York, NY 10022
Telephone: 212.705.7000
Fax: 212.702.3607
E-mail: steven.wilamowsky@bingham.com

- and -

/s/ Steven M. Johnson
Steven M. Johnson
CHURCH, HARRIS, JOHNSON &
  WILLIAMS, P.C.
114 Third Street South
P.O. Box 1645
Great Falls, MT 59403
Telephone: 406.761.3000
E-mail: sjohnson@chjw.com

*Counsel to the Noteholders*

A/75843429.5

## CERTIFICATE OF SERVICE

    I, the undersigned, certify under penalty of perjury that in accordance with the Trustee's Limited Notice List, on December 2, 2013, or as soon as possible thereafter, I caused to be served copies of the foregoing electronically by the Court's ECF notice to all persons/entities requesting special notice or otherwise entitled to the same and that in addition I served by mailing a true and correct copy, first class mail, postage prepaid, to the following persons/entities:

PPL EnergyPlus, LLC
2 North Ninth Street
Allentown, PA 18101

North Western Energy
40 E. Broadway St.
Butte, MT 59701-9394

LS Jensen Construction
4685 Mullan Road
Missoula, MT 59808

Stanley Consultants
8000 S. Chester St.
Centennial, CO 80112

Electrical Consultants, Inc.
3521 Gabel Road, Ste. 2
Billings, MT 59102

Corval Group
1633 Eustis Street
Saint Paul, MN 55108

Falls Construction Company
1001 River Drive North
Great Falls, MT 59401

First Interstate Bank
PO Box 5010
Great Falls, MT 59403-5010

Grassman Tractor Service
512 51st Street South
Great Falls, MT 59405

Modem Woodman of America
Attn: Investment Department
1701 First Avenue
Rock Island, IL 61201

National Rural Utilities Co-op Fin.
20701 Cooperative Way
Dulles, MT 20166

Prudential Capital Group
2200 Ross Avenue, Suite 4200E
Dallas, TX 75201

Yellowstone Electric Company
1919 4th Avenue North
Billings, MT 59101

    /s/Steven M. Johnson
    Steven M. Johnson

A/75843429.5