UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF MONTANA

In re

**SOUTHERN MONTANA ELECTRIC GENERATION AND TRANSMISSION COOPERATIVE, INC**,

Debtor.

Case No. **11-62031-11**

# MEMORANDUM of DECISION

At Butte in said District this 11th day of June, 2014.

Pending in this Chapter 11 bankruptcy case is the Request of Energy West Resources, Inc. ("EWR") and Energy West Montana ("EWM," and collectively, "Energy West") for Allowance and Payment of Administrative Expense Claims filed December 31, 2013, docket no. 1219. The aforementioned request for payment of administrative expense claims is opposed by The Prudential Insurance Company of America, Universal Prudential Arizona Reinsurance Company, Prudential Investment Management, Inc. as successor-in-interest to Forethought Life Insurance Company, and Modern Woodmen of America (collectively, the "Noteholders"), the Debtor, and the Unsecured Creditors Committee. On June 6, 2014, Debtor, the Noteholders, and Energy West submitted the following agreed facts:

1. Southern Montana Electric Generation & Transmission Cooperative, Inc. (the "Debtor") filed a voluntary petition for relief under chapter 11 of the United States Bankruptcy

Code on October 21, 2011 (the "Petition Date") in the United States Bankruptcy Court for the District of Montana (the "Bankruptcy Court").

2. By Order of the Bankruptcy Court dated November 22, 2011, Lee A. Freeman (the "Trustee") was appointed chapter 11 trustee of the Debtor. The Trustee's appointment was subsequently terminated by Order of the Bankruptcy Court dated November 26, 2013, and the Debtor has since that time been in control of its business and affairs as a debtor in possession.

3. The Debtor is a not-for-profit, tax exempt generation and transmission cooperative formed under the Montana Rural Electric and Telephone Cooperative Act. The Debtor provides wholesale electricity and related services to its members for retail supply to their respective members in Montana and Wyoming.

4. Prior to the Petition Date, the Debtor determined to construct a 250 MW coal-fired power plant known as the Highwood Generating System ("HGS"). These plans were later modified by the Debtor such that with respect to HGS, the Debtor endeavored to construct in two phases, a 120 MW natural gas-fired combined cycle combustion turbine electric generation facility. The first phase of the modified HGS construction project ("Phase One") was contemplated to be a simple cycle portion of HGS with commercial operations originally scheduled to begin in January 2011. HGS never operated commercially. Instead, HGS only operated on a limited basis from time to time for the purpose of performing various test runs. The second phase of HGS construction, which was to have been the construction of the combined cycle portion of HGS, never commenced. HGS also includes approximately 19 miles of natural gas transmission pipeline (the "HGS Pipeline").

5. Prior to the Petition Date, the Debtor and Energy West Resources, Inc. ("EWR")

executed that certain Base Contract for Sale and Purchase of Natural Gas dated September 26, 2011 (the "EWR Base Contract"). The EWR Base Contract required EWR to sell and the Debtor to purchase natural gas in specified quantities in specified time-periods at specified pricing and other terms. This supply of natural gas was intended for use by an operating HGS at capacities expected to be required by a fully functional and commercially operating Phase One. The EWR Base Contract is a "Firm Contract" as defined in section 2.19 of the Base Contract or what is commonly referred to as a "take or pay" contract, such that under the EWR Base Contract, the Debtor was required to pay EWR each month for the contract quantity of gas at the contract price for gas actually used and at a formula rate for any shortfall in gas used from the contract amount; that is, the Debtor was required to pay EWR under the EWR Base Contract irrespective of whether the Debtor actually required or accepted delivery of the natural gas. As an example, each EWR invoice to the Debtor dated December 5, 2011 through September 5, 2012 entitled "Invoice for Natural Gas Purchase" for the above referenced product states "volume [of gas] not purchased in MMbtus", using such amount as a component part for the calculation of the amount claimed owed by the Debtor to EWR. The EWR Base Contract expired by its term after the Petition Date on or about August 31, 2012. The obligation of the Debtor to pay EWR under the EWR Base Contract is not collateralized.

6. Prior to the Petition Date, the Debtor and EWR executed that certain Services Agreement dated August 1, 2011 (the "EWR Services Agreement" and together with the EWR Base Contract, the "EWR Agreements"). The EWR Services Agreement provided for EWR to procure and manage the supply of natural gas to HGS. The EWR Services Agreement provides for the Debtor to pay EWR a flat monthly fee for services under the EWR Services Agreement.

Because HGS was not operated, the Debtor did not require or utilize the services provided for under the EWR Services Agreement.

7. Prior to the Petition Date, the Debtor and Energy West Montana ("EWM") executed that certain Confidential Gas Transportation Service Agreement dated September 29, 2011 (the "EWM Transportation Service Agreement"). The EWM Transportation Service Agreement provides for EWM to maintain and operate the HGS Pipeline. The services contemplated to be provided to the Debtor under the EWM Transportation Service Agreement are priced at a flat fee plus a variable fee based on volume of gas throughput in the HGS Pipeline. The EWM Transportation Service Agreement is what is commonly referred to as a "minimum requirements contract", such that EWM is entitled to charge the Debtor an annual amount in the event that the Debtor does not satisfy certain minimum volume throughput requirements through the HGS Pipeline. Because the Debtor never operated HGS, nor correspondingly, the HGS Pipeline on a commercial basis, the minimum volume requirements under the EWM Transportation Service Agreement were never satisfied by the Debtor. The obligation of the Debtor to pay EWM under the EWM Transportation Service Agreement is not collateralized.

8. In connection with the EWM Transportation Service Agreement, an Operating Agreement dated September 29, 2011 was an exhibit (the "EWM Operating Agreement"). The EWM Operating Agreement requires EWM to provide the Debtor safety maintenance services at a flat monthly rate. The Debtor has paid all amounts due for safety maintenance services in a timely manner.

9. EWR and EWM are collectively referred to herein as "Energy West". The EWR

Agreements and the EWM Agreements are collectively referred to herein as the "Energy West Agreements". The Energy West Agreements were all negotiated, executed and became effective prior to the Petition Date.

10. During the pendency of the Debtor's bankruptcy case, neither the Debtor nor the Trustee filed a motion to reject any of the Energy West Agreements, and likewise, during the pendency of the Debtor's bankruptcy case, neither the Debtor nor the Trustee filed a motion to assume any of the Energy West Agreements. During the pendency of the Debtor's case, Energy West did not file a motion to compel assumption or rejection of any or all of the Energy West Agreements.

11. On April 21, 2014, the Debtor filed a Chapter 11 Plan of Reorganization, which was amended by that First Amended Plan of Reorganization dated May 12, 2014 (the "Plan"). Exhibit A to the Plan contains a list of contracts that the Debtor proposes to assume in accordance with the terms and conditions of the Plan. The Plan specifically allows the Debtor to add or remove contracts from Exhibit A, and in the event any contract is removed from Exhibit A, on the Effective Date of the Plan, such contract is deemed rejected. The Energy West Agreements are identified on Exhibit A to the Plan for notice purposes, and the Debtor has informed Energy West that absent acceptable resolution of matters with Energy West, prior to the Confirmation Date (as the term is defined in the Plan), the Debtor will remove the Energy West Agreements from Exhibit A to the Plan.

12. On December 31, 2013, Energy West filed a Request For Allowance and Payment of Administrative Expense Claims (the "Energy West Application") at Docket No. 1219. The Energy West Application seeks allowance and payment of (i) $1,014,573.72 to EWR as an

5

administrative priority claim (the "EWR Administrative Claim") and (ii) $1,278,733.17 to EWM as an administrative priority claim (the "EWM Administrative Claim"). EWR has filed a pre-Petition Date unsecured claim in the amount of $14,465.07 (the "EWR Unsecured Claim"). EWM has filed a pre-Petition Date unsecured claim in the amount of $136,372.52 (the "EWM Unsecured Claim"). The Debtor does not dispute the amounts with respect to the EWR Administrative Claim, the EWR Unsecured Claim, the EWM Administrative Claim or the EWM Unsecured Claim. Instead, the Debtor disputes the characterization of any of these claims as being entitled to administrative priority or being entitled to any treatment under the Plan other than as Class 4 general unsecured claims.

13. The Debtor's monthly operating reports filed with the Bankruptcy Court for filing period October 21, 2011 through November 30, 2011 [Docket No. 135], Amended filing period October 21, 2011 through November 30, 2011 [Docket 136], filing period December 2012 [Docket No. 207], filing period January 2012 [Docket No. 265], Amended filing period January 2012 [Docket No. 303], filing period February 2012 [Docket No. 315], filing period March 2012 [Docket No. 381], Amended filing period March 2012 [Docket No. 407], filing period April 2012 [Docket No. 423], filing period May 2012 [Docket No. 452], filing period June 2012 [Docket No. 494], filing period July 2012 [Docket No. 510], filing period August 2012 [Docket No. 530], filing period September 2012 [Docket No. 567], filing period October 2012 [Docket No. 589], filing period November 2012 [Docket No. 608], filing period December 2012 [Docket No. 645], filing period January 2013 [Docket No. 685], filing period February 2013 [Docket No. 725], filing period March 2013 [Docket No. 797], filing period April 2013 [Docket No. 846], filing period May 2013 [Docket No. 883], filing period June 2013 [Docket No. 931], filing

period July 2013 [Docket No. 986]; filing period August 2013 [Docket No. 1016], filing period September 2013 [Docket No. 1088], filing period October 2013 [Docket No. 1148], filing period November 2013 [Docket No. 1182], filing period December 2013 [Docket No. 1244], filing period January 2014 [Docket No. 1262], filing period February 2014 [Docket No. 1295], filing period March 2014 [Docket No. 1332], and filing period April 2014 [Docket No. 1366] reflect accrued amounts due to Energy West. The Debtor received advice from the Trustee's accountant that because it employed an accrual based accounting system it was required to show on its books and records in monthly operating reports an accrued obligation to Energy West as a result of the receipt of invoices by the Debtor from Energy West "until/unless the contracts [Energy West contracts] are rejected".

14. On March 21, 2014, the Debtor filed with the Bankruptcy Court an Objection to the Energy West Application (the "Debtor Objection") at Docket No. 1304.

15. The Noteholders are senior secured creditors of the Debtor that filed an Objection to the Entry to the Energy West Application on March 21, 2014 at Docket No. 1304.

16. During the pendency of the Debtor's bankruptcy case, neither the Trustee nor the Debtor operated HGS nor the HGS Pipeline on a commercial basis. There were, however, three (3) instances in which the Trustee undertook limited test runs of HGS. In the instances of the three test runs, the Trustee and Energy West made specific arrangements with respect to each of these test runs, whereby the Trustee designated a specified amount of natural gas required for the test run, and prepaid EWM the amount designated by EWM. The contracts for the three tests each provided "[a]ny excess pre-payment funds will be applied to the post-petition administrative claims of SME." For each of the three tests, the Trustee prepaid for more natural gas than

7

actually utilized in the test runs of HGS. In each case, EWM, in turn, sold this excess natural gas into the open market and credited the account of the Debtor the amount received from the sale of excess natural gas. The Debtor asserts that these credits total $170,739.93. EWM asserts that it applied the credits as recited in each of the three contracts; i.e., to amounts allegedly due to EWM in respect of the EWM Administrative Claim. The Debtor and EWM agree that in the event that the Debtor Objection were sustained, (a) it is a legal issue whether the overage amount—$170,739.93—must be refunded to the Debtor and (b) that the overage amount is not otherwise subject to setoff or recoupment.

17. At no time after the Petition Date other than with respect to the limited quantities ordered by the Trustee and agreed to by EWM outside the scope of the Energy West Agreements as referred to in paragraph 15 herein has the Debtor required or received natural gas from EWR, required procurement or management services from EWR or required any of the volume through put requirements on the HGS Pipeline, pursuant to the Energy West Agreements.

18. The Debtor acknowledges the right of EWR to assert damages against the Debtor under the take or pay provisions of the EWR Base Contract and the right of EWM to assert damages against the Debtor under the minimum requirements provisions of the EWM Transportation Service Agreement. The only item in dispute by the Debtor and Energy West with respect to the EWR Administrative Claim and the EWM Administrative Claim is whether under the circumstances of the Debtor and applicable case law within the Ninth Circuit, the EWR Administrative Claim and the EWM Administrative Claim are entitled to administrative priority treatment. In the event that such administrative claims are not allowed, then EWM and EWR may assert the claims as unsecured claims under Class 4 of the Debtor's Plan of Reorganization

of May 12, 2014.

19. The Plan is not feasible if the EWR Administrative Claim and/or the EWM Administrative Claim are allowed in full because the Debtor does not project to have sufficient unencumbered funds on the Effective Date to pay either or both of these claims.

CONTENTIONS OF THE PARTIES

EWM and EWR request that all amounts billed by them pursuant to the Energy West Agreements be allowed as administrative claims against the estate, arguing in the request for allowance of administrative request claims filed December 31, 2013, that it had no choice but to continue to perform pursuant to the Energy West Agreements, that the Trustee elected to continue to receive all of the benefits under the Energy West Agreements pending a decision to assume or reject such contracts, and that the bankruptcy estate is obligated to pay for the reasonable value of the goods and services it received under the Energy West Agreements. Relying on the above contentions, Energy West also argues that the Debtor is estopped from denying the administrative expense status of Energy West's claims.

Debtor counters that the amount Energy West seeks as an administrative claim arose prepetition and is not associated with any goods delivered or services provided to the Debtor, and relate to minimum amounts the Debtor would owe under the Energy West Agreements, regardless of whether goods or services were provided. Debtor further argues that Energy West has failed to demonstrate how the postpetition amounts owing under the Energy West Agreements preserved or benefitted the Debtor or Debtor's creditors. Finally, Debtor argues that it is not estopped from contesting the administrative claim because of accounting principles or its decision to not yet reject the contracts with EWR and EWM. Based upon the agreed facts,

Debtor contends Energy West has improperly retained $170,739.94 of postpetition payments made by Debtor. The Noteholders' objection echoes Debtor's objection, and also argues that the Bankruptcy Code does not authorize implied assumption and that the Noteholders do not consent to the use of their cash collateral for payment of Energy West's alleged administrative claims. The Unsecured Creditors Committee joins in the Debtor's and Noteholders' objections.

## APPLICABLE LAW and DISCUSSION

Section 503(b)(1)(A) allows postpetition administrative expenses for "the actual, necessary costs and expenses of preserving the estate." *Einstein/Noah Bagel Corp. v. Smith (In re BCE West, L.P.)*, 319 F.3d 1166, 1172 (9th Cir. 2003). The burden of proving an administrative expense claim under § 503(b)(1)(A) is on the claimant. *Id.* To establish such a claim, the claimant must show that the debt: (1) arose from a transaction with the debtor in possession; and (2) directly and substantially benefitted the estate. *Id.* The terms "actual" and "necessary" are construed narrowly in order to keep fees and administrative costs at a minimum. *Burlington N.R.R. Co. v. Dant & Russell, Inc. (In re Dant & Russell, Inc.)*, 853 F.2d 700, 706 (9th Cir. 1988). The bankruptcy court has broad discretion to determine whether to grant a § 503 claim. *In re Santa Monica Beach Hotel, Ltd.*, 209 B.R. 722, 725 (9th Cir. BAP 1997), citing *In re DAK Indus., Inc.*, 66 F.3d 1091, 1094 (9th Cir.1995).

In *In re Metro Fulfillment, Inc.*, 294 B.R. 306, 309 (9th Cir. 2003), the Ninth Circuit Court of Appeals reiterated the above-discussed standard for determining whether a claim is an administrative claim under § 503(b):

> Section 503(b)(1)(A) allows for administrative expenses, "including . . . the actual, necessary costs and expenses of preserving the estate, including wages, salaries, or commissions for services rendered after the commencement of the

case . . . ." Administrative expenses

> must be the actual and necessary costs of preserving the estate for the benefit of its creditors. The terms "actual" and "necessary" are [to be] construed narrowly . . . .

> *Burlington N. R.R. Co. v. Dant & Russell, Inc. (In re Dant & Russell, Inc.)*, 853 F.2d 700, 706 (9th Cir.1988) (citations omitted).

> To establish an administrative expense claim, a claimant must show that the debt:
> (a) arose from a transaction with the debtor in possession as opposed to the preceding entity. . .; and
> (b) directly and substantially benefitted the estate.

> *Microsoft Corp. v. DAK Indus., Inc. (In re DAK Indus., Inc.)*, 66 F.3d 1091, 1094 (9th Cir.1995).

As explained by the Ninth Circuit, § 503(b)(1)(A) is construed narrowly in order to maximize and protect the limited assets of the bankruptcy estate for the benefit of the unsecured creditors. *In re Palau Corp.,* 139 B.R. 942, 944 (9th Cir. BAP 1992), *aff'd*, 18 F.3d 746, 750 (9th Cir. 1994).

In the case *sub judice*, the Court finds and concludes that Energy West failed to satisfy its burden of proof to show that it satisfied the requirements for an administrative expense in the amount of $2,293,306.89 under § 503(b)(1)(A) and under the narrow construction applied in this Circuit as explained in *Santa Monica*, 209 B.R. at 725. *See also Metro Fulfillment*, 294 B.R. at 309. Energy West asserts that the Trustee accepted performance and the Debtor received the benefits of the Energy West Agreements and further argues that the Trustee either paid the invoices submitted by Energy West or accrued the unpaid amounts as postpetition accounts payable. As the stipulated facts show, Debtor paid all amounts due for safety maintenance services that were due under the EWM Operating Agreement and similarly prepaid for a designated amount of natural gas to conduct three limited test runs. In the above two instances,

11

Debtor either received services or goods that benefitted the estate. With respect to the other amounts, Energy West was simply billing Debtor for the minimum payments due under prepetition contracts that were entered into by Tim Gregori, CEO and General Manager of Southern Montana Electric Generation and Transmission Cooperative, Inc., the prepetition entity, and not the Debtor-in-Possession. Furthermore, with respect to the contractual minimum payments, Energy West has wholly failed to show a commensurate benefit to the estate or Debtor.

The Court is also not persuaded by Energy West's following argument that Debtor is estopped from disputing Energy West's administrative expense status:

> The Debtor classified these claims and demanded that EWR and EWM not be permitted to cut off the goods or services. EWR and EWM had to continue to perform under the Energy West Contracts pending a decision by the Trustee to reject the contracts. The Trustee accepted performance and the Debtor received the full benefit of the contracts. The Trustee either paid the invoices or accrued the unpaid amounts as postpetition accounts payable, never protesting an invoice, a rate or a quantity or seeking to renegotiate any of the contracts. The actions of the Debtor, whether acting as a debtor-in-possession or through the Trustee, meet all of the traditional elements of equitable estoppel as defined in the Ninth Circuit.

Energy West complains that it was waiting for the Trustee to reject the Energy West Agreements. While that may be so, Energy West had the option, under 11 U.S.C. § 365(d)(2), to seek an order compelling the Trustee to assume or reject the Energy West Agreements within a specified time period. Energy West elected not to undertake such action. Also, as discussed above, Debtor has already paid for the postpetition goods and services that benefitted the Debtor and the Estate. Finally, Energy West was advised by the Trustee that "the accounting treatment of the contracts with Energy West in the Monthly Operating Reports is driven by Generally Accepted Accounting Principles and is not, nor should be construed as, an admission that any claims held

12

by Energy West are entitled to administrative expense priority under Ninth Circuit law."

Construing the Motion narrowly, the Court concludes that Energy West failed to show that it "directly and substantially benefitted the estate" to the extent of $2,293,306.89 as required for allowance under § 503(b)(1)(A). *Metro Fulfillment*, 294 B.R. at 309; *DAK Indus.*, 66 F.3d at 1094. Accordingly, in the exercise of its broad discretion, the Court denies Energy West's administrative claims.[1]

In the Objection filed at docket no. 1302, Debtor requests that the Court enter an order requiring Energy West to repay Debtor a postpetition overpayment of $170,739.94. The Debtor and EWM agreed that in the event Debtor's Objection to Energy West's request for allowance of administrative claims was sustained, (a) it is a legal issue whether the overage amount—$170,739.93—must be refunded to the Debtor and (b) that the overage amount is not otherwise subject to setoff or recoupment. The parties agree that the postpetition contracts for the three tests, which resulted in the $170,739.93 over payment, each provided "[a]ny excess pre-payment funds will be applied to the post-petition administrative claims of SME." The postpetition contract is clear; such overpayments are to be applied to postpetition administrative claims of SME. Absent an administrative claim of its own, Energy West has agreed that any excess prepayment funds would go to Debtor for payment of postpetition administrative claims. For the reasons stated above, the Court will enter a separate order providing as follows:

IT IS ORDERED that the Request of Energy West Resources, Inc. and Energy West Montana for Allowance and Payment of Administrative Expense Claims filed December 31,

---

[1] Debtor has not yet rejected or accepted the Energy West Agreements. Under § 365, if Debtor assumes the Energy West Agreements, Debtor will be required to comply with the requirements of § 365(b)(1).

13

2013, docket no. 1219, is denied; and Energy West Resources, Inc. and Energy West Montana shall pay to the Debtor the excess pre-payment funds in the amount of $170,739.93, which funds shall be used by Debtor for the payment of postpetition administrative claims.

BY THE COURT

/s/ Ralph B. Kirscher
HON. RALPH B. KIRSCHER
U.S. Bankruptcy Judge
United States Bankruptcy Court
District of Montana